**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

———————————————

NEWBORN BROS. CO., INC.,

            Plaintiff,          Civil No. 12-2999 (NLH/KMW)

      v.               **OPINION**

ALBION ENGINEERING COMPANY,

            Defendant.

———————————————

**<u>APPEARANCES</u>:**

JOHN-PAUL MADDEN
TIMOTHY R. BIEG
MADDEN & MADDEN
108 KINGS HIGHWAY EAST, SUITE 200
P.O. BOX 210
HADDONFIELD, NJ 08033-0389

MICHAEL K. TOMENGA
JOHN M. PETERSON
NEVILLE PETERSON, LLP
1400 16TH STREET, N.W.
SUITE 350
WASHINGTON, DC 20036

     *Attorneys Plaintiff Newborn Bros. Co., Inc.*

KERRI E. CHEWNING
ARCHER & GREINER, PC
ONE CENTENNIAL SQUARE
PO BOX 3000
HADDONFIELD, NJ 08033-0968

MICHAEL J. BERKOWITZ
VOLPE AND KOENIG, P.C.
30 SOUTH 17TH STREET
18TH FLOOR
PHILADELPHIA, PA 19103

     *Attorneys for Defendant Albion Engineering Company.*

**HILLMAN**, District Judge

This is a false advertising case brought under Section 43(a) of the Lanham Act and New Jersey unfair competition common law.  For the reasons stated below, the Court finds that Defendant Albion Engineering Company is liable for false advertising and unfair competition.

## BACKGROUND

On May 18, 2012, Plaintiff brought this action in the District of New Jersey.  Between June 5, 2017 and September 11, 2017, the Court conducted a multi-day bench trial.  The case was temporarily stayed on November 9, 2017.  After the parties advised the Court that efforts to resolve this case by mediation were unsuccessful, the Court reopened this case on July 6, 2018.  Following an additional day of hearings on July 9, 2019, the parties submitted post-trial briefs on July 30 and August 20, 2019.  Over the course of two-dozen days of trial and hearings, the Court heard testimony from sixteen witnesses, including two experts.  This matter is ripe for adjudication on the issue for liability with hearings on affirmative defenses and, if those defenses do not dispose of the matter, remedies to follow.

Dispensing guns can be either manual or pneumatic/air powered.  This case concerns manual dispensing guns.  There are three broad types of manual dispensing gun: bulk, cartridge, and

what are called "sausage" guns.  The popularity of each type of dispensing guns varies depending on the sophistication of the user and the task being completed.  Typically, manual dispensing guns contain two vital components: a material containment unit ("MCU") and a handle assembly.  Certain construction and industrial projects and tasks may require additional features or accessories, including caulking knives or spatulas.

A.  The Parties and Their Principals

1. Newborn Bros. Co., Inc.

Newborn Bros. Co., Inc. ("Newborn") is a Virginia corporation, with its principal place of business in Jessup, Maryland.  Newborn maintains warehouses in Jessup, Maryland, Dallas, Texas, and Reno, Nevada.  Newborn was founded in 1974 by Peter Chang.  Since its founding, Newborn has imported and distributed dispensing guns and accessories, relying on contract manufacturers in China and Taiwan to supply products for sale in the United States.  These imported dispensing guns, parts, and accessories arrive from China and Taiwan in finished condition.

Chang began producing caulking guns in his factory in Korea in the early 1970s.  Chang created Newborn shortly after to distribute his caulking guns in the United States.  As the president and founder of Newborn, Chang regularly monitored Newborn's competitors and their products to remain informed about the market.

Between 2005 and 2007, Chang reduced his hours, only working at Newborn part time.  Though Chang has retained a fifty-one percent ownership interest in Newborn, his son-in-law, Albert Lee, has taken over as president.  Lee began working at Newborn in 2002 and now owns around eighteen percent of Newborn. Lee continues to seek Chang's advice on matters relating to Newborn from time to time, including the decision to bring this suit.

Lee testified that when he began working at Newborn, Newborn already "dominated" the paint and hardware market. According to Lee, Chang encouraged him to "break into the industrial/professional caulking gun market."  During his trial testimony, Lee described the differences between these two markets.  Lee observed that the industrial/professional market tends to purchase more "heavy duty caulking guns," including bulk and sausage guns, while the paint and hardware market tends to focus on less durable products like "inexpensive cartridge guns."

Chang and Newborn had previously entered the industrial/professional market for dispensing guns in 1990 with the introduction of two new manual bulk dispensing guns: Newborn 224 and 232.  These models were designed to compete with Defendant Albion Engineering Company's ("Albion") Model 45 and 59 bulk guns.  Lee testified that in creating these two new

products, Newborn was attempting to create "something as similar to the Albion gun as possible."  Newborn priced its bulk guns at $32, $6 less than Albion's models.  Despite the lower prices and what Lee considered to be a superior product, Newborn enjoyed limited success competing against Albion in this market.  Lee testified that between 2002 and 2012, Newborn's sales fluctuated between $5.5 million and $6.5 million (U.S.D.).

To understand this limited success and expand Newborn's share of the market, Lee testified that he "took a long hard assessment of the company."  As part of this assessment, Lee testified that he began asking sales representatives and customers why Newborn's bulk guns were not more competitive and how much competing products cost.  Lee also explained that he keeps records of communications with various overseas manufacturers, so he could "have an idea of the competitive landscape to know what different Taiwanese and Chinese manufacturers are charging for their guns."  Lee testified that a salesperson told him that while the salesman believed Newborn created a superior and less expensive product, Newborn had trouble competing in the industrial/professional market because Albion, Newborn's competitor, manufactured its products in America.

Lee testified that one of Newborn's independent sales representatives, Mike Dekker, confirmed that many customers had

inquired whether Newborn products were made in America like Albion products.  In an email to Lee, Dekker stated that "ever since the legislation of American Recovery and Reinvestment Act (ARRA)[1] the 'Buy American' concept has become popular and Albion has benefited from this."

During his research, Lee testified that he received a quote from Brilliant Engineering, an overseas manufacturer, containing pictures of products Lee identified as belonging to Albion.  Lee asked his contact at Brilliant Engineering, Jackson Sung, to send more pictures of the dispensing guns Brilliant Engineering produced as a means of verifying if these products belonged to Albion.  These pictures prompted Lee to undertake an inquiry into where Albion's products, specifically its Special Deluxe guns, were produced.

As part of this inquiry, Lee testified that he signed up for a service called "ImportGenius."  ImportGenius allows its users to locate and read U.S. Customs' records for imported products.  Lee testified that he searched for Albion's import records and found that "Albion was importing a tremendous amount of goods from Taiwan, including Special Deluxe guns, Deluxe guns, Special Deluxe cartridge guns, accessories, spatulas,

---

[1] Lee testified that the American Recovery and Reinvestment Act was a piece of legislation then-President Obama signed in 2009 to encourage infrastructure spending and for people to buy American made goods.

caulk knives, cones, nozzles, parts, barrels, handles, [and] rods" from Taiwan.

To continue his inquiry into Albion's products, Lee testified that he also began to purchase Albion dispensing guns, observing the statement of origin markings on various Albion products.  Lee also began examining Albion's website at various points in time using the "Wayback Machine," a website that allows users to look at historical snapshots of different websites.  During his trial testimony, Lee discussed several iterations of Albion's website: one from April 7, 2004, June 7, 2007, and June 12, 2010, all of which contained various descriptions of Albion's background.  These websites and their content will be discussed in further detail below.

Lee also began to visit distributor locations in person. During these visits, Lee documented the Albion displays he encountered by taking pictures and collecting Albion's advertising materials.  In some instances, Lee was not able to recall the date of certain photographs or materials that he collected during his inquiry.  Lee also admitted that he could not tell the manufacture date of the Albion guns he photographed during his investigation.  Lee visited a number of distributors[2]

_____

[2] During his trial testimony, Lee described visiting or receiving pictures from various dispensing gun distributors, including CSS, Kenseal, Glenrock, Tools & Accessories, Smalley & company, Procoat Systems, and AH Harris.

in a number of states,[3] observing Albion's products and displays, some of which stated that Albion's products were made in America.

Lee also testified about a comment from an internet forum dated July 25, 2010.  In this comment, the author discusses purchasing a $30 Albion caulking gun and finding a hang tag that says, "Made in Taiwan."  The author then states that they "called Albion on February 2, 2010 and asked them about the tag."  According to this comment, Albion stated that "the page on their website is incorrect.  They import most of their guns from Taiwan."  The post encouraged others to "be wary of anyone claiming to make products in the U.S."  According to this post, "Albion refused to update their website and they are still actively deceiving customers into buying foreign made products with a Made in U.S.A. label."

Lee testified that by the end of 2011, he concluded that Albion was importing many more products than he had previously thought.  In the summer of 2011, Lee testified that he went to the U.S. Customs and Border Patrol Agency to ask if there was any action they could take with regards to Albion's misrepresentations.  Lee testified that he spoke with a customs agent who explained that the agency was overextended and short

---

[3] These distributors were located across several states: Maryland, Illinois, Nevada, and Colorado.

staffed.  According to Lee, the customs agent recommended that
Newborn pursue a private lawsuit.

Lee testified that following this conversation, he
continued to buy more dispensing guns and conduct further
research on how Albion's claims were affecting Newborn.  In
spring of 2012, Lee and the Vice President of Newborn, Brian
Glass, created a seven-question survey using "SurveyMonkey.com"
to collect information on how important country of origin is to
their customer base.  Lee testified that this survey was not
scientific, but rather designed to collect information that
would help make better business decisions.  This survey,
referred to as "the SEAL Group survey," posed both multiple
choice and open-ended questions to distributors about what
Newborn products they buy; their reasons for not purchasing from
Newborn; their thoughts about the quality of Newborn's products;
and their preferences on discounts.

Glass distributed both paper copies and digital links to
Newborn's survey at a trade organization meeting, asking
distributors to relay this survey to an individual within their
organization.  This survey did not prevent distributors from
asking more than one individual to supply responses.  Glass
testified that he received six paper responses and nine
responses through the SurveyMonkey link he circulated, for a
total of fifteen responses.  Ultimately, this survey showed that

a variety factors affect the decision to buy a dispensing gun. Seven out of fifteen respondents answered that the reason they do not buy all or more from Newborn is that Newborn's products are not made in the USA.

These survey results seemed to confirm what Lee and Glass had already expected. Brian Glass testified that he unsuccessfully attempted to sell Newborn products to Extech, a cartridge gun purchaser, in 2007. According to Glass, during his pitch to Extech, he emphasized Newborn's competitive features, pricing, shipping, and customer service to no avail. Glass testified that he felt there was "a kind of firewall" and that he "couldn't get past the fact that we were not made in the U.S.A." Glass further testified that he understood that Extech did purchase products from Albion at this time. As of 2017, Newborn has never sold its products to Extech.

Similarly, Lowry's, a west coast distributor located in California, informed Glass that they would be transitioning away from Newborn products and towards Albion products in May 2010. Glass estimated that Lowry's had been a customer of Newborn for five or six years at this point. According to Glass, Keith Musante, the owner of Lowry's, explained this decision by stating that "Mark Schneider is always talking about how his products are made in the U.S.A. at the SEAL meeting, in his presentations, and in sales calls and I have to support that."

10

Glass testified that he observed a decrease in sales over the next few years until Lowry's no longer purchased from Newborn. Glass testified that Lowry's was not a customer of Newborn at the time of his testimony, but Newborn sold around $3,000 of products to Lowry's in 2014 or 2015.

Newborn filed this lawsuit in May 2012 and released a statement to the press shortly after.  This press release was picked up by several news outlets.  Lee testified that he noticed a change in the markings on Albion's products following Newborn's decision to file a lawsuit.  These changes will be described in greater detail below.

Glass testified that Newborn experienced an increase in product sales to Canadian companies following the filing of this suit.  According to Glass, these customers explained that Albion was no longer issuing NAFTA certificates that entitled customers to a 6.5% tariff savings for products made in America.  Glass testified that Newborn's sales to Aqua-Tech, a Canadian company, increased from $6,600 in 2011 to $44,000 in 2015.

Albion's independent sales representative, Dell Skluzak, testified that following this suit, he was able to sell to distributors that had previously been exclusive to Albion. Overall, Skulzak estimated he doubled his commissions between 2012 and 2017.  Skulzak testified that the area he observed the highest increase in sales was in accessories, but he also saw an

uptick in sausage and cartridge guns.  Skluzak testified that during this time, Newborn only made small adjustments to its prices and sales force.

Skluzak testified that he had unsuccessfully attempted to sell Newborn products to Giroux, a glazing contractor in the Los Angeles area.  According to Skluzak, Giroux would not consider Newborn products because they are made in China.  When Newborn sent Giroux samples, Skluzak testified that Giroux's project manager threw the guns away.

Skluzak also testified that during a sales pitch to Cade Company for Newborn accessories, a buyer told him that "because the Albion spatulas were made in America, his customers preferred them."  Skulzak testified that a representative of Cade Company told him "all things being equal for a quality standpoint, they [Cade Company] would prefer to purchase American made, even if it was more expensive."  Skluzak testified he then informed Cade Company that Albion's spatulas were not in fact made in America.  Once Skluzak encouraged Cade Company to call Albion and confirm the origin of their spatulas, Cade Company began ordering spatulas from Newborn.

In September 2012, Skluzak made contact with Midwest Sealant & Supply ("Midwest Sealant") in Columbus, Ohio.  A Midwest Sealant employee expressed his surprise when he discovered a "Made in Taiwan" marking on Albion's spatulas.

Skluzak testified that shortly after this conversation, Newborn received an order from Midwest Sealant that included spatulas.

Around the same time, Skluzak also visited Triangle Fasteners, a large multi-state distributor that operates in the fastening and fire stop markets.  Skluzak testified that some Triangle Fasteners locations already purchased from Newborn, but this particular location typically did not.  During this meeting, Skluzak discussed that Albion spatulas were not marked as "Made in Taiwan."  Since this meeting, Skluzak mentioned that Newborn has increased sales to Triangle Fasteners by about seventy-five percent.

Skluzak also testified about several distributors who switched from having a close relationship with Albion to embracing Newborn following the filing of this suit.  These distributors included R.L. Wurz, Atlas Supply, Tom Brown, Constructions Sealants Specialist, Lowry's, and S&S Sales.

During his trial testimony, Lee also described the trends he identified in Newborn's profits.  Lee identified a rise in sales between 2006 and 2007, which he attributed to joining the influential trade organization, the SEAL Group, noted above.  In 2008, Lee testified that Newborn's sales within the SEAL Group were around $367,000.  Newborn posted similar numbers in 2009 ($361,000), 2010 ($375,000) and 2011 ($357,000).  In 2012, Newborn's sales to the SEAL Group increased to $410,000.  This

number rose to $589,000 in 2013, $729,000 in 2014, $885,000 in 2015, and topped a million dollars in 2016.

Lee testified that in 2009, after the stock market crash, Newborn sold around $5.5 million of product. In 2011, Newborn sold around $6.2 million. In 2012, this number increased to $6.5 million. Newborn's sales continued to increase to $6.9 million in 2013, $8 million in 2014, and $8.7 million in 2015. Lee testified that in 2016, Newborn sold around $9.3 million of products, which he estimated to be a 50% percent increase between 2011 and 2016. During this time period, Lee testified that "the only major change in the marketplace that I observed was that Albion started marking some of its products in a different way."

   2. Albion Engineering Company

Albion is a New Jersey corporation established in 1929, with its principal place of business in Moorsetown, New Jersey. Before 2005, Albion was located in Philadelphia, Pennsylvania. Albion was purchased by F. Karl Schneider in 1929 and has been passed down through three generations of the Schneider family.

Mark Schneider, the grandson of F. Karl Schneider, began working at Albion in 1988. Schneider succeeded his father as president of Albion in 1999 and is now the company's sole owner. In recognition of the Schneider family's continued control over Albion, Albion described itself as a "third-generation American

14

manufacturer."  Schneider's wife, Lucinda Schneider is also
employed by Albion.  It was evident from Schneider's testimony
that he is proud of the company history and its significant role
in the early development of the caulk gun as an industrial tool.

i.   The Evolution of Albion's Manufacturing Process

Albion manufactures and sells dispensing guns, parts, and
accessories.  From 1929 until 2000, Albion manufactured all its
guns and accessories in its Philadelphia, Pennsylvania plant.
During this time period, Albion produced and sold its Deluxe,
Special Deluxe, Plus, and Ultra dispensing guns, now known as
the "Original Line."  These products were stamped with the
phrase "ALBION ENG. CO. PHILA. PA U.S.A." starting in the 1930s
and continued to be labeled this way into the twenty-first
century.

As early as September 1999, Albion's Board of Directors
began encouraging Albion's new president, Mark Schneider, to
pursue low cost overseas manufacturing alternatives for Albion's
price-sensitive items.  In May 2001, the Board identified
imports from Asia as a top priority for Albion.  The Board
articulated that its long-term business strategy was "to improve
our gross margins with existing customers, then market growth
and new market potentials."  Because overseas importing was a
top priority, Schneider testified that he conducted an extensive
search for manufacturing partners.  Ultimately, Schneider and

Albion chose Asia Global as an agent to help identify manufacturers in East Asia.  In August 2001, Albion began partnering with Kent Bridge Enterprises ("Kent Bridge") to manufacture Albion's new products.  Kent Bridge is a Taiwanese company located in Taichung, Taiwan.

In late 2001, Albion placed it first order for 20,000 dispensing guns from Taiwan.  This initial order was for four models of dispensing gun, which Albion named the "B-line": Albion B1, B-12, B-12Q, and B26.[4]  These models were comparable to other models Albion manufactured in its Philadelphia factory, namely Albion 139-3, 380-3, 350-5, and 340-3.

By September 2002, Schneider reported to the Board that Albion was seeing a decline in its sales of the core dispensing guns.  Schneider further reported that this decline in sales was offset by an increase in sales of Albion's B-line guns.  Albion then entered the next phase of its mission to improve profits: moving production of high-volume products overseas.  In June 2002, Albion's Board recommended realizing this goal by March 2003.

---

[4] During trial testimony, Kenneth Becker, an engineer at Albion, described these products as follows: B1 is a "skeleton gun for 1/10th gallon cartridge.  B12 is another cartridge tool for 1/10th gallon.  B12Q is for a quart size cartridge and B26 is for 1/10th gallon cartridge, a cartridge tool."

On May 20, 2003, Albion began sending gripping plate and release plate handle components to Taiwan.  These parts were produced in Albion's manufacturing facility in Philadelphia. Once produced, these parts were assembled into handle assemblies in Taiwan before being re-imported for final assembly with a barrel and other components back in Albion's Philadelphia plant. Ultimately, these components were used in Albion's Original Line of Special Deluxe Guns.  Albion also began supplementing its stock of barrels for sausage and bulk guns with barrels made in Taiwan.

In 2005, Albion expanded this process of exporting and then re-importing handle assemblies to its Original Line of Deluxe guns.  As of November 2005, Albion also began importing caulking knives from Taiwan.  Around this time, in January 2005, Albion also moved from its location in Philadelphia, Pennsylvania, to Moorsetown, New Jersey.

In June and December 2008, Albion began importing its Classic and Streamline Spatulas.[5]  Starting in 2008, Albion also began importing handle assemblies that were loosely connected to a barrel.  According to Becker, these loosely assembled guns "need[ed] adjustment, lubrication" but were otherwise complete

---

[5] Albion's Classic spatulas are made of wood and are also referred to as Model 258.  Albion's Streamline Spatulas are made of metal and are also referred to as Model 958.

when imported.  These handle assemblies were used in a limited
number of Special Deluxe sausage and bulk guns.  Albion's
Original Line Plus and Ultra guns included handle assemblies
that were made only in Albion's U.S. plant without any imported
components.

In March 2011, Schneider sent a letter to Albion's
distributor customers.  In this letter, Schneider acknowledged
that "[o]ur competitor [Newborn] began offering look-alike DL-
45s and DL-59s [Albion Special Deluxe guns] earlier this year."
According to Schneider's letter, Albion felt "strongly that
these will not improve your ability to service your customer"
and warned that "[i]nferior tools will cause problems and hurt
your reputation."  Schneider's letter continued on to refer to
Newborn guns as "knock-off guns" and "imitations" of Albion
guns.  Ultimately, Schneider offered to replace Newborn guns for
Albion's comparable products.

ii.  Albion's Labels and Marketing Practices

Schneider testified that it was his belief that it was
appropriate to identify products as being "Made in America" if
over fifty percent of the cost of the tool were incurred within
the United States.[6]  Schneider also testified that he did

---

[6] ECF No. 315 at 32 ("I felt that as long as we put more than 50
percent of the cost into the tools in the States, we were okay.
And, of course, I was being advised by my agent, and that really
was about it.").  When pressed, Schneider had no explanation of

assessments of his products and their manufacturing costs to ensure that Albion met this standard for labeling items as "Made in America."  Schneider's formula for calculating production costs included labor, overhead at the manufacturing plant, items made in the United States, and post-production packaging.  Using this formula, Albion decided to stop applying a "Made in the U.S.A." label to its guns with imported subassemblies in 2008.

Albion's Original Line

    Albion's Plus and Ultra guns were labeled "Made in the USA."  As mentioned above, Albion has stamped its Deluxe and

---

where there this formula came from or why he felt it justified the continued use of a "Made in America" label.  Nor did Albion introduce any hard calculations or other evidence of how this formula was actually applied to particular products or lines of product. See ECF No. 316, at 92-105; see also ECF No. 342, at 61-62 and ECF No. 342, at ¶¶ 125-26.  It appears to have been either an ad hoc, or worse post-hoc, attempt to create the illusion that Albion's imprecise and at times indiscriminate use of "Made in America" was a good faith mistake.  The Court concludes on the testimony as a whole, as set forth in more detail in this Opinion, that at least up through the filing of this case, and as it related to export certificates up through the trial testimony in this matter, Albion lacked any systematic or disciplined program designed to insure that its products met Department of Homeland Security marking requirements, that its export certificates were truthful, or that its website and product literature regarding foreign-made products sold domestically adequately and accurately revealed the country of origin.  Rather, the Court concludes Albion deliberately kept its head in the sand content to free-ride on, and at times promote, the false illusion that it was a purely "Made in the USA" company.

Special Deluxe guns with the phrase "ALBION ENG. CO. PHILA. PA. U.S.A." since the 1930s.

In March 2004, Schneider discussed the labels on Albion's Special Deluxe guns with Asia Global. During this correspondence, Schneider wrote "Albion label – made in U.S. problem, we need to check. We will install label on all tools until resolved." Schneider testified that he may have checked with Asia Global because they were Albion's agent and more experienced with importing.

Once Albion began exporting certain aspects of its manufacturing process for Special Deluxe guns, some, but not all, Special Deluxe guns with imported handle assembles including dummy rods without an attached barrel were marked "Made in USA." Albion contends that from February 2008 forward, all "Made in USA" statements were removed from Albion's Special Deluxe guns.

According to trial testimony from Robert Reynolds, Albion's marketing and business manager, Albion sells around 45,000 Special Deluxe guns per year, over half of which are steel barrel bulk guns. Reynolds testified that Albion's Special Deluxe sausage and cartridge guns represent less than fifteen percent of Albion's Special Deluxe guns, or around 5,000 guns per year.

The B-Line

Albion introduced its B-line of products in 2001.  In June 2002, Albion posted an announcement on its website regarding the introduction of the B-line.  This announcement stated, "it took over 2 1/2 years to find an overseas manufacturing partner that could meet our quality and production standards."  This announcement further identified the B-line products as "low-cost imports."  Albion referenced the B-line again when it posted a blog update on January 1, 2005.  This blog described the B-line as "built overseas to our specifications and offer[ing] a rugged tool with the cost of an import."  This post remained available on the subsequent versions of the Albion website.  Other than this announcement, Albion did not initially advertise the B-line in its handbooks and used separate sell sheets for the B-line.

When Albion first produced the B-line, the products were marked with a gold and black sticker reading "Made in Taiwan" on the recoil plate.  Schneider testified that a distributor told him that the gold sticker was "loud" and asked if Albion would consider using "something that's not that loud."  Schneider testified that he knew Albion was "bound by law" to display the made in Taiwan label, but was not positive which law set out any specific requirements.  Schneider testified that he did not consider taking "Made in Taiwan" off the tool, but instead Albion "did homework on this" and chose to stamp the recoil

plate of the B-line guns instead.  By December 2002, Albion switched to using a no-contrast stamp on the B-line's recoil plate.  In an email to a distributor in August 2003, Schneider described this stamp as "out of the way, difficult to see" and speculated that he thought the distributor "would be pleased."

In March 2004, Albion instructed its Taiwanese manufacturer, Kent Bridge, to print "75 Year History – USA Manufacturer and Designer" on the MCU of the B-Line cartridge guns.  Albion did not apply this statement on the other guns included within the B-line.  This statement was updated in July 2011 to read "80 Year History – USA Manufacturer and Designer." Around December 12, 2012, Albion removed this statement from the B-line cartridge guns.

In 2005, Albion again changed the markings on the B-line. This time, Albion opted to use a hang tag that contains a Taiwan mark on one side and a barcode and lubricating instructions on the other.  This tag was made of laminated material and is attached to the gun by a plastic security ring that runs through a hole in the top of the handle assembly.  During his trial testimony, Becker testified that the hang tag could be removed and that customers would likely remove it before use.  According to Albion, this hang tag was considered "an essential part of the tool before it is sold" and Albion definitely did not want the hang tag removed before sale.  When Albion implemented this

change, it also asked Kent Bridges to remove their information
from the B-line products.  With the hang tag and the Kent
Bridges markings removed, nothing on the dispensing gun
identifies the product as originating from overseas.[7]

Presently, Albion uses a metal stamp on the recoil plate of
the B-line tools to indicate that these tools are made in
Taiwan.  Reynolds testified that Albion sells between 75,000 and
100,000 B-line sausage guns per year.  In contrast, Reynolds
explained that Albion's B-line bulk gun sales were "low, a
thousand, a couple thousand per year."

Albion Accessories

As detailed above, Albion began producing its accessories
in Taiwan starting in 2008.  Albion's Taiwan-made knives and
spatulas were packaged in individual poly bags.  Multiple poly
bags were then placed inside boxes.  These boxes of poly bags
containing Albion accessories were then placed inside a larger
carton that was labeled "Made in Taiwan."  When Albion's Classic
Spatula was first imported, there was no country of origin

---

[7] Of course, it makes common sense, and this Court concludes on
this basis alone, that users of the B-Line guns would remove the
hang tags before use or that they would fall off during
prolonged use.  Absent the hang tag, no other markings indicated
a foreign origin.  Anyone examining the tool in such a condition
post-sale and examining the banner sticker on the MCU would
easily be misled into believing the product was domestically
produced.

designation on the product.  Later, Albion began burning and/or etching "Taiwan" into the handles of its spatulas.

Albion Bulletins 297, 297B, 297C, and 297D advertise both the Classic and Streamline spatulas.  Bulletin 297 does not contain a country of origin representation.  Bulletin 297B advertises the Streamline Spatulas as "Made in the USA" and features and American flag in the background.  Reynolds testified that Bulletin 297C was "very similar" to Bulletin 297B.  Bulletin 297D makes no reference to "Made in America." According to Reynolds, Bulletin 297D was created in 2001 and is "primarily geared towards the distributors."

Prior to 2008, Albion distributed sell sheets with its Classic Spatulas.  This sell sheet featured an American flag and the claim "Made in USA."  Schneider testified that when Newborn copied Albion's Classic Spatula, Albion "had no way of at least differentiating our tools from theirs, so we put an American flag on the sell sheet and pushed it until we decided to move it to Taiwan."  Once Albion began importing its accessories, Albion stopped distributing this sell sheet with its accessories.

<u>Albion's Website</u>

Albion has used several different versions of its website, each of which includes different content and statements relevant to this case.  In 2004, Albion's website contained a page entitled "The Albion Difference."  On this page, Albion included

eight bullet points, the first of which read: "All our dispensing products and accessories are designed and manufactured in the USA, from our location in Philadelphia, Pennsylvania."  In total, the 2004 website contains 600-700 pages.

Albion updated its website in 2007.  Part of this update included changes to the "Albion Difference" page.  This page was updated to read: "all of our dispensing gun products and accessories are designed and manufactured in the USA, from our location in Philadelphia, Pennsylvania."  (emphasis in original).  The Court notes that at this point in time, Albion had moved its manufacturing facilities from Philadelphia, Pennsylvania to Moorsetown, New Jersey.  The 2007 website also contains 600-700 pages.

Albion again updated its website in August 2010.  At this point, Albion retired its 2004 website.  The general statement found on Albion's "Albion Difference" page was updated to read: "All of our dispensing gun products and accessories are designed in the USA, from our location near Philadelphia, Pennsylvania." The 2010 website contains 650-675 pages.

At various times, Albion has had its other advertising materials available for download from its website.

Albion's Sell Sheets, Catalogs, Owners Guide, Bulletins, and
Other Publications

Albion differentiates between its B-line and Original Line

products in its advertising literature and internal

documentation.  However, according to Albion, "Albion did not

actively change the Owner's Guide or other advertising material

individual boxed with Albion's Original Line of guns."  Albion

did not include these materials with its B-line guns.

Schneider testified that Albion's catalog "contains

information to help distributors and end-users select an

appropriate drive system for their product or project."  Catalog

268, which was available to download from the Albion website,

contains the statement "All Albion Products are Made in America"

in the bottom right-hand corner of its cover.  Catalogs 255B,

257C, and 262A, which were also available to download from

Albion's website, contains a logo with Albion's name and logo

and "Made in America" underneath it.  A similar logo also

appears on Albion Bulletin 211C.  Catalogs 267A and 267E feature

the Albion logo, website address, and the claim "All Albion

Products are Made in America."  Catalog 267E also lists Albion's

location as Philadelphia, Pennsylvania.  Catalogs 267E and A

were included with Special Deluxe and Deluxe dispensing guns

until January 2009.

Albion began using Catalog 333 on January 21, 2009. According to Reynold's trial testimony, Catalog 333 is "full of special nozzles, other specialty tools."  This catalog also includes the B-line tools, which it identified as "USA engineered with the savings of an import."  This Catalog stated that "Albion is a third generation American manufacturer." Unlike previous Albion catalogs, Catalog 333 does not include the statement "All Albion Products are Made in America."

Reynolds testified that he recalled Albion announcing Catalog 333 and implying that Albion's distributors should discard old catalogs like Catalog 267E.  According to Reynolds, Albion stated this message more explicitly later on, but acknowledged that "[i]t always takes a while for distributors to change over."  Reynolds testified that Albion would occasionally contact its distributors directing them not to use outdated materials "but there's not a regular program" for doing so. Albion shipped dozens of these catalogs to its distributers in boxes reading "Take One."  Reynolds testified that these boxes were "designed to sit on the shelf or the counter of a distributor and encourage customers to pick up a copy of our catalog when they're there purchasing other things."  Between 2011 and 2012, Reynolds estimated that Albion shipped 600 boxes, containing 7,200 copies of this catalog to its distributors.

Bulletin 281A is a new product announcement for Albion Commodity Cartridge and Sausage guns.  The product announcement describes the products and states "Only Albion gives you both— our line of U.S. manufactured professional tools as well as commodity guns . . ."  On the reverse of this announcement, Albion describes itself as a "third generation American manufacturer."  Bulletin 281C announces the redesigned B-line guns and compares Albion's B-line to European and Asian imports. This bulletin does not mention that the B-line guns are also Asian imports.

Bulletin 298 highlights Albion's firestop products, emphasizing that Albion has the largest line of products that can be adapted for firestopping.  This bulletin does not include any "Made in USA" claims and identifies Albion's B-line guns as "built overseas" and offering the "cost savings of an import."

Albion's Owner's Guide includes the statement "All Albion products are made in America" on the bottom of one page.  This guide provides instructions for users on how to convert and adjust Albion's cartridge and bulk guns.  The Albion Owner's Guide is included with every Deluxe and Special Deluxe dispensing gun.  However, because these instructions do not apply to B-line users, the Owner's Guide is generally not distributed with B-line guns.  Albion updated its Owners Guide

to reflect it had relocated to Moorestown, New Jersey but did

not modify any other elements of the Owner's Guide at that time.

Albion also produced carton labels for the outside of

virtually all individually boxed dispensing guns.  According to

Reynolds, these labels "show some popular accessories . . . that

caulkers need to perform their jobs."  Reynolds further

testified that these labels are meant to target end users,

though distributors would also see it as well.  This label does

not include a country of origin claim.

NAFTA and FTC Certification

In some cases, Albion's customers requested a North

American Free Trade Agreement ("NAFTA") certificate of origin

from Albion.  Rachel Lelionis, an employee in Albion's customer

service department, testified that her role sometimes included

issuing these certificates of origin.  Lelionis testified that

Albion received between fifteen and twenty requests for NAFTA

certificates of origin per year.

Lelionis testified that she did not conduct any independent

research as to what NAFTA required for these certificates, but

instead relied on training from a coworker.  These certificates

read "Meets FTC all or virtually all made in U.S.A. eligibility

requirements."  Lelionis testified that she did not know what

the FTC is or what it requires in terms of product labeling.

Lelionis testified that her understanding of which companies

29

needed these certificates were "any company in Canada or Mexico
needs the certificate of origin in order for the products to
ship to their locations."  She testified that no one at Albion
explained the purpose of these certificates to her, but that a
customer had informed her these certificates were necessary for
clearing customs.

According to Lelionis, Albion could produce these
certificates itself, but it would also receive forms from
customers and complete them.  Lelionis also testified that she
would not fill out all portions of the form herself but would
instead receive partially completed forms from other Albion
employees.  For instance, Lelionis testified she would not fill
out the tariff classification portions of these NAFTA
certificates herself, but either did not alter the number
already filled in or left the space blank for someone else to
fill in.

Newborn introduced into evidence a certificate of origin
signed by Lelionis for the Minnesota Mining and Manufacturing
Company ("3M"), dated August 22, 2008.  This certificate
included the statement "The supplier also agrees to promptly
notify 3M company in writing of any change in the country of
origin for an end product listed below."  Lelionis could not
recall a time that Albion issued subsequent notice about a
change in country of origin.  Schneider also could not recall an

instance where Albion had withdrawn a certificate of origin.  On
this certificate, Lelionis testified that she had indicated
"yes" on the certificate, signifying that Albion's product met
the FTC's "all or virtually all" made in U.S.A. standard.
Reynolds acknowledged that this information provided to 3M was
false.  Newborn also introduced a NAFTA certificate Albion
issued to McMaster-Carr with similar issues as the 3M
certificate discussed above.  Lelionis also testified that two
Canadian companies, Construction Distribution and Supply and
Jamac Sales, also requested NAFTA certificates from Albion about
once per year.

Lelionis testified that she began changing the country of
origin references when Albion began importing in Taiwan.
Lelionis further testified that she knew the B-line guns to be
made in Taiwan.  She further testified that her understanding
was that Albion had never imported any products from Taiwan
other than the B-line and the Viper line.

Newborn introduced several other certificates of origin
signed by Albion in 2015 and 2017.[8]  Schneider testified he did
not consider these to be certificates of origin for NAFTA, but
instead generic certificates of origin.

---

[8] These certificates were issued to Carlisle SynTec (based in
Carlisle, Pennsylvania), Coastal Construction Products (based in
Jacksonville, Florida), Ellsworth Adhesives, Lawson Products,
and Nuco (based in Guelph, Canada).

<u>Albion's Communications Regarding its Country of Origin
Designation</u>

Albion received feedback about the labeling on its B-line
and adjusted these labels.  Albion regularly communicated with
its customers several times about its products and their labels.

In August 2004, Albion's board member, Louis Matlack shared
his concerns about some of the content of Albion's catalog.  In
an email Matlack stated "I'm concerned about the statement on
page 3 – 'all Albion products are made in America' . . ."
Matlack continued, "I assume there is some truth to this
statement.  I wonder how you can acknowledge your import
business which I believe will have to continue to grow."
Matlack testified that he could not recall receiving a response
to this email.  When discussing the 2004 website and its
statement that "All of our dispensing products and accessories
are designed and manufactured in the U.S. from our location in
Philadelphia, Pennsylvania," Matlack also testified that he was
"probably . . . concerned that maybe this was overbroad."
Matlack testified he could not remember any specific actions
being taken in response to these concerns.

In November 2004, Dan Sweeney, an employee at Millennium
Adhesives ("Millennium"), contacted Albion about a batch of B-26
guns.  Millennium Adhesives is an adhesives retailer in the
roofing industry.  Sweeney's email referred to "the Taiwan-

stamped B26T1500 (USA) guns" and informed Albion that "[w]e have all decided that all of these guns need to be returned to have the latch plate replaced."  Schneider testified that these guns were stamped with "Taiwan" on the body of the gun.  Sweeney's email further detailed that Millennium Adhesives "need[ed] applicators that we can sell as being made in the U.S.A." Albion replied to Sweeney that it would "replace quote, made in Taiwan recoil plates with a no-labeled recoil plate.  The cost for the rework will be a not-to-exceed $2.48 per unit." Millennium then shipped these products back to Albion.  Albion in turn completed the rework with unstamped recoil plates that were made in Taiwan.  Schneider testified that Albion did not seek legal counsel about the legal issues surrounding Millennium's request.

In 2006, Albion customized a B-12 cartridge gun for an adhesive manufacturer called Top Industries.  In the course of customizing these cartridge guns, Top Industries requested that the "Made in Taiwan" mark be "move[d] to an obscure segment of the box."  Albion agreed to "over label" its products for Top Industries, meaning it placed a Top Industries label over the Albion information originally printed on the boxes.  In addition to Top Industries, Reynolds testified that Albion would also over label for Saint Gobain, a French adhesive manufacturer that distributes in the United States.  Reynolds testified customers

would request that Albion over label their products because
"customers have a desire to make the product appear as their
own." According to Reynolds, over labelling could also be
achieved by painting over the markings printed on a box.

In March and April 2007, Hilti contacted Albion about the
label on cartons of Albion Special Deluxe guns. Hilti is a
Liechtenstein based company. Reynolds testified that Hilti
would supply Albion with the labels for the cartons of Special
Deluxe guns. These labels included a "Made in USA" claim, which
Reynolds acknowledged was "an oversight on [his] part." When
Hilti contacted Albion to change these labels, Hilti stated that
a part number was incorrect, and Albion made the requested
change but did not alter the Made in USA claim. Reynolds
testified that Hilti likely "made an assumption" about the
origin of Albion tools, but also acknowledged that Hilti relied
on Albion for this information.

In September 2008, Albion also applied a label created by
3M to its Special Deluxe Sausage guns. These guns are
individually boxed and contain an "inner case label." This
label includes a "Made in U.S.A." claim. Reynolds acknowledged
that these guns did contain foreign content at this time. These
Special Deluxe Sausage guns also contained a "master case label"
that also read "Made in the U.S.A." Reynolds characterized the
inclusion of a "Made in U.S.A." claim on both the inner case and

master cases labels as "an oversight on this one item that was a special one-time promotion." According to Reynolds, 3M buys a variety of Albion guns, most of which are from Taiwan and labeled as such.

When asked if similar oversights had occurred in other situations, Reynolds testified that Hilti and 3M present unique situations where customers supply Albion with artwork. Reynolds testified that typically Albion supplies artwork and labelling for its products.

In 2009, Albion paid for an advertisement in ABC Supply's catalog. As will be discussed below, ABC Supply is a distributor with around 900 retail locations. Albion paid $5,000 for a two-page advertisement. In this advertisement, Albion identified model 139-3, a Deluxe gun, and four Special Deluxe models (380-5, DL59T13, DL45T13, DL45T14) as being "Made in the USA." Schneider also communicated to ABC supply that it could place "Made in USA" labels on all Albion's tools.[9] In this

---

[9] Plaintiff and Defendant disagree about the proper interpretation of Schneider's sentence in this email. Newborn emphasized Schneider's use of the term "ALL" to mean he was encouraging ABC Supply Co. to label all of Albion's products as Made in America. Albion contends that Schneider emphasized that ABC Supply Co. could label ALL "Albion" products as made in America. According to Albion, by putting the term Albion in quotation marks, Schneider was conveying to ABC Supply Co. that he meant only Albion's original line, not Albion's B-line products. The Court credits Newborn's interpretation of Schneider's statement.

email, Schneider noted that model 139-3 was the only tool with
significant overseas costs.  He also stated that he would want
an additional $3.96 if ABC elected to put "Made in USA" on it.

   iii. Albion's Actions Since the Filing of This Suit

   Albion contends that it has ceased most, if not all of the
conduct Newborn relies on in this suit.  Albion has since
removed the "Made in USA" claims from its Plus and Ultra guns.
Lelionis testified that Albion has stopped issuing certificates
of origin but did not offer insight into why.

   Reynolds testified that once this suit had been filed,
Albion began prioritizing asking distributors to take products
labeled "Made in U.S.A." down.  According to Reynolds, Albion
had been providing replacement products to distributors on a
case-by-case basis prior to this lawsuit.  Reynolds acknowledged
that "some [distributors] comply, others do not."  Reynolds also
stated that Albion has been replacing certain guns with newer,
differently marked products on a case-by-case basis.  Becker
testified that Albion stopped including its Owner's guide in
boxes with its products.

   In June 2012, the U.S. Customs and Border Protection Agency
issued a "Notice to Mark" regarding the hang tag on Albion's B-
line dispensing guns.  This notice acknowledged the presence of
the hang tag on Albion's B-line guns but stated that it was "not
in close proximity to line stating USA Manufacturer and

36

Designer."  The U.S. Customs and Border Protection Agency also remarked that the hang tag is not required on all future shipments, but instead considered "optional to importer."  In response to this notice, Albion began putting a "Made in Taiwan" sticker on the handle of its B-line product as it had done before.  This sticker, unlike the previous sticker applied to the B-line guns, was white with black lettering.  Schneider testified Albion also "reworked all of [its] inventory" in response to this notice.

   B. Relevant Non-Parties

      The Court heard testimony from multiple other actors within the manual caulking gun market.  These witnesses included representatives from competitor companies and customer distributors.  A brief description of these relevant non-party witnesses is offered below.

         1. Competitors

Cox North America

      Cox North America ("Cox") competes against both Newborn and Albion in the industrial/professional market.  Primarily, Cox distributes cartridge and aluminum barrel dispensing guns as well as a limited number of sausage guns.  Unlike Newborn and Albion, Cox does not produce steel barrel dispensing guns.  Cox manufactures its products in England and distributes them in the United States, Japan, and Australia, among other places.  Cox

was a pioneer in the market, creating aluminum handle guns in the 1980s or 1990s. As a result of this innovation, the parties agree that Cox dominated the industrial/professional market until 2000.

According to Lee, Newborn had more success competing against Cox than Albion when it entered the industrial/professional market. Lee testified that Cox's guns lack some of the features that Newborn offers on its cartridge guns. Lee further explained that as a general matter, Cox's products are more expensive than Newborn's. Albion also explains Newborn's success competing against Cox by asserting that because Cox does not produce steel barrel dispensing guns, Cox lacks a full line of products and is less attractive to customers who require bulk dispensing guns.

Furthermore, Albion asserts that at least some number of customers have chosen to purchase Cox's products because of its superior quality. The Court heard deposition testimony from Victoria Eyde, Cox's Chief Operating Officer, that customers have told her that they prefer Cox dispensing applicators over some of its competitors based on quality. Cox is not a member of several trade groups that Albion and Newborn participate in.

Tiger Enterprises/Kenmar

Since the early 1990s, Tiger Enterprises has sold a line of sealant dispensers under the "Kenmar" name. Kenmar makes

industrial bulk manual dispensing guns with steel barrels and
steel handles.  A vast majority of Kenmar's parts are made in
Tiger Enterprises' Connecticut factory.  The parties do not
agree whether Tiger Enterprises/Kenmar competes with Albion and
Newborn in the manual dispensing gun market.  Newborn contends
that Tiger Enterprises/Kenmar had stopped its efforts to attract
customers away from Albion and Newborn.  In contrast, Lance
Florian, a fifty percent owner of Tiger Enterprises, identified
Cox, Newborn, and Albion as Tiger Enterprises' competitors
during his deposition testimony.

Florian testified that Tiger Enterprises/Kenmar could not
compete with the price of imports but were instead "looking for
people that were looking for American-made stuff."  Florian
testified that "there's some people that do believe that made in
American is better."  Florian also testified that customers
often associate durability and quality with country of origin.
As such, Florian testified that Tiger Enterprises received
inquiries from customers looking for caulking guns made in
America.  According to Florian, some customers are willing to
pay up to fifteen percent more for a product labeled as "Made in
USA."  Florian also acknowledged that in his experience, he
found that durability and quality may be more important factors
than country of origin for dispensing gun customers.

Kroger, Wellmade, Z-Pro, Dripless, Viking, Hyde, Sherwin
Williams, Durango, Great American, and Tajima etc.

Over the course of the trial testimony, various witnesses
identified several other competitors in the dispensing gun
market.  Some, like Viking, have ceased to exist.  Some, like
Kroger, are difficult to find in the American market.  Some,
like Tajima, are not based in the United States.

2. Trade Groups

Albion and Newborn both participate in various trade
groups.  Lee testified that Newborn generally offers special
pricing to members of these trade organizations.

The SEAL Group

The Sealant Engineering and Allied Lines Group, or SEAL
Group, is a trade organization comprised of the twenty biggest
sealant distributors in the United States.  Typically, SEAL
Group members serve large construction projects such as
skyscrapers, stadiums, and parking lots.

Both Newborn and Albion are members of the SEAL Group and
represent the only caulking gun manufacturer members of the
group.  Cox is not a member of SEAL.  Schneider referred to SEAL
Group members as "blue chips" because of Albion's longstanding
relationships with the members.  Lee testified that members of
the SEAL Group were "like family" and that the Group met twice a
year.  Lee also testified that he made an announcement at a SEAL

Group meeting that Newborn was pursuing a lawsuit against Albion for Lanham Act violations.

SWRI

The Sealant Waterproofing and Restoration Institute, SWRI, is an organization of caulking contractors or seal and waterproofing contracts.  SWRI has between 300 and one thousand members.  Newborn and Albion are both members of SWRI.

After an SWRI meeting in March 2009, Reynolds took notes about potential customers he met with.  These notes included a discussion Reynolds had with David Crawford of Crawford Construction.  Crawford is not a direct purchaser or Albion products, but does purchase Albion products through distributors.  During this conversation Crawford mentioned to Reynolds that he had received more than a dozen free Newborn guns.  Reynolds testified that he told Crawford that Newborn guns were made in China.  Reynolds further testified that Crawford replied, "[t]hat's how we got in this economic mess." In his notes, Reynolds remarked that "Made in U.S.A. could become even more important during this economy."

During this conversation, Reynolds did not tell Crawford that Albion's Special Deluxe bulk gun included foreign content. Reynolds further acknowledged that when Crawford received Albion's Special Deluxe bulk gun, Crawford would have received an Albion catalog bearing the phrase "All Albion products are

made in America."  Reynolds agreed that this statement was not
accurate but did not agree that Crawford would have been
deceived by Albion's material or his conversation with Reynolds.
When asked about this conversation during his testimony,
Reynolds acknowledged that a "Made in USA" claim plays a role in
purchasing decisions, though this role may vary from individual
to individual.

Sphere 1

    Sphere 1 is a trade organization comprised largely of
Specialty Tools & Fasteners Distributors Association ("STAFDA")
members that operates as a buying group whose members are
encouraged to buy from manufacturer-members of the group.
Reynolds testified that Albion had tried to join Sphere 1
several times.  In a 2011 email, Albion communicated to Sphere 1
that Albion was an American manufacturer.  Reynolds testified
that at this time Newborn was already a member of Sphere 1.
Accordingly, Reynolds testified that Albion attempted to
distinguish itself from Newborn by emphasizing that they "are
not just a distributor" but also manufacture their products.

ACDI, Reliable, STAFDA

    Over the course of many days of trial testimony, the
witnesses discussed numerous other trade organizations in which
Newborn and Albion participate.  Associated Construction
Distributors International, ACDI, is a trade organization of

industrial and construction distributors that operates as a buying group.  Reliable, like ACDI, is a buying group.  STAFDA, is a trade organization of heavy-duty construction supply houses that carry industrial dispensing guns.  Newborn is a member of STAFDA.

   3. Distributors

Both Newborn and Albion rely on distributors to sell their products.  According to Reynolds, Albion has input into how the displays appear in stores and can encourage distributors to display certain items.  Reynolds further testified that Albion provides certain point of sale materials to distributors and that some distributors take requests, while others do not.

ABC Supply Co. Inc.

ABC Supply Co., ("ABC Supply") is a nationwide distributor with approximately 900 retail outlets.  ABC Supply sells roofing products and roofing-related products, including caulk.  Newborn sold its products to ABC Supply between 2002 and 2005.  Newborn alleges that it lost ABC's business because of a company preference for American-made products.

Albion also sells its products to ABC Supply.  ABC Supply's catalog depicts Albion products with an American flag in the background of the page.  As stated above, Albion paid $5,000 for a two-page advertisement in ABC Supply's catalog.

Amazon

Both Albion and Newborn sell their products directly to end users through Amazon.com, which Lee testified is "probably the biggest online retailer in the world." Lee testified that when Newborn lists its products on Amazon, Newborn supplied to product's relevant information, including country of origin. According to Lee, Amazon does not always ask for import designation when listing products. Lee testified that he saw Albion's products listed on Amazon as "Made in U.S.A."

According to Reynolds, Albion began selling its products on Amazon in 2014. Reynolds estimated that 75 Albion products are listed for sale on Amazon, including Albion's Original Line and its B-line. Reynolds testified that Albion's most popular product on Amazon is its B-12 S-20 sausage guns. Reynolds testified that he is usually the person in charge of supplying information to Amazon for Albion's listings. However, according to Reynolds, "any seller can supersede our information or image without notification." Reynolds testified that this has occurred to a number of Albion products since 2014.

Newborn introduced evidence that in September 2015, Albion's Amazon listings for its imported accessories included the claim "Made in U.S.A."

D.M. Figley

D.M. Figley is a wholesale distributor that primarily
specializes in waterproofing materials.  The Court heard
testimony from Rene DesRochers, a former sales manager and
current Vice President of Sales at D.M. Figley, and George Hall,
a former branch manager and purchaser for D.M. Figley.
DesRochers testified that ninety-nine percent of D.M. Figley's
sales are from sealants, waterproofing products, and concrete
repair products.  DesRochers estimated that less than one
percent of D.M. Figley's sales came from dispensing guns and
accessories.  According to trial testimony from DesRochers, D.M.
Figley only relies on three suppliers: Albion, Newborn, and Cox.
DesRochers further testified that it stocks only a limited
number of products from Cox and purchases a larger variety of
dispensing guns from Albion and Newborn.

George Hall of D.M. Figley Hall testified that he "dealt
with a lot of union personnel," especially in Menlo Park,
California, who specifically asked for products made in America.
Hall estimated that twenty to thirty percent of his customers
expressed this preference for products made in America.

Hall testified that he understood "Albion was all American
made, with the exception of the B-line guns."  Hall explained
that the basis of his understanding came from both Albion's
literature, the marking on the guns themselves, and conversation

45

with Albion employees, including Schneider.  According to Hall, Schneider stressed that Albion guns were made in America as a means of promoting his product.

Accordingly, when customers expressed a preference for products made in America, Hall assumed that these customers' options were limited to Albion products.  According to Hall, "if it weren't for the 'Made in America,' they would have brought other brands.  They would have bought Cox or Newborn more, if it wasn't for the U.S.A. representation."

Hall testified that he was informed by a sales representative who did not work for Albion that parts of Albion's guns were not made in the United States.  Hall then confirmed this information with an Albion representative.  Hall testified that it was "disparaging" to find out that Albion's Deluxe and Special Deluxe guns were not made in the United States.  However, this new information did not cause Hall to change his buying habits.  Instead, Hall testified that D.M. Figley "probably sold more Newborn guns after that because I was no longer pushing Albion as being U.S.A. made."

In addition to country of origin, Hall also identified quality and price as factors relevant to a dispensing gun purchase.  According to Hall, he did not generally experience any problems with the quality of Albion products.  Despite the general reliability of Albion products, Hall testified that

customers did complain that Albion's B-line products would jam or slip frequently.  In response, Hall testified that he reduced his purchases of Albion's B-line products to almost zero.  Hall also testified that Albion products would sometimes be priced higher than comparable products.  Rene DesRochers testified that D.M. Figley prioritizes quality over cost and takes versatility into account for its purchasing decisions.

Like Hall, DesRochers also testified that Schneider emphasized to them that Albion products were made in America. DesRochers testified that when he found out that parts of Albion's guns were made overseas he was "kind of surprised that that would be the case because, frankly, Mark Schneider had always pretty much touted that his guns are made in the U.S.A., and, you know, for a lot of people that probably is, a big perhaps purchasing decision or an important question."

DesRochers testified that this information, though surprising, was not a pressing concern.  DesRochers testified he did not have an opinion on whether he found Albion's claims to be misleading.  According to Desrochers' testimony, he "never really gave it much thought as to whether that [Made in the U.S.A.] meant assembled in the U.S.A. or made in the U.S.A., if there is a technical difference between those two terms."

Kenseal

Kenseal is one of the larger SEAL Group distributors and has locations in Baltimore and Beltsville, Maryland, New Jersey, New York, North Carolina, Pennsylvania and Virginia.  Lee testified that he visited Kenseal's Baltimore location during his research on Albion's products.

In May 2012, at a Kenseal location in Baltimore, Maryland, Lee observed an Albion Special Deluxe gun marked as "Made in U.S.A."  In March 2013, at a Kenseal location in Baltimore, Maryland, Lee testified that he observed an Albion banner printed with Albion's logo and the phrase "America's Dispensing Tool Specialist."  Lee further testified that he saw an Albion B-line gun with no hang tag listing its country of origin.

In June 2017, Glass testified that he observed an Albion bulk dispensing gun marked "Made in U.S.A." at a Kenseal location in Folcroft, Pennsylvania.

Smalley & Company

Smalley & Company ("Smalley") is one of the largest distributors of industrial sealant on the West Coast.  Smalley is based in Denver, Colorado with has branches in Nevada, Arizona, California, and Utah.  Smalley is a member of the SEAL Group and carries both Newborn and Albion products.

Lee received an email from one of Smalley's representatives, Kevin Johnson, in which he stated he "sometimes get[s] customer requests that a customer wants to buy America

only."  Johnson then asked Lee where Newborn guns were
manufactured.  Lee replied to Johnson that Newborn products were
manufactured in Taiwan and China.  Lee also informed Johnson
that Cox guns are made in England, and asked Johnson to inform
Lee if he was aware of where Albion produced its guns.  Johnson
replied that "Albion guns, part number model 139, DL guns are
made in the U.S.A. all others overseas."

TB Philly

     TB Philly is a distributor of construction materials
including sealants and caulking materials as well as guns for
dispensing these materials.  The Court heard testimony from
Anthony Bartle, TB Philly's owner and Vice President.  Bartle
testified that TB Philly sells Newborn, Albion, and Cox
materials.  During his testimony, Bartle acknowledged that the
Albion guns on display in his store said "Made in U.S.A." on
them.  Despite this display, Bartle testified that he was not
familiar with a country of origin designations and that "if it's
been on an invoice that I've seen before, I've certainly never
paid attention to it."

Western Waterproofing/Brown Brothers Waterproofing

     The Court heard testimony from Anthony Carroll of Browns
Brothers Waterproofing.  Carroll, a former purchaser for Western
Waterproofing in Denver Colorado, testified about his knowledge
of Albion products.  When asked if he had a belief regarding the

Albion guns he purchased for Western Waterproofing, Carrol

responded "Sure, it was printed right on the side of the box,

'Made in America' or 'Made in U.S.A."

When asked to describe the relative importance of products

being "Made in the U.S.A." for his purchasing decisions at

Western Waterproofing, Carroll responded that it was "kind of an

underlying guideline." In following this guideline, Carroll

testified that he "primarily tried to buy American Made

products." In addition to country of origin, Carroll also

identified dependability as an important factor in his

purchasing decisions. Carroll further testified that he had

some leeway on pricing of the products he purchased. Carroll

testified that he and Western Waterproofing moved away from

Albion products when "the quality started going downhill, and

the guys were complaining to me . . ."

CS Behler, Lance Construction, and Glenrock

Over the course of trial testimony, the witnesses discussed

numerous other distributors of Newborn and Albion products. CS

Behler is a distributor based out of New York. CS Behler

purchases both Albion products and a limited number of Newborn

products. CS Behler's website included two Albion logos, one

that read "Made in U.S.A." and another that read "Made in

America."

Lance Construction is a distributor of construction products in Chicago, Illinois.  Lance Construction sells both Albion and Newborn products.  Lee testified that it has been difficult for Newborn to get a lot of business with Lance Construction.

Browns Brothers Waterproofing is a contractor specializing in building restoration, based out of Centennial, Colorado.

Glenrock is a distributor in Chicago with multiple branches in Indiana and Wisconsin.  Glenrock is a member of the SEAL Group.  In May 2011, at a Glenrock location in Elmhurst, Illinois, Lee observed Albion Special Deluxe Cartridge and Bulk guns marked as "Made in U.S.A."

Lee and Glass also testified to observing Albion products at other distributors during the course of their investigation.[10] In May 2011, at a distributor named Tools & Accessories in Jessup, Maryland, Lee testified that Dell Skluzak sent him a picture of a banner reading "Albion America's Dispensing Tool Specialist" displayed above two Albion dispensing guns marked as "Made in U.S.A."  Lee testified that in May 2012, at a PFI location in Cincinnati, Ohio, he observed an Albion Special Deluxe model marked "Made in U.S.A." along with a banner with Albion's logo reading "America's Dispensing Tool Specialist."

---

Lee also discussed pictures he received from Dell Skluzak taken in a Procoat Systems location in Denver, Colorado an and an A.H. Harris location in Baltimore, Maryland.  Glass reported that in June 2017 he saw an Albion bulk dispensing gun at Thoro System Waterproofing in Folcroft, Pennsylvania with a sticker that said "Made in U.S.A."

     4. Expert Witnesses

Robert Wallace

Robert Wallace testified as an expert on behalf of Newborn. Wallace is the managing partner of Best of Breed Branding Consortium, a branding consultancy firm based out of New York. Wallace has worked in advertising, marketing, and branding for approximately thirty years.  He has served as an expert witness in approximately forty different cases, covering a variety of products.

Wallace testified generally about the purpose of branding and marketing and provided insight into what may drive consumer product decisions.  The parties agree that Wallace did not perform an independent consumer survey involving the dispensing guns at issue in this case.  Due to time constraints, Wallace did not conduct a valid quantitative survey for this case. Instead, Wallace prepared an expert report based on third party surveys.  Wallace testified that he was asked to explain his

understanding of the "impact of the 'Made in America' claim or statement."

Wallace testified that the "Made in USA" claim "has tremendous value." Though Wallace acknowledged that time constraints played a role in his decision not to conduct a survey, he also testified he did not think an additional survey would be necessary to form his opinion. During his trial testimony and in his report, Wallace highlighted the finding of six or seven surveys aimed at measuring the impact of a "Made in USA" claim. According to Wallace's analysis of these surveys, a significant number of respondents identified "Made in USA" as a factor in their purchasing decisions, if not one of the most important factors.

<u>Stephen Nowlis</u>

Stephen Nowlis testified as an expert on behalf of Albion. Nowlis is a professor of Marketing at Washington University's Olin Business School. He has studied and worked in marketing, consumer behavior, decision making, survey researching, and branding. Nowlis testified that he has been deposed around thirty times for a number of cases.

Nowlis analyzed, evaluated, and rebutted Wallace's report and provided his own report. Nowlis also did not conduct a quantitative survey in this case. Nowlis disagreed with Wallace's assessment that a further survey was not necessary.

During his testimony, Nowlis contended that because the surveys Wallace referenced were flawed, this evidence did not support Wallace's conclusion.  Nowlis cited these survey's use of aided questions, lack of control group and peer review, and reliance on a market different from the one at issue in this case as reasons for discounting their results.  Nowlis further asserted that Wallace selectively emphasized certain results from the surveys that confirmed his conclusion, while ignoring conflicting results.

Nowlis expressed skepticism about the FTC's statements that consumers take into consider whether a product was "made in America," noting that "[t]he FTC does surveys sometimes and sometimes it doesn't, so I don't know where they're getting this recommendation from."  Despite his doubts about the FTC's empirical basis for its claims that Made in America influences behavior in the market, Nowlis stated "we could all agree that sometime 'Made in the USA' is material to some people, but sometimes it isn't."  Nowlis further testified that "people would say it [a Made in USA claim] is important to them, they want to feel patriotic, but at the end of the day . . . is it really going to affect their purchase decision? That to me, it seems like the big issue here."  Nowlis acknowledged that consumers might express a preference for products made in America but fail to follow through.

Rhonda Harper

Newborn briefly retained Rhonda Harper as an expert witness in this case.  Lee testified that Harper was hired to conduct a survey.  The parties agree that no such survey was conducted by Harper or any other witness in this case.

5. Third Party Surveys

As none of the experts hired by the parties conducted a survey in preparation for this case, the parties refer to several surveys and studies conducted by third parties.  These resources are discussed below.

Product Specific Studies

Wallace referenced six product specific studies: (1) New Balance Athletic Shoes Study; (2) 1994 International Mass Retail Association Study; (3) American Hand Tool Coalition Survey; (4) Crafted with Pride in the U.S.A. Council, Inc.; (5) BGE Ltd; and (6) National Consumers League.  These six studies involved the impact of the "Made in America" claim, but not did not assess the dispensing gun industry specifically.  These studies' topics ranged from shoes to collectible plates to hand tools.  The parties agree that plates are "quite different than dispensing guns or caulking guns."

Wallace asserted that "country of origin is not always the most important thing, depending on the product . . . but in every case it is a strong consideration."  Albion and Nowlis

question Wallace's interpretation of the data and some elements of the studies themselves.

Hand Tool Opinion Survey

The Hand Tool Opinion Survey consisted of 600 computer-assisted telephone interviews discussing sockets, ratchets, and wrenches, conducted in 1996.  The respondents were divided evenly between professionals, serious do-it-yourselfers, and casual do-it-yourselfers.  The parties agree that relatively few respondents identified "Made in America" as a reason behind a purchasing decision when asked an open-ended question.

SEAL Group Survey

Unlike the other surveys Wallace referenced, the SEAL Group Survey did not include end users.  Instead, fourteen SEAL Group distributors conducted surveys among their representatives. Wallace testified that this survey was not intended for publication or to provide any projection for the general population's preferences.

Other Articles and Sources

Wallace also relied on blog posts and articles related to the impact of the "Made in America" claim on various products. The majority of these blogs and articles were dated between 2012 and 2015.  Albion questioned the reliability and impartiality of these sources.

Reynolds testified that Albion commissioned a marketing consultant named Cal Smedley to help Albion decide whether to begin producing and selling an imported line of tools between 1989 and 1991.  Reynolds testified that he recalled that Smedley reported that "all other things being equal, that at the point of purchase, if a buyer was comparing a USA versus a foreign product, that somewhere around ten or eleven percent premium price was about as much as the average end user of a caulking gun would pay."

### ANALYSIS

A. Subject Matter Jurisdiction

This Court has subject matter jurisdiction over this case pursuant to 15 U.S.C. § 1121 for actions arising under the Lanham Act and 28 U.S.C. 1331 for actions arising under the laws of the United States.  The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's New Jersey common law claim.

B. Bench Trial Opinion Standard

This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a)(1).  Pierre v. Hess Oil Virgin Islands Corp., 624 F.2d 445, 450 (3d Cir. 1980) (holding that to be in compliance with Rule 52(a), findings of fact and conclusions of law do not need to be stated separately in a court's memorandum opinion); see also Ciolino v. Ameriquest

Transp. Services, Inc., 751 F. Supp. 2d 776, 778 (D.N.J. 2010)
(issuing an opinion which constituted the courts findings of
fact and conclusions of law).

   C. Bench Trial Opinion

      1. Lanham Act Claims

   Plaintiff brings a Lanham Act claim under 15 U.S.C. §
1125(a).[11]  Section 1125(a) creates two bases of liability: false
association under § 1125(a)(1)(A), and false advertising under §
1125(a)(1)(B).  See Lexmark Int'l Inc. v. Static Control
Components, Inc., 572 U.S. 118, 122 (2014).  The Third Circuit
has held that false association and false advertising are
governed by different standards.  Mun. Revenue Serv., Inc. v.
Xspand, Inc., 700 F. Supp. 2d 692, 716 n. 45 (M.D. Pa. 2010)
(citing Facenda v. N.F.L. Films, Inc., 542 F.3d 1007, 1021 (3d
Cir. 2008)("In fact, (a)(1)(A) requires only a likelihood of

---

[11] As this Court has previously noted, "[t]he parties' briefs
make no distinction between the Lanham Act claim and the unfair
competition claim under New Jersey common law.  The legal
analysis is the same for both claims."  See Newborn Bros., Inc.
v. Albion Eng'g Co., No. 12-2999, 2016 U.S. Dist. LEXIS 181611,
at *5, n.3 (D.N.J. Dec. 20, 2016) (citing Smart Vent Prods. V.
Crawl Space Door Sys., 2016 U.S. Dist. LEXIS 10852, at *16 n. 10
(D.N.J. Aug. 15, 2016) (stating that "unfair competition claims
under New Jersey statutory and common law mirror unfair
competition claims under § 43(a) of the Lanham Act," and
collecting cases)).  Having concluded below that Plaintiff has
made out its claims under the Lanham Act the Court reaches the
same conclusion regarding Plaintiff's state law claim without
further analysis necessary.

confusion whereas claims of impliedly false statements under (a)(1)(B) require showing actual confusion or misleading statements.")).

Albion asserts that Newborn has only alleged a false advertising claim.  Newborn argues that its Lanham Act claims encompass both false advertising and false association.  While it appears that Newborn's allegations relate to both claims, it is ultimately a question for the Court which, if any, of these claims bears liability for Albion.

Albion has asserted several affirmative defenses, including failure to state a claim, laches, estoppel, unclean hands, statute of limitations and lack of standing.  The Court will not rule on these defenses in this Opinion.[12]

2. Burden of Proof

The standard of proof for liability under the Lanham Act depends on the type of relief sought.  See Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641, 648-49 (3d Cir. 1958); see also Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627

---

[12] ECF No. 259, at 104.  While discussing Newborn's motion in limine regarding evidence in support of Albion's affirmative defenses (ECF No. 208), the Court determined that the issue of unclean hands, other affirmative defenses, and disgorgement of profits was unripe until the Court ruled on liability.  The parties will be afforded 20 days to advise the Court as to what procedural steps they propose for the Court to take to complete the record on the asserted affirmative defenses and join those issues for resolution by the Court before the Court consider the availability of remedies.

F.Supp. 2d 384, 480 (D.N.J. 2009) (quoting <u>Porous Media Corp. v.</u>
<u>Pall Corp.</u>, 110 F.3d 1329, 1335 (8th Cir. 1997) ("A plaintiff
suing to enjoin conduct that violates the Lanham Act need not
prove specific damage.  In contrast, courts require a heightened
level of proof of injury in order to recover money damages.")).

In this case, Plaintiff seeks both injunctive and monetary
relief.  For injunctive relief, the elements are as follows:

(1) that the defendant has made false or misleading
statements as to his own product [or another's];

(2) that there is actual deception or at least a tendency
to deceive a substantial portion of the intended audience;

(3) that the deception is material in that it is likely
to influence purchasing decisions;

(4) that the advertised goods travelled in interstate
commerce; and

(5) that there is a likelihood of injury to the plaintiff
in terms of declining sales, loss of good will, etc.

<u>Warner-Lambert Co. v. BreathAsure, Inc.</u>, 204 F.3d 87, 91-92 (3d
Cir. 2000).

For monetary relief, the elements are identical to the ones
listed above, with one important distinction.  To seek monetary
relief, "the causation and injury element for an award of
damages is higher than the general standard for injunctive
relief."  <u>Bracco Diagnostics</u>, 627 F.Supp.2d at 480.  In addition
to proving elements one through four listed above, a plaintiff
seeking to recover monetary relief must "link the alleged
deception with actual harm to its business."  <u>MB Imps., Inc. v.</u>

T&M Imps., LLC, 2016 WL 8674609, at *5 (D.N.J. 2016) (internal quotations omitted).

It is Newborn's burden to prove by a "preponderance of the evidence" all the elements of its Lanham Act claim.  Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Pharms., Inc., 19 F.3d 125, 129 (3d Cir. 1994).  Newborn cannot "mix and match statements, with some satisfying one Lanham Act element and some satisfying others."  Verisign, Inc. v. XYZ.com LLC, 848 F.3d 292, 299 (4th Cir. 2017).  The corollary to this rule is that Newborn need only prove one statement satisfies all elements.  Id.

3. Albion's Actionable Statements

To evaluate a claim of false advertising under Section 43(a) of the Lanham Act, the Court must determine which of the accused party's statements are actionable.  To make this determination, the Court must decide "whether the challenged statement is one of fact . . . or one of general opinion."  EP Henry Corp. v. Cambridge Pavers, Inc., 383 F.Supp.3d 343, 349 (D.N.J 2019) (citing Pizza Hut, Inc. v. Papa Johns Int'l Inc., 227 F.3d 489, 495-96 (5th Cir. 2000)).

Firstly, an action for false designation of origin requires an affirmative statement.  See FMC Corp. v. Summit Agro USA, LLC, 2014 WL 6627727, at *6 (D. Del. Nov. 14, 2014) ("[W]hile it a key omission of fact might contribute to a Section 43(a)

claim's efficacy, in and of itself an omission is insufficient;
the plaintiff must also point to an actionable affirmative
statement in order to breathe life into such a claim."].
Therefore, it follows that a failure to disclose facts is not
actionable under the Lanham Act.  See U.S. Healthcare, Inc. v.
Blue Cross of Greater Phila., 898 F.2d 914, 921 (3d Cir. 1990).
However, the Third Circuit has also held that "a statement is
actionable under § 43(a) if it is affirmatively misleading,
partially incorrect, or untrue as a result of failure to
disclose a material fact." Id. (internal citations and markings
omitted).

Secondly, actionable statements must be made by the
defendant.  Rhone-Poulenc Rorer Pharms., 19 F.3d at 129 (listing
the first element of Section 43(a) as "the defendant has made
false or misleading statements as to his own product [or
another's] . . ."].  This requirement does not eliminate
liability for statements made by third parties.  In Bracco
Diagnostics, a judge of this Court held that speech by a third
party that was created, sponsored, and presented by the
defendant was actionable under the Lanham Act.  627 F.Supp.2d at
462-63 (citing Bolger v. Youngs Drugs Prods. Corp., 463 U.S. 60,
67-68 (1983) and Semco, Inc. v. Amcast, Inc., 52 F.3d 108, 112
(6th Cir. 1995)).  Similarly, the 11th Circuit has permitted
plaintiffs to bring claims of contributory false advertising

when a plaintiff shows that (1) the third party engaged in false advertising and (2) the "defendant contributed to that conduct by knowingly inducing or causing the conduct, or by materially participating in it." Duty Free Americas, Inc. v. Estee Lauder Cos., Inc., 797 F.3d 1248, 1276-77 (11th Cir. 2015).

Thirdly, the timing of the allegedly false statement bears on whether a statement is actionable.  Some courts, including a judge in this District, have held that "statements made inside the product's packaging, available only to consumers after the purchase has been made, do not affect the choice to purchase" and therefore are not actionable under the Lanham Act.  See Interlink Prods. Int'l, Inc. v. F & W Trading LLC, 2016 WL 1260713, at *4 (D.N.J. Mar. 31, 2016) (citing Gillette Co. v. Norelco Consumer Prods. Co., 946 F.Supp. 115, 135 (D. Mass. 1996) and Marcyan v. Nissen Corp., 578 F. Supp. 485, 507 (N.D. Ind. 1982)).

Lastly, statements of puffery are non-actionable for purposes of the Lanham Act.  "[B]ald assertions of superiority or general statements of opinion" cannot be the basis of liability under the Lanham Act.  EP Henry Corp., 383 F.Supp.3d at 349 (citing Pizza Hut, 227 F.3d at 495-96).  The Third Circuit has defined puffery as "exaggeration or overstatement expressed in broad, vague, and commendatory language." Id. (quoting Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d

Cir. 1993)).  The Third Circuit has further defined puffery as
"advertising that is not deceptive for no one would rely on its
exaggerated claims."  U.S. Healthcare, 898 F.2d at 922.

Statements in issue must be specific and measurable,
"capable of being proved false or of being reasonably
interpreted as a statement of objective fact."  Pizza Hut, 227
F.3d at 496.  "A statement of fact is one that (1) admits of
being adjudged true or false in a way that (2) admits of
empirical verification."  Presidio Enters., Inc. v. Warner Bros.
Distrib. Corp., 784 F.2d 674, 679 (5th Cir. 1986).  A judge of
this Court has previously held that "misdescriptions of specific
or absolute characteristics of a product are actionable."
Stiffel Co. v. Westwood Lighting Grp., 658 F.Supp. 1103, 1115
(D.N.J. 1987).  The Third Circuit has held that "false claims
that explicitly or implicitly address product attributes of
importance to customers and make statements that are measurable
by comparative research are not puffery."  Bracco Diagnostics,
Inc., 627 F.Supp.2d at 464 (citing Castrol Inc., 987 F.2d at
946-46).[13]

---

[13] Bracco Diagnostics also provides examples of statements that
did not constitute puffery.  In Castrol Inc., the Third Circuit
held that Pennzoil's claim of superior engine protection was not
mere puffery because it was "both specific and measurable by
comparative research." 987 F.2d at 946.  In Stiffel, a judge of
this Court found that a claim to superiority flowing from
purported independent tests was not puffery.  Stiffel Co. v.
Westwood Lighting Grp., 658 F.Supp. at 1115.  In Genderm Corp.

The Court finds that a several of Albion's statements are actionable under the Lanham Act.  Albion made a number of affirmative statements about the origin of their products, including "All Albion products are Made In America,"[14] and "All our dispensing products and accessories are designed and manufactured in the USA, from our location in Philadelphia, Pennsylvania."[15]  Albion did not have had a duty under the Lanham Act to disclose the details of its manufacturing process.  However, the statement "All Albion Products are Made In America" is affirmatively misleading, incorrect, and untrue as a result of Albion's failure to disclose that some Albion products are partially or in some cases, entirely, produced in Taiwan.

Albion was the party that made these statements.  Though these statements are speech by a third party, and not Albion itself, there is sufficient evidence to conclude that Albion created, sponsored, and presented this information.

---

v. Biozone Labs, the Northern District of Illinois held that false descriptions of clinical trials were not mere puffery. 1992 WL 220638 at *14-15 (N.D. Ill. 1992).  In American Home Prods. Corp. v. Johnson & Johnson, the Southern District of New York held that an advertisement that suggested that most hospitals recommended Tylenol was not puffery.  654 F.Supp. 568, 588-89 (S.D.N.Y. 1987).

[14] This statement appears on multiple pieces of Albion's marketing and advertising materials, including multiple catalogs and Albion's Owner's Guide.

[15] Albion posted this statement and a slightly modified version of this statement on its 2004 and 2007 websites.

Significantly, Albion controls its distributors' use and
distribution of its products and marketing materials through its
retention of its rights to the commercial use of the copyrights
and trademarks appearing on those products and materials. *See,
e.g.*, DTX482 at 28 ("No other use, copying or transmission of
the trademarks or copyrighted material [other than for
informational and noncommercial personal purposes] may be made
without the express prior written consent of Albion Engineering
Company, Inc."). Albion's products and marketing materials
carry Albion's registered trademarks and copyrighted material.

These statements were not exaggerated claims that would
constitute puffery. Instead, these statements were claims that
purchasers, Newborn, and others relied on when reading Albion's
products, displays, and literature. The Court notes that third
parties who rely on Albion's false representations to sell
Albion's products are evidence that the third parties themselves
were deceived by Albion's false origin claims and evidence that
Albion has never corrected the false perception it created about
the origin of its products. Numerous instances of trial
testimony support this conclusion.

The Court distinguishes Albion's statements available after
purchase from the statements discussed in Interlink Prods.
Int'l, Inc. In Interlink Prods. Int'l Inc., the court found
that instruction manuals included with the defendant's

showerheads were not "made to influence a consumer in his or her choice to purchase a product." 2016 WL 1260713 at * 4 (quoting Gillette Co., 946 F.Supp. at 135).  In this case, Albion's catalogs and an Owner's Guide are packaged with certain Albion products.  These materials contain the statement "All Albion Products are Made in America" on their covers.  This statement is not an instruction on how to use or install the product purchased as in Interlink Prods. Int'l Inc.  Instead this statement brands Albion falsely as a manufacturer of products made entirely in the United States.

Moreover, Albion's product catalog specifically lists other Albion products available for purchase, supporting a finding that these materials were meant to influence future purchasing decisions.  Albion has also continued this practice of including its catalogs and Owner's Guide in its retail packaging for over a decade, evidencing an intention to influence future sales of its products.  The Court further notes that even if Albion's catalog and Owner's Guide were not advertising statements because they were included in packaging after purchase, these materials were available for download from Albion's website at any point during the purchasing process.

Albion's statements about the origin of its products are not mere puffery.  A statement that a product is "Made in America" or "Made in USA" is not a bald assertion of

superiority, but rather a specific claim about a product's origins.  Albion did not express its claim as an exaggeration or overstatement using broad, vague, or commendatory language.  Instead, Albion identified a specific location where its products were made.  Furthermore, "Made in America" is not a bald assertion of superiority, but rather a specific standard defined by Government agencies.  Under the Third Circuit's standards, Albion's claims are deceptive because as the evidence in this case showed they are a type of claim a customer would rely on for information about a product's origins.

Albion's "Made in America" claim is specific, measurable, and capable of being proved false.  Lee's testimony about his inquiry into the origin of Albion's products illustrates that these claims can be adjudged true or false in a way that admits of empirical verification.  Lee's inquiry also demonstrates that these claims are measurable by comparative research. Schneider's testimony about his understanding of the claim "Made in America" and his formula further support a finding that these claims are specific, measurable, and capable of being proved false.  Instead, Albion's made in American claim is capable of being proved false and could reasonably interpreted as a statement of objective fact.  Both Newborn's and Albion's experts testified that a "Made in America" claim addresses product attributes of importance to customers, supporting a

finding that these statements were not mere puffery on Albion's part.

Having concluded that Albion's statements are actionable, the Court will proceed to address the elements of a false advertising claim under the Lanham Act for these statements.

### 4. Elements

#### i. Element One: Falsity

The first element of the Lanham Act requires that "the defendant has made false or misleading statements as to his own product [or another's]". BreathAsure, 204 F.3d at 91. False or misleading statements support a cause of action under the Lanham Act if they are "either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." Groupe SEB USA, Inc. v. Euro-Pro Operating LLC, 774 F.3d 192, 198 (3d Cir. 2014) (internal quotations omitted) (citing Novartis Consumer Health, Inc. v. Johnson & Johnson-Merk Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002)).

It is Plaintiff's burden to prove "falsity as to specific dates, impacted products and the allegedly false statements accompanying those sales." Newborn Bros., Inc. v. Albion Eng'g Co., 2016 U.S. Dist. Lexis 181611, at *15 (D.N.J. 2016); see Larry Pitt & Assocs. v. Lundy Law LLP, 294 F.Supp.3d 329, 340 n. 59 (E.D. Pa. 2018) ("It was [Plaintiff]'s burden to identify each of the specific messages in [Defendant]'s advertisements

and explain why they should be construed as unambiguously and literally false."). If a plaintiff cannot or does not prove that a claim is literally false, he or she must prove that the statement is deceptive or misleading. <u>Rhone-Poulence Rorer Pharms.</u>, 19 F.3d at 129 (citing <u>U.S. Healthcare</u>, 898 F.2d at 922).

"A determination of literal falsity rests on an analysis of the message in context." <u>Id.</u> As part of this context, the Court considers "whether statements 'are false or misleading at the time they are made.'" <u>Bracco Diagnostics Inc.</u>, 627 F.Supp. 2d at 464 (quoting <u>ALPO Petfoods, Inc. v. Ralston Purino Co.</u>, 720 F.Supp. 194, 205 n. 12 (D.D.C. 1989) (rev'd in part on other grounds)). Statements that later become false are not actionable under the Lanham Act. <u>Id.</u> (citing <u>ALPO Petfoods Inc.</u>, 720 F.Supp. at 205 n. 12 ("The Lanham Act prohibits claims that are false or misleading *at the time they are made*." (emphasis in original))); see also <u>Klayman v. Judicial Watch, Inc.</u>, 628 F.Supp.2d 112, 150 (D.D.C. 2009) (holding that a newsletter that contained true statements when sent, but false statements when received and read was not actionable). This context may also include statements other than the allegedly false claim that appear on the product or advertisement. See <u>Parks LLC v. Tyson Foods</u>, 863 F.3d 220, 227-29 (3d Cir. 2017); see also <u>Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.</u>, 653

F.3d 241, 252-54 (3d Cir. 2011).  In Pernod Ricard, the Third
Circuit held that no reasonable consumer could be misled by use
of the brand name "Havana Club" where there was a "factually
accurate, unambiguous statement of the geographic origin of
Havana Club rum."  Pernod Ricard, 653 F.3d at 252.

    "[O]nly an unambiguous message can be literally false."
Novartis, 290 F.3d at 587.  A literally false statement can
either be explicit or "conveyed by necessary implication when,
considering the advertisement in its entirety, the audience
would recognize the claim as readily as if it had been
explicitly stated."  Id. at 587 (internal quotation marks
omitted).  The more a statement "relies upon the viewer or
consumer to integrate its components and draw the apparent
conclusion," the less likely it is that the statement is
literally false.  Id. (citing inter alia BreathAsure., 204 F.3d
at 96).

    At least one court has found that a "Made in USA" claim is
ambiguous.  See Honeywell Intern. Inc. v. ICM Controls Corp., 45
F. Supp.3d 969, 986-89 (D. Minn. 2014).  In Honeywell, the
District Court of Minnesota highlighted the different
definitions of the term "made" according to FTC guidelines and
policies, other federal regulations and dictionary definitions
before ultimately concluding that "Made in the USA" is an
ambiguous claim.  See id.

Generally, a showing that a statement does not conform with a federal agency's guidelines is insufficient evidence that a claim is literally false or misleading.  See G&W Labs., Inc. v. Laser Pharms., LLC, 2018 U.S. Dist. LEXIS 102132, at *46 (D.N.J. June 19, 2018) (discussing the court's hesitance to "create an applicable [] standard, where none exists"); see also Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 229 (3d Cir. 1990) (declining to "blur the distinctions between the FTC and a Lanham Act plaintiff"); Honeywell, 45 F. Supp.3d at 987. On the other hand, customs and FTC standards remain relevant for the Court to consider in its decision-making process, especially when the agency has developed an expertise in the area.  See e.g., New Colt Holding Corp. v. RJG Holdings of Florida, Inc., 312 F.Supp.2d 195, 235 n. 16 (D. Conn. 2004) (referring to the FTC's "all or virtually all" standard to evaluate the made in the U.S.A. claims of origin"); Master Lock Co. v. Hampton Prods. Int'l Corp., 1996 U.S. Dist. LEXIS 19780, at *8-12 (E.D. Wisc. Dec. 2, 1996).

In this case, Albion has made both literally false statements and ambiguous statements that have the tendency to deceive consumers.  After looking at Albion's various messages in context, the Court finds that Newborn has succeeded in identifying specific dates, impacted products, and false statements accompanying those sales.

Albion's False Statements

The Court finds that Albion made a number of false statements as defined by the Lanham Act.  These literally false statements are discussed below.

Albion signed and returned certificates of origin to 3M and other companies that falsely stated that Albion's products met the FTC's standard.  Albion's employee, Robert Reynolds, acknowledged that this was not appropriate at the time the certificate was signed.  Albion argues that while these claims may be incorrect, they are not actionable under the Lanham Act because they are not advertising.

The Court finds that these statements meet the criteria for literal falsity under the Lanham Act.  Taking the message in context, the certificates Albion issued were unambiguous in stating that Albion's products met the FTC's "all or virtually all" made in the U.S.A. standard.  These certificates and their message do not rely on the viewer to draw any apparent conclusions and are therefore more likely to be literally false. As established above, Albion's products did not meet the FTC's standard at the time these certificates were issued.  While Albion's failure to meet FTC standards may not be sufficient evidence of a literally false statement, the Court considers the FTC's expertise and standards for made in the U.S.A. claims to be relevant in determining literally falsity in this case.

Newborn argues that Albion's practice of over labelling or altering products to obscure its products' origins amounts to false statements.  Albion allowed Hilti and 3M to supply labels that claimed Albion products were made in the United States. Newborn contends that while these practices are not false statements made by Albion, they are falsely presented by Albion. Newborn also highlights that Albion also altered its products according to the Millennium's requests by replacing recoil plates stamped with "Made in Taiwan" with blank recoil plates. Albion moved "Made in Taiwan" to an "obscure" segment of the boxes of products it sent to Top Industries and Saint Gobain.

The Court agrees with Newborn that the statements appearing on the 3M and Hilti labels are literally false.  As discussed above, the fact that Albion relied on third parties to distribute these false labels does not necessarily preclude a finding of liability.  These labels were created, sponsored, and presented by Albion to obscure the true origins of Albion products.  The Court finds that Albion's practice of replacing recoil plates and relocating country of origin claims is not literally false because these messages are ambiguous and rely on the viewer to integrate information to interpret this message.

Albion created a page on its 2004 and 2007 website that stated "All our dispensing products and accessories are designed and manufactured in the USA, from our location in Philadelphia,

Pennsylvania."[16]   In 2004, when Albion was developing this website, Albion's board member, Louis Matlack, expressed his concern about this statement being "overbroad" because it failed to acknowledge Albion's import business.

Additionally, Albion Catalog 267E featured the statement "All Albion products are made in America" on its cover. According to Reynold's testimony, this catalog may have been in use as early as 2006 and continued until January 21, 2009. During trial testimony, Schneider admitted that this was a false statement.   Catalog 268 includes the claim "All Albion Products Are Made in America" and was also available to download from Albion's website until it was replaced by Catalog 333.

The Court finds that these advertising statements meet the elements of literal falsity as defined by the Lanham Act.   They are unambiguous and were false when made.

<u>Albion's Misleading Statements</u>

Albion also made a number of statements that the Court considers ambiguous and misleading as defined by the Lanham Act. These statements are listed below.

---

[16] The Court notes that the location of Albion in 2007 was Moorestown, New Jersey, not Philadelphia, Pennsylvania as stated.   Though this is also a literally false statement, it is of marginal materiality for purposes of Plaintiff's Lanham Act claims.

As discussed above, Albion placed stamps or printed various statements on its products.  Albion's Original Line products were stamped with "ALBION ENG. CO. PHILA. PA. U.S.A." starting in the 1930s and well into the 21st century.  Newborn argues that this is an ambiguous and misleading statement because it could lead consumers to believe the product was made in the United States, when the Original Line products were, in most cases, made at least partially abroad.  Albion contends that this statement is merely an address, understanding this to be a "piece of legacy information from when Albion had moved from Philadelphia."

Albion printed "75 Year History – USA Manufacturer and Designer" on its B-line guns starting in March 2004.  This statement was updated to read "80 Year History" in July 2011.  Newborn argues that this was an ambiguous and misleading statement that could cause consumers to believe the B-line guns were made in the United States rather than Taiwan.  Kenneth Becker, an engineer at Albion, acknowledged that these statements could create the impression that these products were made in the United States.  Albion contends that a survey is necessary to ascertain what message these statements sent to consumers.  Albion further contends that because it has never ceased manufacturing at least some of its products in the United States, it has properly retained the title "USA Manufacturer."

Newborn also points to several statements in Albion's
advertising, catalogs, and bulletins that Newborn characterizes
as ambiguous and misleading.  Newborn takes issue with Albion
continuing to refer to itself as a "third generation American
manufacturer" while producing a significant portion of its
products in East Asia.  Newborn also highlights that Albion
Bulletin 281A, a new product announcement for the B-line,
identifies Albion's products lines as "U.S. manufactured
professional tools as well as commodity guns" without
acknowledged its imported products.  Similarly, Newborn contends
that Albion Bulletin 281C makes another ambiguous but misleading
claim when it compares Albion's B-line to Asian and European
imports without acknowledging that the B-line is also imported.
Albion again asserts that is has properly retained the title
"American manufacturer" by continuing to manufacture at least
some of its products in the United States and by maintaining its
design an engineering effort within the United States.

Lastly, Newborn claims that Albion's advertisement in ABC
Supply's catalog is ambiguous and tends to deceive because it
portrays Albion's Special Deluxe models as being "Made in the
USA" when significant portions of these guns were manufactured
in Taiwan.

The Court finds all of these statements to be misleading.
Albion contends that some of these misleading statements are not

actionable because they are not affirmative statements or
statements made by Albion.  However, the Court finds these
statements to be affirmatively misleading or partially incorrect
as a result of Albion's failure to disclose that some of its
products are either wholly or partially made in Taiwan.  See
U.S. Healthcare, 898 F.2d at 921.  Albion's "third generation
American manufacturer" and "USA manufacturer" claims, when
considered in the context of Albion's blanket statement, its
other marketing, and its employees' emphasis on country of
origins, convey by necessary implication that Albion products
are made in America.  These statements do not rely on consumers
to integrate separate components and draw a conclusion.

     In contrast, Albion's comparison to other imports does rely
on consumers to integrate separate components in order to draw
the conclusion that Albion products are made in America.
Albion's statement that it manufactures "professional tools as
well as commodity guns" requires a similar amount of
integration.  This integration supports the claim that these
statements are likely not literally false.  Instead, the Court
finds that these statements are ambiguous and tend to deceive.

     With regard to all the above statements, both literally
false and misleading, Newborn has met its burden of proof for
the purposes of a Lanham Act claim.  These statements were false
at the time they were made.  Albion began producing its B-line

in Taiwan in 2001.  Though in some cases, the creation date of some of Albion's catalogs is not clear, the Court distinguishes these facts from the case presented in Klayman v. Judicial Watch, Inc.  Klayman concerned a claim in a single monthly newsletter.  628 F.Supp.2d at 145-47.  In that case, the District Court for the District of Columbia held that the defendant was not liable for a statement in a single newsletter that became false in the time between the newsletter was sent and when it was received.  Id. at 150.  The case before the Court today concerns the continual distribution of outdated literature containing statements that had not been true for years as part of a pattern of deception in the marketplace.

Albion argues that it does not emphasize these made in America claims in its advertising and literature.  Instead, Albion characterizes these claims "general statements" made in a small font alongside other, more nuanced statements about the origin of their products.  In support of this argument, Albion highlights that some of its publications like Bulletins 297D and 298 make no reference to Albion products being "Made in America."  Albion also points out that Bulletin 298 acknowledges that Albion's B-line guns are "built overseas" and offer the "cost savings of an import" as evidence that its advertising materials are not false or ambiguous and misleading.  The Court finds nothing to suggest that these occasional acts of candor

render the false and deceptive nature of Albion's other claims
unactionable under the Lanham Act.

Albion further argues that no reasonable consumer could be
misled by these claims because Albion included a factually
accurate, unambiguous statement of the geographic origin of the
B-line guns as in Pernod Ricard.  In Pernod Ricard, both the
name "Havana Club" and "Made in Puerto Rico" appear on the same
label.  653 F.3d at 252.  In this case, there is no guarantee
that a customer reading a catalog or a section of Albion's
website would also encounter Albion's blog post, press release,
or a B-line gun itself.  It is true that Albion included in a
press release and blog post that the B-line guns are
manufactured in Taiwan.  Albion's B-line guns were also labeled
as made in Taiwan either through a sticker, stamp, or hang tag.
However, in looking at the entire context of Albion's messages,
the Court finds that these statements remain literally false or
misleading.  Often the statement "All Albion Products are Made
in America" was not coupled with the caveat that Albion's B-line
guns were manufactured in Taiwan, or that Albion employs a
lesser standard for "Made in America."

Albion cites Honeywell for the proposition that claims like
"Made in U.S.A." or "Made in America" are necessarily ambiguous,
and therefore cannot be literally false.  The Court does not
read Honeywell to mean that there is no discernible standard for

what "Made in America" means.  The Court distinguishes the facts
in Honeywell from the ones before it today.  Honeywell did not
involve products made entirely abroad, nor did it involve end
products that were required by law to be marked legibly,
permanently, and conspicuously with their foreign country of
origin pursuant to specific decisions thereon by U.S. Customs
and Border protection.  Honeywell also did not present a blanket
statement regarding a country of origin.  Under any of the
thresholds discussed in Honeywell, Albion's B-line guns do not
meet the standard for being "Made in America" as they are wholly
manufactured in Taiwan.

Albion argues that the Court should not take any customs
rulings into consideration because they are not advertising and
do not influence consumer decisions.  Even if the Court did
agree with Albion's assessment of the utility of these rulings,
they would still be relevant to the Court's consideration of
falsity.  While it is not a sufficient demonstration of falsity,
the United States Customs Service or its successor agency has
issued rulings regarding Albion's products and their markings.
Though Albion may contest whether these rulings are binding,
these rulings are unambiguous: certain Albion guns should not be
labeled "Made in America."  Similarly, the Court is permitted to
consider whether Albion's products meet the FTC's guidelines for
a product being "Made in America."  Through Albion's own

81

admission, Albion's products do not meet this standard.  The Court finds that these statements are literally false.

The Court finds that Newborn has met its burden for this element.

### ii. Element Two: Deception of a Substantial Portion of the Intended Audience

Plaintiff's burden for element two of a false advertising claim differs depending on whether Defendant's statements are literally false or literally true or ambiguous.  See Pernod Ricard, 653 F.3d at 248 ("[A]ctual deception or a tendency to deceive is presumed if a plaintiff proves that an advertisement is unambiguous and literally false.  If the message conveyed by an advertisement is literally true or ambiguous, however, the plaintiff must prove actual deception or a tendency to deceive . . ." (internal citations omitted)).

Plaintiff's burden for element two also depends on the relief sought.  See Newborn Bros., Inc. v. Albion Eng'g Co., 2016 U.S. Dist. Lexis 181611, at *9 (D.N.J. 2016).  For injunctive relief, proof of a literally false statement allows the Court to presume deception. Id.  ("At a minimum, it cannot be disputed that '[p]roof of literal falsity relieves the plaintiff of its burden to prove actual consumer deception' when a plaintiff seeks only injunctive relief.") (quoting Groupe SEB USA, 774 F.3d at 198)); see also Gallup, Inc. v. Talentpoint,

Inc., 2001 WL 1450592, at *13 (E.D. Pa. Nov. 13, 2001) ("Where plaintiff seeks injunctive relief and shows that a claim is literally false, a court need not consider where the public is misled."). In the Third Circuit, this presumption of deception is rebuttable. Bracco Diagnostics, 627 F.Supp.2d at 477. On the other hand, for monetary relief, Plaintiff must still "prove actual consumer deception even if the claim is based on literal falsity." Mun. Revenue Serv. Inc. v. Xspand, Inc., 700 F.Supp.2d 692, 716 (M.D. Pa. 2010); see Gallup Inc., 2001 WL 1450592, at *13 ("Where, however, a plaintiff seeks monetary damages, proof of actual deception is required.").

Actual deception requires that the false or misleading statement "actually deceives a portion of the buying public." Parkway Baking Co., 255 F.2d at 648-49. A plaintiff who merely argues how customers *could* react has not met his or her burden to prove actual deception. Sandoz Pharm. Corp., 902 F.2d at 229. Instead, plaintiffs must show by a preponderance of evidence "how consumers *actually do* react." Id. (emphasis in original).

Proof of deception can be, and often is, proven though a properly conducted survey. Pernod Ricard, 653 F.3d at 248; Rhone-Poulence Rorer Pharms., 19 F.3d at 129-30 ("[T]he success of the claim usually turns on the persuasiveness of a consumer survey."). However, these cases do not stand for the

proposition that a plaintiff must produce a properly conducted
survey to demonstrate actual deception.  See Novartis, 290 F.3d
at 587.  A plaintiff is not required to produce and rely on a
survey when "consumer deception can be determined by examining
the challenged name or advertising on its face."  Id.[17]  In
Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc., the
Third Circuit opined that "a plaintiff's failure to conduct such
a survey where it has the financial resources to do so, could
lead a jury to infer that the plaintiff believes the results of
the survey will be unfavorable."  921 F.2d 467, 475 (3d Cir.
1990).  Immediately following this statement, the Third Circuit
reaffirmed that surveys are "not essential where, as here, other
evidence exists."  Id.

_____

[17] In Novartis Consumer Health, Inc., the Third Circuit described
other cases in which a survey was not necessary because the face
of the name or advertising was misleading.  290 F.3d at 587-88.
In BreathAsure, the defendant claimed that its capsules would
help freshen breath.  Over the course of litigation, it became
clear that the capsules would have no effect on bad breath.  The
defendant was enjoined without reliance on a survey.
BreathAsure, Inc., 204 F.3d at 89-97.  In Castrol, the
defendant's advertising impliedly claims superiority against its
competitors.  This claim was found to be false, and the
defendant was enjoined without reliance on a survey.  Castrol,
987 F.2d at 947-48.  In Cuisinarts, the defendant implied that
all twenty-one three Michelin star restaurants used their brand
of professional food processor over a competitor's food
processor.  This claim was found to be false because the
competitor did not make a professional food processor.  The
defendant was enjoined without reference to a survey.
Cuisinarts Inc. v. Robo-Coupe Int'l Corp., 1982 WL 121559, at *
2-3 (S.D.N.Y. 1982).

If a consumer survey is introduced as evidence, the proponent of the survey has the burden of proof in establishing that the survey was conducted in accordance with accepted principles of research.  Merisant Co. v. McNeil Nutritionals LLC, 242 F.R.D. 315, 219 (E.D. Pa. 2007) (citing Pittsburgh Press Club v. United States, 579 F.2d 751, 758 (3d Cir. 1978)).  Merisant Co. also provides a list of several facts a court must consider to determine if a survey meets applicable standards.[18]  Id. at 319-20.  If a Court does find a survey technically unreliable, this determination goes to the weight accorded to a survey, not its admissibility.  Id. at 320.  Ultimately, the Third Circuit has concluded that a survey should not be excluded "unless it is so flawed that it would be completely unhelpful or harmful to the trier of fact."  Id. (citing AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 617 (7th Cir. 1993)).

---

[18] These factors include: "A proper universe must be examined and a *representative* sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. Just as important, the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purposes of the survey or the litigation. *A fortiori* the *respondents* should be similarly unaware." Merisant Co., 242 F.R.D. at 319-320 (emphasis in original)(citing Pittsburgh Press Club, 579 F.2d at 758.).

"Above all, the survey's design must fit the issue which is to be decided by the jury, and not some inaccurate restatement of the issue, lest the survey findings inject confusion or inappropriate definitions into evidence." J&J Snack Foods, Corp. v. Earthgrains Co., 220 F.Supp.2d 258, 270 (D.N.J. 2002). A survey's proper universe should be "that segment of the population whose perceptions and state of mind are relevant to the issues in the case." Citizens Fin. Group v. Citizens Nat'l Bank, No. 01-1524, 2003 U.S. Dist. LEXIS 259777, at *9-10 (W.D. Pa. Apr. 23, 2003) (citing 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67 (4th Ed. 2001)). A survey that relies on the wrong universe "will generally be of little probative value in litigation". Id. (citing McCarthy on Trademarks and Unfair Competition, § 32:159).

No matter the type of proof a plaintiff relies on, there is no quantitative measure of the degree to which an advertisement must mislead or deceive consumers to prevail. Stiffel, 658 F.Supp. at 1114. In Stiffel, this Court acknowledged that "'a qualitative approach rather than a quantitative determination is enough to support a conclusion that an advertisement "tends" to mislead . . .'" Id. (quoting McNeilab, Inc. v. American Home Prods. Corp., 501 F. Supp. 517, 528 (S.D.N.Y. 1980)).

In this case, Newborn seeks in essence monetary damages and relies on ambiguous and misleading statements by Albion. As

86

such, the Court finds that Newborn must prove actual deception.
After reviewing the facts discussed below, the Court finds that
Newborn has met this burden.

The parties agree that neither Newborn nor Albion conducted
a survey regarding Albion's products or messaging.  However,
this lack of survey evidence is not fatal to Newborn's claims.
Albion argues that the Court should infer from Newborn's
decision not to utilize Rhonda Harper's services to conduct a
survey that the survey results would have been unfavorable.
Albion did not introduce evidence to suggest that Newborn had
the financial means to do so.  The Court declines to make
Albion's suggested inference.[19]

Albion and Albion's expert, Stephen Nowlis, contend that
Newborn's expert testimony from Robert Wallace was not credible.
Albion and Nowlis question both the relevance the credibility of
the surveys that formed the basis of Wallace's report by stating
that they are outdated and off-topic.  Albion argues that
Newborn has not met its burden of establishing that these
surveys were done in accordance with the accepted principles of

---

[19] Even if the Court were to assume that Harper's survey would be
unfavorable, it would still have to be weighed against, and
ultimately not outweigh, the other significant evidence
proffered by the Plaintiff including expert testimony, other
relevant surveys and direct proofs that Defendant's messaging
was deceptive.

research.  Albion also highlights that the SEAL Group survey
Newborn conducted was unscientific and improperly designed.

The Court finds that these surveys and Wallace's subsequent
testimony were admissible, were helpful to this Court, and at
least suggestive of consumer deception.  The Court further notes
that these surveys were introduced into evidence by Albion, not
Newborn.  Newborn acknowledges the limitations of the SEAL Group
survey and take care not to overstate its conclusions about SEAL
Group members' opinions.  Though the surveys Wallace cited in
his report address products other than dispensing guns, the
Court does not find that these surveys inject confusion or
inappropriate definitions into evidence.  Nor do these surveys
rely on a completely unrelated universe of consumers such that
the Court should not consider these surveys as evidence at all.

Furthermore, even if the Court did reject Newborn's
evidence and Wallace's testimony, Newborn has introduced several
instances of actual consumer deception.  The Court will assess
this evidence qualitatively, rather than quantitatively as has
been done before in this District.  See Stiffel, 658 F.Supp. at
1114.

Newborn's evidence of consumer deception includes a number
of conversations with Albion customers.  Anthony Carroll
testified that he believed Albion products were made in America
because it was "printed right on the side of the box."  George

Hall testified that he thought all Albion products were American-made, with the exception of the B-line guns. Hall testified he reached this understanding based on his conversation with Albion representatives and knowledge of Albion's promotional literature. Another D.M. Figley employee, Rene DesRochers, testified that he was surprised to learn that Albion used parts that were made overseas. Smalley representative Kevin Johnson's email to Lee seems to convey some confusion over which Albion products are made overseas.

Though he did not testify directly, from Reynold's descriptions of his conversation with David Crawford, it appears Crawford believed Albion products were made in America. Crawford told Reynolds he would not buy Newborn products because they were made in Asia but was comfortable buying Albion products. Reynolds further acknowledged that Crawford had been sent Albion promotional materials bearing the claim "All Albion Products are Made in America."

Similarly, customers from 3M and Hilti did not testify at trial as to their knowledge of where Albion manufactured its products. Reynolds testified that he thought 3M and Hilti had assumed Albion's blended products were made in America when they created labels for Albion to use.

While not a case of actual deception, Anthony Bartle testified that he did not know where Albion products were made.

Albion's board member, Louis Matlack, expressed his concerns that Albion was deceiving its customers through its advertising about the origin of Albion products.  The unidentified author of the comment left on an internet forum about dispensing guns at least supports a finding that Albion's statements have a tendency to deceive.

The Court finds that this evidence is sufficient to support Newborn's claim under the Lanham Act.  In addition to Albion customers like Anthony Carroll, George Hall, and Rene DesRochers were deceived into thinking that almost all Albion products were made in America.  Though George Hall and Kevin Johnson were aware that Albion's B-line was made in Taiwan, this does not negate his misunderstanding about the origins of Albion's Deluxe and Super Deluxe products.

The Court does not regard the fact that Anthony Bartle was not deceived by Albion's statements as being fatal to Newborn's case.  Newborn is not required to demonstrate that every potential customer was deceived in order to meet its burden.  Though anecdotes about Reynold's conversation with Crawford and Reynold's estimation of 3M and Hilti's understandings are not dispositive, they do support a finding that consumers were actually deceived.

<ul>
<li>iii.  Element Three: Materiality</li>
</ul>

"The materiality inquiry focuses on whether the false or misleading statement is likely to make a difference to consumers." Bracco Diagnostics Inc., 627 F.Supp.2d at 478 (internal quotations omitted).  Similar to the discussion of element two, materiality can be presumed from a literally false statement for a claim of injunctive relief.  See U.S. Healthcare, 898 F.2d at 922; see also Bracco Diagnostics, 627 F.Supp. 2d at 478 ("Once it is determined that a statement is false, it is presumed to be material" (citing Telebrands Corp. v. E. Mishan & Sons, No. 97-1414 1997 WL 232595, at *22 (S.D.N.Y. May 7, 1997)).

For monetary relief (or is equivalent), regardless of whether a statement is literally false or misleading, a plaintiff must prove materiality.  Bracco Diagnostics, 627 F.Supp. 2d at 478-79 ("[A]lthough the presumption of materiality, as it applies when there is a finding of literal falsity, is highly relevant to injunctive relief, the Court needs to make additional findings before imposing an award of damages . . ."); see also Pizza Hut, Inc., 227 F.3d at 497.  "Without a showing of materiality, "a statement in advertising, even if false, would have no economic impact and could cause no injury." Pamlab, L.L.C. v. Macoven Pharms., L.L.C., 881 F.Supp.2d 470, 477 (S.D.N.Y. 2010).  This element requires that a plaintiff "prove that the defendant's deception is 'likely to

influence the purchasing decision.'" Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 311 (1st Cir. 2002) (quoting Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 33 n. 6 (1st Cir. 2000)).

In Parkway Baking, the Third Circuit held that the plaintiff failed to show materiality where the plaintiff "introduced no evidence that anyone who purchased 'Hollywood' bread with the false designation on the wrapper did so because of the false wrapper, nor is there any evidence that anyone would have refused to purchase this bread had they known of the fallacious label." 255 F.2d at 648-49.

According to the Second Circuit, Plaintiff can establish materiality by "showing that the false or misleading statement relates to an 'inherent quality or characteristic' of the product." Cashmere & Camel Hair Mfrs. Inst., 284 F.3 at 311-12 (citing National Basketball Ass'n v. Motorola Inc., 105 F.3d 841, 855 (2d Cir. 1997)).

The Second Circuit further held that a statement is material when "the defendant and plaintiff are competitors in the same market and the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiffs." Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d 48, 70-71 (2d Cir. 2016) (citing Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186,

190 (2d Cir. 1980)).  Similar to the Second Circuit's description of materiality, a court in the District of Maryland held that "a statement is material if it describes a product or service as having a characteristic that most consumers would find appealing."  Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC, 875 F.Supp.2d 511, 529 (D. Md. 2012).

The Court finds that because Newborn seeks monetary damages or its equivalent, it would be inappropriate to presume materiality in this case.  Newborn must therefore prove that Albion's statements about its products' country of origin were material.  After reviewing the facts discussed below, the Court finds that Newborn has met this burden.  Newborn has introduced both direct and circumstantial evidence showing that Albion's deception is likely to influence consumers' purchasing decisions.

Unlike the plaintiff in Parkway Baking, Newborn has introduced evidence that customers who purchased Albion dispensing guns with a false designation on the packaging did so because of the false designation and would have refused to purchase this product if they had known of the fallacious label.  According to Reynolds, David Crawford purchased and used Albion products that were packaged with Albion promotional materials bearing the claim "All Albion Products are Made in America."  Crawford expressed to Reynolds that he would not use Newborn

93

products because they were made overseas.  Though Albion argues about the reliability of the Internet forum comment Newborn introduced, this comment provides another example of a customer who purchased an Albion dispensing gun bearing a false designation and would have refused to do so had they known that not all Albion products are made in America.

Furthermore, Newborn has demonstrated that Albion and Newborns are competitors in the same market and that Albion's false advertising is likely to lead consumers to prefer Albion's products over Newborn's.  Albion argues that Newborn has not established a sufficient level of competition between Albion and Newborn to establish the materiality of Albion's made in America claims.  The Court acknowledges that the industrial/professional manual dispensing gun market relies on distributor-manufacturers other than Albion and Newborn, such as Cox and Kenseal.  The Court further acknowledges that Albion's and Newborn's product lines do not perfectly overlap in terms of versatility, features offered, and price.

However, having acknowledged these statements, it is clear that Albion and Newborn compete over some portion of customers, if not the large majority of them, within the professional/industrial market.  Albion acknowledges that it wanted to distinguish itself from Newborn to gain access to Sphere 1.  Schneider testified that Albion and Newborn's

spatulas were virtually identical, prompting Albion to briefly add an American flag to its sell sheets.  The parties agree that Albion and Newborn are the only caulking gun distributors within the SEAL Group, suggesting that the two companies compete for business within this group.  Albion's offer to its customers to replace Newborn guns for its customers further illustrates that Albion and Newborn products are reasonable substitutes for one another.

Having established that Albion and Newborn compete in the same market, the Court must next determine whether Albion's made in USA claims led customers to prefer Albion's products.  Robert Wallace testified that a "Made in USA" claim has "tremendous value" and was a factor in a significant portion of consumer decisions.  Nowlis acknowledged that "sometimes 'Made in the USA' is material to some people."  These people included Anthony Carroll, who testified that he actively tried to buy American-made products.  George Hall similarly testified that he had met and served customers, many of whom were union members, who would have pursued other brands like Cox and Newborn if not for Albion's Made in America claims.

Rene DesRochers similarly agreed that made in America claims were "perhaps a purchasing decision or concern."  Kevin Johnson of Smalley contacted Lee, stating that he had customers ask for made in America products specifically.  Lance Florian

testified that a product being made in America was so preferable that for some customers, it justified a price increase.  The research Albion solicited in the late 80s and early 90s also suggested a similar trend: products made in America are worth a premium.  This testimony also supports a finding that a dispensing gun being made in America is a characteristic that most consumers would find appealing.

The parties do not dispute that there are multiple factors that influence a customer's decision to purchase dispensing guns.  Newborn asserts that is sufficient to show that Albion's "made in America" claims were one of several factors that influenced consumers' decisions.  Albion contends that because purchasers buy Albion products for reasons other than the country of origin, Newborn has failed to meet its burden. Albion contends that the fact that not all of its advertising materials contain a Made in America claim is evidence that this was not a point of emphasis for Albion.  As further evidence, Albion highlights that each version of its website contains hundreds of pages.  Therefore, according to Albion, the "Albion Difference" page on its website was likely not material to any customers due to its obscurity and lack of emphasis on the claim the country of origin of Albion products."

The Court finds that Newborn was not required to demonstrate that customers were purchasing Albion products *only*

because they were made in America.  The Court finds that
Albion's claims were material in light of the substantial
evidence that many customers consider it a relevant factor.

            iv. Element Four: Travel in Interstate Commerce

    The parties agree that Albion's products travel in
interstate commerce.  Plaintiff has therefore satisfied this
element.

            v. Element Five: Injury

    As discussed above, Plaintiff's burden of proof for
injunctive and monetary relief differ.  In denying Albion's
motion for summary judgment, this Court has previously
determined that "Newborn in not entitled to a presumption that
Albion's allegedly literally false statements caused it injury
in the form of diverted sales." Newborn, 2016 U.S. Dist. Lexis
181611 at *11.  In the same opinion, this Court also held that
Newborn "should be put to its proofs" as to specific dates,
impacted products, and false statements accompanying those
sales.  Newborn at *15.

    Under both standards, "a plaintiff must plead (and
ultimately prove) an injury to a commercial interest in sales or
business reputation proximately caused by the defendant's
misrepresentations."  Lexmark Int'l., 572 U.S. at 140.  The
Supreme Court further defined proximate causation in Lanham Act
cases by stating that "a plaintiff suing under § 1125(a)

ordinarily must show economic or reputational injury flowing
directly from deception wrought by the defendant's advertising;
and that occurs when deception of consumers causes them to
withhold trade from the plaintiff."  Id. at 133.

> a. Injunctive Relief

Section 34 of the Lanham Act authorizes courts to grant
injunctive relief.  15 U.S.C. 116 ("Courts . . .  shall have the
power to grant injunctions, according the principles of equity .
. .").  Indeed, an injunction has become the "usual and normal
remedy" and "the usual historical practice has been that a
prevailing plaintiff in a case of trademark infringement or
false advertising will ordinarily receive permanent injunctive
relief of some kind."  5 J. Thomas McCarthy, Trademarks & Unfair
Competition § 30:1 (4th ed. 2006).

The Third Circuit has ruled that there is no presumption of
irreparable harm for injunctive relief for false advertising
claims under the Lanham Act.  Ferring Pharms., Inc. v. Watson
Pharms., Inc., 765 F.3d 2015, 216, 219 (3d Cir. 2014) (upholding
the district court's denial of a preliminary injunction because
the plaintiff failed to demonstrate that it would likely suffer
irreparable harm).  To successfully seek an injunction, a
plaintiff must demonstrate that "that there is a likelihood of
injury to the plaintiff in terms of declining sales, loss of
good will, etc."  BreathAsure, 204 F.3d at 91-92.  This

demonstration must be "something more than a mere subjective belief that he is . . . likely to be damaged." BreathAsure, 204 F.3d at 93.  Plaintiffs must also prove that there is "a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising." Id. at 95 (inner markings omitted) (quoting with approval Carter-Wallace, 631 F.2d at 190).  Plaintiffs must show more than direct competition between the parties in order to prove a likelihood of economic injury proximately caused by alleged false or misleading advertising.  Gravelle v. Kaba Ilco Corp., 684 Fed. Appx. 974, 980-81 n. 5 (Fed. Cir. 2017).

The normal considerations for granting a permanent injunction apply to a Lanham Act claim.  The Court must consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of a permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest.  Bracco Diagnostics, 627 F.Supp.2d at 479.

For a party seeking injunctive relief, "irreparable injury does not require diversion of actual sales and it can include the loss of control of reputation, loss of trade, and loss of goodwill."  W.L. Gore & Assocs., Inc. v. Totes Inc., 788 F. Supp. 800, 810 (D. Del. 1991) (granting an injunction where

"tarnish to a reputation" and "repeated claims of competitive superiority made to the same market of consumers will eventually lead to lost sales and deprive [Plaintiff] of a legitimate competitive advantage."). In cases of false advertising claims, "the public has a right to information that will allow them to assess the quality of a product and to accurately price the product in accordance with their priorities and desires." Id. at 813 ("False advertising deprives the consumer of this information and deceives them into thinking that they are buying a less expensive equivalent, a bargain on a quality product.").

"[W]here there has been a cessation of the conduct complained of, at any time prior to the judgment, it is a matter for the exercise of the discretion of the court, as to whether an injunction should issue." Parkway Baking, 225 F.2d at 649.

Monetary Relief

Section 35 of the Lanham Act authorizes courts to consider monetary damages, including "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C. 1117(a). This section also states that monetary relief "shall constitute compensation and not a penalty." 15 U.S.C. 1117(a). As stated above, the causation standard for monetary is higher than the causation standard for injunctive relief. Bracco Diagnostics, 627 F.Supp.2d at 480. In light of this higher standard, a plaintiff must "link the

alleged deception with actual harm to its business." MB Imps., Inc. v. T&M Imps., LLC, 2016 WL 8674609 (D.N.J. 2016) (internal quotations omitted).  This Court has previously held that "a competitor suing for literally false advertising and seeking monetary damages as a remedy must make a showing of actual injury."  Newborn at *13; Bracco Diagnostics, 627 F.Supp.2d at 480.  Frequently, this injury will take the form of diverted sales.  Newborn, 2016 U.S. Dist. Lexis 181611 at *13.  An inference based on the chronology of events is not an adequate showing of diverted sales where other equally credible theories exist.  Bracco Diagnostics, 627 F.Supp.2d at 488; Larry Pitt, 294 F.Supp.3d at 342.  The Eighth Circuit has further held that "in a suit for money damages where a defendant misrepresented its own product but did not specifically target a competing product, plaintiff may be only one of many competitors, and without proof of causation and specific injury each competitor might receive a windfall unrelated to its own damage." Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1335-56 (8th Cir. 1997).

Uncertainty of the quantity of damages does not negate the plaintiff's burden of proving an injury in fact.  "Injuries and damages are separate inquiries under the Lanham Act." Gravelle, 684 Fed. Appx. at 981.  However, without injury, there can be no damages.  Id.  The Supreme Court has also held that "[e]ven when

a plaintiff cannot quantify its losses with sufficient certainty to recover damages, it may still be entitled to disgorgement of defendant's ill-gotten profits."  Lexmark, 572 U.S. at 135-36.

Once the plaintiff proves entitlement to monetary relief, the Court will weigh the factors the Third Circuit listed in Banjo Buddies Inc. v. Renosky to determine if equity weighs in favor of disgorging the defendant's property.  399 F.3d 168, 175 (3d Cir. 2005).  These factors include: (1) whether the defendant had the intent to confuse or deceive; (2) whether sales have been diverted; (3) the adequacy of other remedies; (4) any unreasonable delay by the plaintiff in asserting his rights; and (5) the public interest in making the conduct unprofitable; and (6) whether this is a case of palming off. Id.; see also Merisant Co. v. McNeil Nutritionals, LLC, 515 F.Supp.2d 509, 529 (E.D. Pa. 2007) (discussing and applying the approach used by the Third Circuit in Banjo Buddies).

The Court finds that Newborn has established that it is entitled to both injunctive and monetary relief.

Regarding Newborn's request for injunctive relief, Newborn seeks a permanent injunction ordering Albion to: (1) cease the allegedly false advertising; and (2) take corrective action in the form of (a) a press release and website posting "regarding the court's decisions" and (b) corrective advertisements which

would stat that "the products at issue are not manufactured in the United States and are made in Taiwan.

Newborn has shown actual success on the merits.  Newborn has also shown that it would be irreparably injured by a denial of injunctive relief.  Albion's repeated claims that its products are made in America, which as discussed above, is closely related to competitive superiority in the dispensing gun market, has led to lost sales and deprived Newborn of its competitive advantage.  Despite Newborn's best efforts to emphasize its added features and lower prices, Newborn has struggled to compete with Albion in the professional/industrial market.  Newborn's evidence demonstrates that its competitive advantages were undercut by Albion's claims that its products were made in America.  Customers like Extech, Giroux, and Crawford Construction did not consider purchasing from Newborn, but did purchase from Albion, despite the fact that neither company produces all of its products in the United States.

The Court finds that the granting of a permanent injunction will not result in even greater harm to Albion.  According to Albion, it has already ceased most of the allegedly false advertising.  Albion has not introduced evidence that the corrective actions Newborn seeks would be cost-prohibitive or harmful to Albion.  In light of this alleged ceased false

advertising, it is within the Court's discretion to order a permanent injunction.

Lastly, the public interest weighs in favor of granting a permanent injunction. Allowing the public to access updated, accurate, and nuanced information about the country of origin of Albion products will allow consumers to make better decisions that accurately reflect their preferences.

With regards to Newborn's request for monetary relief, the Court finds that Newborn has demonstrated that it is entitled to monetary damages. Newborn no longer seeks lost profits as part of its monetary relief, and only requests disgorgement of Albion's profits.

The Court finds that Newborn has linked Albion's deceptive statements to an actual injury. In Newborn's case, its injury manifests in the form of diverted sales. Both Skluzak and Lee testified that following the filing of the lawsuit and increased attention on the country of origin of Albion's products, Newborn reported an increase in sales. Skluzak testified that the doubled his commissions and made sales to customers he had previously tried to sell to unsuccessfully. These customers included Cade Construction, Midwest Sealant & Supply, Lance Construction, Triangle Fasteners, R.L. Wurz, Atlas Supplies, Tom Brown, Lowry's, and S&S Sales.

Lee testified more generally about Newborn's profits, which he estimated doubled between 2012 and the third quarter of 2015. Lee pointed to Newborn's five-fold increase in sales to Smalley, a member of the SEAL Group with a preference for American-made products.  According to Lee, Newborn saw the greatest growth in products that compete directly with Albion products. Specifically, Newborn products that compete with Albion's B-line guns were a source of large growth during this period.

According to Skluzak and Lee, this uptick in sales is not attributable to any changes in pricing or sales force at Newborn.  Instead, Lee testified that the only change he noticed during this time was in the way that Albion was marketing its products.

Albion contends that this chronology is insufficient to establish injury because there are equally credible theories that explain the increase in sales.  Albion suggests that Newborn's growth is attributable to the rebounding of the market following a global recession in 2008 and 2009.  To support this theory of global growth, Albion contends that it also experienced growth in all business segments during this time period.  Albion also offers Newborn's innovative displays and new, popular products as explanations for this increase in sales.

In response, Lee testified that Newborn's sales had not been severely curtailed by global economic recession, and therefore it was unlikely that this upswing in sales is attributable to a market rebound.  Otherwise, Lee did not contest Albion's alternative explanations.

If this chronology was Newborn's only evidence of injury, this evidence may not be sufficient to establish that Newborn is entitled to monetary relief.  However, instead of merely focusing on sales that came to Newborn as a result of increased public attention on Albion's country of origin claims, Newborn also highlights sales it never made because they were diverted to Albion.  Newborn points to George Hall's testimony that he pushed Albion products to the detriment of Newborn's at D.M. Figley.  Hall testified that he sold more Newborn products once he became aware that Albion products contained foreign content. Similarly, Newborn relied on testimony from Carroll, Crawford, and Skluzak regarding diverted sales at Western Waterproofing, Crawford Construction and Giroux.  At these stores, buyers' beliefs that Albion manufactured all its products in America led them to disregard Newborn as a viable option for its customers. Newborn also contends that it lost its sales at ABC Supply to Albion as a result of ABC Supply's preference for American-made products.  Furthermore, Newborn also asserts that it was injured by losing its exclusive status at Sphere 1 because Albion

distinguished itself as an American manufacturer.  Taking this evidence together, the Court finds that Newborn has proven a causal connection between Albion's deception and its injuries.

In weighing the factors listed in Banjo Buddies, the Court finds that equity weighs in favor of disgorging Albion's profits.  Albion intended to distinguish itself from Newborn by stating that all of its products were made in the United States to the detriment of its customers understanding of where Albion products were made.  As stated above, Newborn has demonstrated that Albion's statements diverted sales away from Newborn. Given that Albion has made these false statements over a number of years, the Court finds that other remedies such as a permanent injunction are not adequate in this case.  Albion argues that Lee and Newborn have been aware that its B-line guns were produced overseas for a number of years but waited until 2012 to file this lawsuit.  The Court declines to penalize Lee and Newborn for conducting an investigation into the origin of Albion products, assessing its own market position, and consulting with the U.S. Customs and Border Patrol Agency before filing this suit.  As discussed above, the public interest weighs in favor of making false and/or deceptive advertising unprofitable.  These facts do not present a case of palming off; Albion was not attempting to present its products as being the same as Newborn's.  Taking these factors into consideration, the

Court determines that disgorgement of properties is appropriate in this case.

The Court need not determine with certainty the amount of damages Newborn is entitled to at this moment.  See Gravelle, 684 Fed. Appx. at 981.  For now, it is enough the Newborn has shown an actual injury.  If Albion's affirmative defense fail in whole or in part, the Court will schedule a subsequent hearing to hear evidence on damages.

## CONCLUSION

For the reasons stated above, Defendant Albion Engineering Company is liable for violations of the Lanham Act and the common law of New Jersey as to unfair competition.  Having ruled on the issue of liability, the Court will afford the parties 20 days to advise the Court has to how they wish to proceed regarding Albion's asserted affirmative defenses.

An appropriate Order will accompany this Opinion.


Date: August 22, 2020                    s/ Noel L. Hillman
At Camden, New Jersey                    NOEL L. HILLMAN, U.S.D.J.