### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

———————————————

NEWBORN BROS. CO., INC.,

               Plaintiff,          1:12-cv-02999-NLH-AMD

     v.                      **OPINION**

ALBION ENGINEERING COMPANY,

               Defendant.

———————————————

<u>**APPEARANCES**</u>:

JOHN-PAUL MADDEN
TIMOTHY R. BIEG
MADDEN & MADDEN
108 KINGS HIGHWAY EAST, SUITE 200
P.O. BOX 210
HADDONFIELD, N.J. 08033

     *Attorneys Plaintiff Newborn Bros. Co., Inc.*

JEFFREY M. SCOTT
ARCHER & GREINER, PC
ONE CENTENNIAL SQUARE - P.O. BOX 3000
HADDONFIELD, N.J. 08033

KERRI E. CHEWNING
ARCHER & GREINER
1025 LAUREL OAK ROAD
VOORHEES, N.J. 08043

     *Attorneys for Defendant Albion Engineering Company.*

<u>**HILLMAN**</u>, District Judge

     The Court received evidence relevant to Plaintiff Newborn

Bros. Co., Inc.'s ("Newborn") request for disgorgement of

Defendant Albion Engineering Company's ("Albion") profits during

a bench trial which took place over the course of four days

between December 13, 2023 and December 19, 2023.[1]  This opinion
represents the Court's findings of fact and conclusions of law
pursuant to Federal Rule of Civil Procedure 52.

## I. Background

The Court presumes the parties' familiarity with the facts
of this protracted litigation and recites only those facts
relevant to the issue of disgorgement and injunctive relief.
Newborn filed suit on May 18, 2012 alleging violations of the
Lanham Act, 15 U.S.C. § 1125(a), and unfair competition premised
on allegedly false statements, misrepresentations, and omissions
of the geographic origin of Albion products.  (ECF 1 at ¶¶ 120-
58).  On December 20, 2016, the Court denied the parties' cross-
motions for summary judgment, (ECF 187; ECF 188), and the case
proceeded to trial during the spring and summer of 2017.  The
case was thereafter stayed, (ECF 328), and administratively
terminated, (ECF 329), while the parties pursued resolution
through mediation.  The case was reopened on July 6, 2018, (ECF
333), and the parties made post-trial submissions.

---

[1] The Court additionally held evidentiary hearings on November
29, 2023; November 30, 2023; and December 6, 2023 to supplement
the record on the issue of a potential permanent injunction.
(ECF 429; ECF 430; ECF 433).  The Court also heard oral argument
for Newborn's motion in limine to exclude Albion's substitute
expert, Brett A. Margolin, Ph.D., on December 11, 2023.  (ECF
434).  The Court denied Newborn's motion in a subsequent opinion
and order.  (ECF 444; ECF 445).

In its August 22, 2020 opinion, the Court found a number of Albion statements actionable under the Lanham Act – including affirmative statements that "All Albion products are Made In America" and "All our dispensing products and accessories are designed and manufactured in the USA, from our location in Philadelphia, Pennsylvania," (ECF 363 at 65), and held that signed certificates of origin, website and catalog statements, products stamped "ALBION ENG. CO. PHILA. PA. U.S.A.," product markings indicating seventy-five or eighty years of American manufacture, and similar representations were all false or misleading, (id. at 73-82).  The Court further determined that Newborn met its burden in demonstrating that customers were deceived by these misrepresentations and that they were material to purchasing decisions.  (Id. at 82-97).  Finally, after balancing the appropriate factors, the Court held that permanent injunctive relief and disgorgement of Albion's profits were both warranted.  (Id. at 102-08).

The Court's opinion and order directed the parties to make proposals concerning Albion's asserted affirmative defenses.  (Id. at 108; ECF 364).  In a February 26, 2021 order, the Court advised that unclean hands was the only affirmative defense for which the record was incomplete and ordered the parties to meet and confer and propose trial dates to elicit related testimony.  (ECF 371).  The Court subsequently denied Albion's request to

reopen the record for evidence concerning its affirmative defense of failure to state a claim and denied its laches, waiver, estoppel, statute-of-limitations, failure-to-state-a-claim, and lack-of-standing defenses.  (ECF 372; ECF 373).

A bench trial was held on Albion's unclean-hands defense from July 19, 2021 to July 21, 2021, (ECF 380; ECF 381; ECF 382), and following post-trial submissions, the Court allowed supplemental letters indicating the last date on which Newborn engaged in conduct similar to Albion's unlawful conduct, (ECF 407).  The Court later held that Albion adequately supported its unclean-hands defense and set February 7, 2007 – the date of a declaration supporting Newborn's trademark renewal application – as the date prior to which relief from the Court's earlier opinions would not be granted, (ECF 410 at 10-13; ECF 411).

Evidentiary hearings were held on November 29, 2023; November 30, 2023; and December 6, 2023 concerning Newborn's request for a permanent injunction.  (ECF 429; ECF 430; ECF 433).  The Court held a bench trial on disgorgement on December 13, 2023; December 14, 2023; December 15, 2023; and December 19, 2023.  (ECF 438; ECF 440; ECF 441; ECF 447).  The parties, at the Court's request, have submitted for its consideration proposed findings of fact and conclusions of law.  (ECF 454; ECF 455; ECF 455-1).  Albion has also applied to reopen the record concerning its unclean-hands defense in light of the belated

4

disclosure by Newborn of a photo of a product bearing the "Newborn USA" logo taken in May 2019, (ECF 432), and moved to strike the rebuttal testimony of Newborn's expert, Joseph Lesovitz, (ECF 452). Those arguments are addressed below.

## II. Discussion

### A. Jurisdiction

The court exercises original jurisdiction over this matter pursuant to the Lanham Act. See 15 U.S.C. § 1121(a); see also 28 U.S.C. 1331. It exercises supplemental jurisdiction over Newborn's common-law claim. See 28 U.S.C. § 1367(a).

### B. Bench Trials

In an action tried without a jury, a court must state its findings of fact and conclusions of law, which "may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1). Despite the separateness contemplated by Rule 52, see id., the Third Circuit has permitted findings of fact and conclusion of law to be stated together, see Pierre v. Hess Oil Virgin Islands Corp., 624 F.2d 445, 450 (3d Cir. 1980) ("It was not required under Rule 52 of the Federal Rules of Civil Procedure that the findings and conclusions be stated separately."); see also Ciolino v. Ameriquest Transp. Servs., Inc., 751 F. Supp. 2d 776, 778 (D.N.J. Nov. 22, 2010) (citing Pierre and issuing an opinion constituting its findings of fact and conclusion of law).

**C. Lanham Act[2]**

Both injunctive and monetary relief are available under the
Lanham Act, see 15 U.S.C. §§ 1116(a), 1117(a), with injunctive
relief representing "the 'usual and standard remedy,'" MB
Imports, Inc. v. T&M Imports, LLC, No. 10-3445, 2016 WL 8674609,
at *5 (D.N.J. Dec. 23, 2016) (quoting Bracco Diagnostics, Inc.,
627 F. Supp. 2d at 479).  The causation standard for monetary
damages is higher than that for injunctive relief.  Id.
District courts exercise significant discretion in awarding
injunctive and monetary relief.  See Ferring Pharms., Inc. v.
Watson Pharms., Inc., 765 F.3d 205, 210 (3d Cir. 2014) (noting

---

[2] The Court acknowledged in its 2020 opinion that the parties did
not distinguish Newborn's Lanham Act and unfair competition
claims in their briefing.  (ECF 363 at 58 n.11).  Having
concluded that Newborn was successful in its Lanham Act claim,
the Court similarly found as to its unfair competition claim
because the legal analysis for both was the same.  (Id.).  The
Court reiterates that conclusion here.  See Cambridge Pavers,
Inc. v. EP Henry Corp., 407 F. Supp. 3d 503, 509-10 (D.N.J.
Sept. 10, 2019) ("[U]nfair competition claims under New Jersey
statutory and common law generally parallel those under § 43(a)
of the Lanham Act." (alteration in original) (quoting Bracco
Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384,
454 (D.N.J. June 5, 2009))); CSC Holdings, LLC v. Optimum
Networks, Inc., 731 F. Supp. 2d 400, 411 (D.N.J. Aug. 17,
2010)("This state unfair competition provision is equivalent to
the federal unfair competition provision contained in Section
43(a) of the Lanham Act, and a claim for unfair competition
under New Jersey common law is substantially similar to these
statutory claims.  Accordingly, a finding of liability under
Section 43(a) of the Lanham Act leads to a finding of liability
under the New Jersey unfair competition law." (citations
omitted)).

that decisions to grant or deny motions for preliminary injunctions are reviewed for abuse of discretion); World Ent. Inc. v. Brown, 487 F. App'x 758, 762 (3d Cir. 2012) (finding that the district court did not abuse its discretion in disgorging profits).

The Lanham Act empowers courts to grant injunctions "according to the principles of equity and upon such terms as the court may deem reasonable" to prevent violations under 15 U.S.C. § 1125.  See 15 U.S.C. § 1116(a).  To warrant a permanent injunction, a plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.
>
> E.A. Sween Co., Inc. v. Deli Exp. of Tenafly, LLC, 19 F. Supp. 3d 560, 576-77 (D.N.J. May 13, 2014) (quoting eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006)) (granting injunctive relief as part of default judgment in a Lanham-Act action).

The Lanham Act also provides for the recovery of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  Courts deciding whether disgorgement of a defendant's profits is appropriate consider: 1) whether the defendant intended to confuse or deceive, 2) whether sales have been diverted, 3) the adequacy of other remedies, 4) whether the plaintiff

7

unreasonably delayed assertion of their rights, 5) the public interest in rendering misconduct unprofitable, and 6) "whether it is a case of palming off." Kars 4 Kids Inc. v. America Can!, 8 F.4th 209, 223 (3d Cir. 2021) (quoting Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 175 (3d Cir. 2005)). Disgorgement is not automatic and is to be "denied where an injunction satisfies the equities of a case." Id. (quoting A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 166 F.3d 197, 209 (3d Cir. 1999)).

It is the plaintiff's burden when assessing a defendant's profits to prove the defendant's sales while it is the defendant's burden to prove costs and deductions. See 15 U.S.C. § 1117(a). Therefore, for a disgorgement calculation, "the plaintiff first need only estimate the 'defendant's sales,' then the burden shifts to the defendant to deduct costs and show what portion of those sales are not attributable to the infringing conduct." See Juul Labs, Inc. v. 4X PODS, 509 F. Supp. 3d 52, 71-72 (D.N.J. Dec. 22, 2020) (citing 15 U.S.C. § 1117(a) and Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 206-07 (1942)).

**III. Analysis**

**A. Disgorgement**

The Court makes the following findings of fact on the issue of disgorgement.

- Newborn and Albion are direct competitors in the caulking gun market.  Newborn and Albion have both been members of organizations including Sphere 1, a trade organization and buying group, and Sealant Engineering and Allied Lines ("SEAL") group, a trade organization and the largest distributor of industrial sealants.  (2017 Trial Tr., Lee at 249:24 to 250:17, 251:17 to 252:2).  Newborn and Albion were the only two caulking gun manufacturers in the SEAL group.  (Id. at 250:16-17).

- While Albion President Mark Schneider identified Cox as "more of [Albion's] competitor than Newborn by far," (2023 Trial Tr., Schneider at 388:12-15), Cox did not participate in groups such as SEAL, Sphere 1, or others, (id. at 387:13-14; 2017 Trial Tr., Lee at 259:1-9).

- In a March 2011 letter to distributors, Schneider offered to trade Newborn products purchased by recipients for Albion products – in some cases offering greater than a one-for-one product match.  (2017 Trial Tr., Lee at 330:4 to 331:9).  Such evidence indicates to the Court that Albion and Newborn directly competed with one another and Albion acknowledged that fact through its conduct.

- Newborn President Albert Lee credibly testified that the nature and competition of the modern caulking gun market is such that many industrial distributors carry just one

vendor.  (2023 Trial Tr., Lee at 51:7-21).  Lee further
testified that material manufacturers ("OEMs") generally
have not split private label sales and use one
manufacturer.  (Id. at 82:7-16).  Newborn began private-
labeling guns and Albion followed suit, with guns sometimes
co-branded as Albion or Newborn products and sold next to
non-private-label guns at distributors.  (Id. at 82:17 to
83:22).

- Albion saw value and a strategic advantage in the
  marketplace by presenting itself as an American
  manufacturer.  In March 2009, Robert E. Reynolds, Albion's
  director of marketing, recorded in Albion's contract
  management system a conversation he had during an industry
  trade meeting with David Crawford, an end-user and owner of
  a Philadelphia-based caulking company.  (2017 Trial Tr.,
  Reynolds at 1583:5 to 1584:15).  Crawford had received a
  dozen free Newborn caulking guns to which Reynolds remarked
  that they were made in China, Crawford responded "[t]hat's
  how we got into this economic mess," and Reynolds noted in
  the contract management system that "Made in U.S.A. could
  become even more important during this economy."  (Id. at
  1584:19 to 1585:22).  In 2011, while seeking membership
  into Sphere 1, Albion sought to distinguish itself from
  importers such as Newborn – which was already a member – by

touting its status as an American manufacturer.  (Id. at 1802:12 to 1803:10).

- Testimony elicited at trial also demonstrated that a former Newborn customer, Lowry's, opted to give more business to Albion – to Newborn's detriment – upon a representation by Schneider that Newborn's products were made in China and Taiwan while Albion manufactured products in the United States.  (2017 Trial Tr., Glass at 905:13-24).  Lowry's, which had been a Newborn customer for several years, eventually ceased buying from Newborn in 2015 or 2016. (Id. at 905:25 to 907:1).  Lee testified that OEMs did not purchase Newborn products due to their foreign manufacture. (2023 Trial Tr., Lee at 61:23 to 62:11).

- In April 2007, Albion labeled caulking guns made for Hilti, an OEM, "Made in USA," despite the fact that the guns had imported barrels and handle assemblies.  (2017 Trial. Tr., Reynolds at 1775:12 to 1779:19).  Similarly, in September 2008, caulking guns erroneously labeled "Made in U.S.A." were provided to a customer, Minnesota Mining & Manufacturing Company, despite foreign components.  (Id. at 1783:21 to 1785:18).

- Anthony Carroll, former purchasing agent for a Denver-based specialty contractor – Western Waterproofing, testified that "Made in U.S.A." was an "underlying guideline" for his

purchasing and that he believed Albion products to be American made.  (2017 Trial Tr., Carroll at 1448:12 to 1449:12, 1450:9 to 1451:1)

- A June 2012 notice from United States Customs and Border Protection – which followed the evaluation of five shipping containers – directed that future imported shipments "must be marked with country of origin on stickers on each piece which are not easily removed, showing the country of origin in close proximity (next to, above or below) the line saying USA Manufacturer and Designer on product" and that the "Made in Taiwan" hangtags were "not in close proximity to line stating USA Manufacturer and Designer," to which Albion responded by placing "Made in Taiwan" stickers on handles.  (2017 Trial Tr., Schneider at 2592:19 to 2594:5, 2595:11 to 2600:22).

- A December 2012 change notice by Albion sought to confirm the deletion of certain labels on B-line guns and stated that "existing number 500-427 and 500-428 point of purchase labels used on the B12, B12Q, B26 and B26Q tools is illegal in regards to all country of origin regulations."  (2017 Trial Tr., Becker at 988:25 to 989:3, 989:17-22, 990:17-23).  White, self-adhesive "Made in Taiwan" labels were added to the handles of B-line tools in 2012 and later

replaced by stamped recoil plates.  (Id. at 992:15 to
994:15; 2017 Trial Tr., Schneider at 2602:4-14).

- Albion B-line guns feature a metal stamp on the recoil
plate indicating Taiwanese origin in addition to a hangtag.
(2017 Trial Tr., Schneider at 2602:4-14, 3790:25 to
3791:17).  Private-label B-line guns are similarly marked.
(2023 Evid. H'rg Tr., Schneider at 382:20 to 383:20).

- Lee testified that – in his experience – B-Line guns would
feature hangtags indicating Taiwanese manufacture.  (2023
Evid. H'rg Tr., Lee at 275:25 to 276:9, 282:11 to 283:3;
284:7-14).  Further, Tyler Hippen, Newborn's national sales
and marketing manager, acknowledged that if a gun featured
a "Made in Taiwan" hangtag, its purchaser would be aware of
its Taiwanese manufacture and assume that a subsequently
purchased gun would also be made in Taiwan.  (2023 Evid.
H'rg Tr., Hippen at 59:21 to 60:22).

- At the liability phase of trial, Lee testified that
Newborn's sales increased following Albion's change in
country-of-origin markings, with a fifty-percent increase
from 2011 to 2016.  (2017 Trial Tr., Lee at 375:6 to
376:10).  This assertion is supported by summary income
data provided in Newborn's expert's report.  (ECF 446-1 at
274-75).

Newborn advances in its proposed findings of fact and

conclusions of law that Albion diverted Newborn sales based on representations that its products were manufactured in the United States and Newborn's were not.  (ECF 454 Facts at ¶¶ 57-61, 66).  Newborn has met its burden in showing Albion sales of $31,811,390 while Albion has failed to meet its burden of establishing costs and other deductions, entitling Newborn to a disgorgement amount of $15,566,513 as calculated by Lesovitz. (Id. Law at ¶¶ 39-40).

Albion responds that Newborn has failed to show – as required by the Court – that it was harmed by any of Albion's actions and adds that Newborn has ignored factors beyond country of origin that would lead a customer to purchase Albion products.  (ECF 455-1 at ¶¶ 72-92).[3]  Albion further points to

---

[3] Albion also seeks to re-open the record for its unclean-hands defense.  (ECF 455-1 at ¶¶ 1-7).  During the evidentiary hearing, Plaintiff presented a photograph in the form of a PDF file of a distributor's display of caulking guns and accessories.  (2023 Evid. Hr'g Tr., Hippen at 44:4-15).  Counsel for Albion, appropriately so, requested the photograph in its native format.  (Id. at 14:23 to 15:11; ECF 432 at 16-17).  The original photograph showed a legacy Newborn accessory bearing the Newborn logo incorporating an outline of the United States, (2023 Evid. Hr'g Tr., Lee at 394:1-12, 418:13-19), the logo the Court relied upon in setting the outside date for disgorgement. Albion now argues that in light of this evidence the Court should reopen the unclean-hands record and consider the use of the Newborn logo as of the date of the photograph, May 7, 2019. (ECF 432 at 9).  While the Court is disturbed by the late production of this document and acknowledges that in some sense it is akin to the same conduct of Albion that Newborn complains of, the Court concludes that is insufficient to warrant a change in the Court's bar date.  First, the image shows an accessory,

14

the cost disparity between Albion and Newborn products – with many Albion caulking guns priced forty percent higher or more – as evidence that Albion and Newborn products do not compete in the marketplace and cites survey data and testimony that consumers' American-made preference cannot account for purchases made despite such cost disparities. (Id. at ¶¶ 104-124). Newborn has failed show that any purchasers of B-line guns were confused by their country of origin and Albion adds that such guns have always been marked and the labels boasting Albion's seventy-five and eighty years of American manufacture were true when made. (Id. at ¶¶ 136-59).

As a court within this Circuit has thoughtfully described, potential disgorgement of a defendant's profits proceeds in two stages. See Keurig, Inc. v. Sturm Foods, Inc., No. 10-841, 2013 WL 633574, at *1 (D. Del. Feb. 19, 2013) (citing Banjo Buddies, 399 F.3d at 176). In Stage 1, the plaintiff must demonstrate that an accounting is appropriate and courts, in turn, balance the Banjo Buddies factors. Id. If an accounting is deemed

---

and the Court has excluded accessories from the disgorgement calculation despite evidence in the record during the liability stage that Albion failed to properly mark accessories of foreign origin. (ECF 410 at 13 n.6). Second, unlike the pervasive nature of Albion's legacy products, displays and literature still present in the marketplace, this is single isolated incident of a single product. The Court concludes that it is of de minimus evidentiary value and immaterial to the Court's present and past rulings.

appropriate, the matter proceeds on to Stage 2 in which a court must estimate profits to be disgorged and it is there that the plaintiff must prove the defendant's sales and the defendant must prove "how much, if any, of its profits were not derived from its unlawful conduct."  Id. at *1-2; see also 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."); Am. Eagle Outfitters, Inc. v. Walmart, Inc., No. 2:20-CV-00412, 2023 WL 1778786, at *4 (W.D. Pa. Feb. 6, 2023) (noting, in a Daubert opinion, that district courts continue to rely upon the Supreme Court's pre-Lanham Act decision in Mishawaka Rubber & Woolen Manufacturing Co. in permitting defendants to present evidence that profits are unattributable to unlawful conduct).

The Court, in its 2020 opinion, considered the Banjo Buddies factors and concluded that Newborn demonstrated that disgorgement was appropriate.  (ECF 363 at 104-08).  That places this matter squarely in Stage 2.  It is therefore Newborn's burden to prove Albion's sales and Albion's burden to prove costs and other deductions from that amount.  See 15 U.S.C. § 1117(a).  The Court, as it advised during the August 21, 2023 status conference, expected to premise any disgorgement or denial thereof on findings – to be demonstrated by the parties – that products did or did not compete and customers' decisions to

16

purchase one product over another were or were not influenced by country of origin.  (2023 Status Hr'g Tr. at 17:7-17).

Lesovitz calculated Albion's total revenue from relevant products to be $31,811,390 from the start of the disgorgement period – February 8, 2007 – through 2015, representing approximately fifty-one percent of Albion's total revenue through 2013.  (ECF 446-1 at 4, 23-25; 2023 Trial Tr., Lesovitz at 143:1-20).  Lesovitz further determined that Albion's profits attributable to products at issue total $15,566,513.  (ECF 446-1 at 29-30).  The Court concludes that Newborn has met its burden.  See Avco Corp. v. Turn and Bank Holdings, LLC, 659 F. Supp. 3d 483, 503 (M.D. Pa. Mar. 2, 2023) ("Unlike lost profits, for disgorgement of profits, the plaintiff's burden is merely to demonstrate 'the infringer's sales before the burden of proof shifts to the defendant to show costs and deductions.'" (quoting Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc., 855 F.3d 163, 177 (3d Cir. 2017))).

Albion challenges Lesovitz's report and testimony for failing to differentiate between competing and non-competing products, analyze why a customer may purchase a particular caulking gun over another, or pinpoint actual confusion regarding the origin on B-line products.  (ECF 455-1 at ¶¶ 126, 129-38).  The Court presumes that these arguments derive, at least in part, from the Court's comments during the August 21,

17

2023 status conference that it would be inequitable to disgorge profits if the products at issue did not compete or the decision to purchase one product over another was unrelated to country of origin. (ECF 455 at ¶¶ 188-94 (advocating for the Court to disregard Lesovitz's report because it assumed competition between products and did not analyze other reasons for purchasing one product over another)). Such an argument misreads the Court's instructions.

While the Court did and does find that it would be inequitable and contrary to its responsibility under the Lanham Act to disgorge profits unrelated to Albion's offending conduct, it rejects any interpretation that places the burden of proof of the sales attributable to specific representations or consumer confusion affirmatively on Newborn. See Keurig, Inc., 2013 WL 633574, at *2 ("The court declines to place a burden of proof on plaintiff in the second stage to show defendant's sales attributable to the unlawful conduct."); Sabinsa Corp. v. Creative Compounds, LLC, No. 04-4239, 2011 WL 3236096, at *7 (D.N.J. July 27, 2011) ("A presumption of diversion of sales arises after a Plaintiff prevails on its infringement claim, and as long as the Plaintiff can show that monies were obtained by Defendant from sales of the infringing product, the burden is on the Defendant to overcome this presumption."). Rather, such burden is to be placed on Albion. See Avco Corp., 659 F. Supp.

18

3d at 495 ("When seeking to disgorge profits, 'the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.'  Such deductions include 'profits demonstrably not attributable to the unlawful use of' the plaintiff's trademark." (citation omitted) (quoting 15 U.S.C. § 1117(a) and then Members 1st Fed. Credit Union v. Metro Bank, No. 1:09-cv-1171, 2011 WL 208743, at *5 (M.D. Pa. Jan. 21, 2011))); Lontex Corp. v. Nike, Inc., No. 18-5623, 2021 WL 1145904, at *10 (E.D. Pa. Mar. 25, 2021) ("Once Lontex proves Nike's sales, the burden shifts to Nike to demonstrate the 'costs or deductions' which reduce the amount of its total sales to its profits.  Nike, through presentation of its own evidence and experts, may seek to introduce facts and make arguments regarding how a damages award should be calculated."); Members 1st Fed. Credit Union, 2011 WL 208743, at *5 (concluding that the First Circuit's holding "that 'once the plaintiff has shown direct competition and infringement, the statute places the burden on the infringer to show the limits of the direct competition'" was consistent with the Lanham Act's plain language and Supreme Court and Third Circuit caselaw (quoting Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 63 (1st Cir. 2008))).

The Court agrees with Judge Cavanaugh's observation in Sabinsa Corp. that "it appears difficult for a defendant,

19

innocent or not, to defend himself in a claim for disgorgement
of profits." 2011 WL 3236096, at *8. The Court further finds
that the applicable burden shifting allows for, and in some
instances encourages, parties to argue past one another to the
collective detriment of themselves and the Court. A plaintiff's
minimal obligation to prove sales and a defendant's heavier
burden to deduct costs, demonstrate a lack of competition or
confusion, and make other showings to subtract from the sales
figure do not naturally result in apples-to-apples comparisons.
Though a plaintiff need not present evidence of competition or
confusion, it may also be in its interest to go above and beyond
to present such evidence to anticipatorily rebut the defendant's
proofs. This, in the Court's recent experience, may be
especially so when the predicate for potential disgorgement is
country-of-origin markings and representations that may be
applicable or inapplicable across an array of products as
opposed to the more typical infringement of an identifiable
mark.

    So is the case here. Now in Stage 2, Newborn has presented
evidence of sales and Albion has focused its rebuttal not on
costs associated with those sales – which itself would be
difficult to decipher as the parties differ on underlying sales
figures – but rather the lack of competition among products and
consumer confusion. Albion also points to durability, quality,

goodwill, and other alternative factors that may explain customers' purchase decisions.  There are no apples-to-apples comparisons for the Court to make here, but rather oranges and bananas and pears.  In this cornucopia of data sets and competing contentions, the Court concludes that Albion has met most, but not all, of its heavy burden.

The Court first notes that the opinions of Lesovitz and Margolin start at different points.  While Lesovitz's report begins with total revenue of $31,811,390, (ECF 446-1 at 4), Margolin's report references sales up to $21.7 million and exhibit F(a) tallies net sales totaling a maximum of $16,571,646 for all Albion imported caulking guns deemed by Newborn to be competitive, (426-1 at 28, 45).  This discrepancy is attributable in part but not in whole to Margolin's assumption that the disgorgement period concluded on December 31, 2012 due to Albion's corrective actions, (id. at 5), while Lesovitz calculated revenues through 2015, (ECF 446-1 at 23).[4]

_____

[4] Following trial, Albion sought to strike Lesovitz's rebuttal testimony.  (ECF 452).  Lesovitz's rebuttal testimony focused on the materiality of discrepancies in data sets from an accounting perspective.  (2023 Trial Tr., Lesovitz at 417:6-20, 419:1 to 420:2).  Though these discrepancies may help explain, in part, the differences in the parties' starting figures, the Court has not considered the materiality of data discrepancies in its analysis, believes that the disgorgement sum below is equitable in light of the parties' multiple competing contentions – including competing starting figures, and would be inclined – in exercising its discretion under 15 U.S.C. § 1117(a) – to adjust

The Court finds some logic in Margolin's delineation. While, as will be explained below, the Court concludes that market confusion persists – largely in the form of legacy products – testimony at trial indicated that by the end of 2012, Albion took corrective measures with respect to the labeling of its products, (2017 Trial Tr., Becker at 988:25 to 989:3, 989:17-22, 990:17-23, 992:15 to 994:15), and Newborn's sales shot up in 2012 following the filing of the instant lawsuit and related notice to customers, (2017 Trial Tr., Lee at 372:3-16).

From these uneven beginnings, Margolin's analysis proceeds along a "process of exclusion," (2023 Trial Tr., Margolin at 200:23-24), whereby alleged lack of competition and consumer confusion whittle profits subject to disgorgement down to anywhere from $0 to $2.15 million with several intermediate levels in between, (ECF 426-1 at 28-31).  With respect to lack of confusion, Margolin posits that repeat purchasers of Albion B-line caulking guns – defined as customers who purchased a B-line gun during two or more separate years – were made aware of the guns' Taiwanese origin by way of a stamp, sticker, or hangtag and thus any subsequent purchase was made for reasons

---

a larger sum downward.  Therefore, to the extent that Albion contends that Lesovitz's rebuttal testimony was improper as it did not rebut any new matter or new theories, the Court will deny the request as moot because the testimony did not bear on the Court's decisions as articulated in this opinion.

unrelated to country of origin, (id. at 18-20; 2023 Trial Tr.,
Margolin at 234:25 to 235:10).  Excluding such customers,
according to Margolin's model, reduces applicable net sales to
$1,430,710 for Albion-label products and $183,717 for private-
label products.  (ECF 426-1 at 45; 2023 Trial Tr., Margolin at
236:3-12).[5]

The Court is persuaded by this reasoning.  The Court did
not seek to imply a "natural corollary," (ECF 426-1 at 18), when
it noted in its 2020 opinion that customers reviewing a catalog
or website may not encounter press releases or blog posts
stating that B-line guns were made in Taiwan – and even in that
very paragraph concluded that "in looking at the entire context
of Albion's messages . . . these statements remain literally
false or misleading," (ECF 363 at 80).  Nonetheless, it is
logical to the Court that a customer who purchased a B-line gun
would have been placed on notice of its foreign manufacture
between their initial purchase and a subsequent one made a year

---

[5] Margolin's testimony, (2023 Trial Tr., Margolin at 234:25 to
236:12), and Albion's proposed statement of facts, (ECF 455 at ¶
177 (quoting DTX-350)), both refer to a starting figure of
approximately $9.8 million for Albion-label products, which
differs from the starting figure of $10,253,688 in Exhibit F(a)
of the report placed on the docket for Newborn's motion in
limine and which the Court cites in this opinion, (ECF 426-1 at
45).  Relevantly, both versions conclude that $1,430,710 in net
sales remain after excluding repeat B-line purchases.  (Id.; ECF
455 at ¶ 177).

or more later.  Hippen acknowledged the same during the Court's
evidentiary hearing.  (2023 Evid. H'rg Tr., Hippen at 59:21 to
60:22).  Therefore, in the Court's view, the subsequent
purchases show a disregard for country of origin as a deciding
factor.

Margolin next seeks to exclude sales from Albion caulking
guns that were deemed to not be economically competitive with
Newborn products, which would further push relevant net sales
down to $122,443 for Albion-label guns and $62,884 for private-
label guns.  (ECF 426-1 at 45).  These exclusions are premised
on anecdotal trial testimony indicating that customers would be
willing to pay up to fifteen percent more for American-made
products, thus any purchases of Albion products priced above
fifteen percent cannot be attributed to country-of-origin
preference.  (Id. at 16-18; 2023 Trial Tr., Margolin at 249:21
to 250:19).  Margolin's exclusions were limited to Albion guns
priced fifteen percent or more above Newborn products, Albion
guns priced anywhere below Newborn guns remain.  (2023 Trial
Tr., Margolin at 284:10-21).

The Court is unpersuaded by Albion's economic-
competitiveness argument, which relies heavily on trial
testimony acknowledged – but not adopted – in the Court's 2020
opinion.  (ECF 363 at 39; 2023 Trial Tr., Margolin at 249:21 to
250:4).  There is no dispute that country of origin is just one

of a variety of factors that may lead a customer to purchase one
caulking gun over another, but it is also clear that Albion saw
value in representing itself as an American manufacturer and
sought to distinguish itself from competitors, particularly
Newborn, on that basis. (2017 Trial Tr., Glass at 905:13-24;
2017 Trial Tr., Reynolds at 1584:14 to 1585:2, 1802:12 to
1803:14).  Finding for Albion on this issue would risk, at least
in some instances, unjustly giving Albion the benefit of
excluding relevant products based on markups.

Having concluded that Albion has failed to meet its burden
in excluding these sales, the Court exercises its discretion in
fashioning an appropriate remedy.  See Zinn v. Seruga, No. 05-
3572, 2009 WL 3128353, at *33-34 (D.N.J. Sept. 28, 2009); see
also CPC Props., Inc. v. Dominic, Inc., No. 12-4405, 2013 WL
5567584, at *5 (E.D. Pa. Oct. 9, 2013) ("Courts have
considerable discretion in fashioning an appropriate remedy
under § 1117.").  Here, while factors beyond country of origin
are relevant in purchasing decisions, the Court finds no
definitive evidence quantifying the value of American
manufacture.  In that dearth, the Court declines to further
subtract from relevant sales, concluding that such ambiguity
most appropriately favors Newborn.  See Banjo Buddies, 399 F.3d
at 178 ("Even if Banjo Buddies receives a windfall in this case
– which, as discussed in the previous paragraph, is impossible

25

for this court to determine – it is preferable that Banjo
Buddies rather than Renosky receive the benefits of Renosky's
infringement." (citing Mishawaka Rubber & Woolen Mfg. Co., 316
U.S. at 206-07)); Keurig, Inc., 2013 WL 633574, at *2 ("In
placing the burden on the infringer to prove any proportion of
its total profits which may not be attributed to wrongful
conduct, § 35(a) errs on the side of giving a windfall to the
aggrieved party, rather than to the wrongdoer." (citing
Mishawaka Rubber & Woolen Mfg. Co., 316 U.S. at 206)).

The Court further declines to exclude private-label sales
from the disgorgement figure.  Exclusion of private-label sales
is based on the premise that "Albion's private label sales, by
definition, did not carry the Albion label and therefore could
not benefit from the actionable statements."  (ECF 426-1 at 20).
The Court is unable to find that Albion's private-label sales
are divorced from the same or similar cultivation of a
reputation as an American manufacturer as referenced above.  The
Court further credits trial testimony from Lee that some
private-label customers wish to market their products as
American-made and private-label guns are sometimes co-branded
with the original manufacturer.  (2023 Trial Tr., Lee at 82:7 to
83:22).  In the face of uncertainty as to the influence of
Albion's cultivated reputation, co-branding, and a history of
Albion mislabeling private-label guns, the Court concludes that

26

any potential windfall should favor Newborn.  See Banjo Buddies,
399 F.3d at 178.  Therefore, the Court will combine Margolin's
figures for Albion-label and private-label sales for a total of
$1,614,427.

Finally, Margolin's analysis calculates potential
disgorgement at thirteen percent of identified net sales, in
this case $209,875.  (ECF 426-1 at 45).  This deduction again
relies on the premise that a customer will pay no more than a
fifteen-percent premium for American-made products and a
fifteen-percent markup equates to a thirteen-percent profit
margin.  (Id. at 25, 25 n.42; 2023 Trial Tr., Margolin at 242:23
to 243:7).  The Court, as stated above, is unpersuaded by a
bright-line, fifteen-percent cutoff.  Further, it concludes that
it would be inequitable to permit Albion to keep eighty-seven
percent of the remaining net sales.  See Banjo Buddies, 399 F.3d
at 177-78 (rejecting the infringer's argument that the plaintiff
was entitled to only the percentage of profits it would have
received under a contract, concluding that "[a]llowing Renosky
to keep half the estimated profits of his infringing activities
would not serve the Congressional purpose of making infringement
unprofitable – Renosky would be unjustly enriched and other
would-be infringers would be insufficiently deterred").

This leaves the Court at a total disgorgement figure of
$1,614,427.  The Court will further grant injunctive relief

below.  Thought it recognizes that disgorgement is inappropriate when an injunction suffices, see Kars 4 Kids Inc., 8 F.4th at 223, the Court finds that disgorgement is necessary here to balance the effects of Albion's offending conduct, see Sabinsa Corp., 2011 WL 3236096, at *8 (disgorging profits despite finding that an injunction may have been sufficient upon a finding that a likelihood of confusion existed, a presumption of diversion of sales arose, and the infringer failed to overcome that presumption).  The sum of $1,614,427 is an appropriate approximation of the equities as well as the considerations to be balanced, including Albion's failure to meet its burden as to costs, the differing starting sales figures, the undetermined value of American-made designations and reputations, and the varied branding of private-label guns.  Disgorgement sums are to serve as compensation as opposed to a penalty, 15 U.S.C. § 1117(a), and the Court would be inclined to exercise its discretion in adjusting to a higher or lower recovery if met with a significantly greater or lesser figure, see Darius Int'l, Inc. v. Young, No. 05-6184, 2008 WL 1820945, at *53 (E.D. Pa. Apr. 23, 2008) ("The Court has wide discretion to fashion an equitable remedy and may increase or decrease the damages award as equity requires.").

The Court will similarly decline to enhance the sum. Newborn notes that recoveries may be enhanced pursuant to 15

U.S.C. § 1117 when recovery is inadequate or to deter further willful violations. (ECF 454 Law at ¶¶ 28-31). Deterrence, however, cannot serve as the basis for an enhancement. See Kars 4 Kids Inc., 8 F.4th at 224 n.22. Further, as described above, the Court finds $1,614,427 to be an adequate remedy and that enhancement would risk constituting an impermissible penalty. See Avco Corp., 659 F. Supp. 3d at 507 ("[C]ourts must be careful in enhancing damages, 'because granting an increase could easily transfigure an otherwise-acceptable compensatory award into an impermissible punitive measure.'" (quoting Kars 4 Kids Inc., 8 F.4th at 224)).

Finally, Newborn asserts that it is entitled to prejudgment interest. (ECF 454 Law at ¶¶ 44-45). Pursuant to the New Jersey Rules of Court, courts shall "include in the judgment simple interest . . . from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later" for tort actions. N.J. Ct. R. 4:42-11(b). Interest calculations are made at "the average rate of return, to the nearest whole or one-half percent, for the corresponding preceding fiscal year terminating on June 30, of the State of New Jersey Cash Management Fund" with a two-percent per-annum increase for judgments exceeding the monetary limit of the Special Civil Part of $20,000, see N.J. Ct. R. 4:42-11(a)(ii)-(iii), (b); see also N.J. Ct. R. 6:1-

2(a)(1)(stating that matters cognizable in the Special Civil Part include civil actions "seeking legal relief when the amount in controversy does not exceed $20,000").  Common-law unfair competition is a tort, see ADP, LLC v. Kusins, 215 A.3d 924, 951 (N.J. Super. Ct. App. Div. 2019), and prejudgment interest is awarded as a matter of right in tort actions, DC Plastic Prods. Corp. v. Westchester Surplus Lines Ins. Co., No. 17-13092, 2022 WL 17129205, at *2 (D.N.J. Nov. 22, 2022).  Disgorgement is an available remedy in New Jersey unfair competition claims.  See Avaya Inc., RP v. Telecom Labs, Inc., 838 F.3d 354, 387-88 (3d Cir. 2016).

Despite reference to prejudgment interest in Lesovitz's report, (ECF 446-1 at 30), and Newborn's closing, (2023 Trial Tr. at 454:23 to 455:2), prejudgment interest is not referenced in Albion's proposed findings of fact or conclusions of law. Margolin's report expressly states a lack of basis to opine on the applied rate or compounding methodology.  (ECF 426-1 at 27-28).  The Court will therefore include prejudgment interest totaling $533,577.00.[6]

---

[6] The Court calculates prejudgment interest by multiplying the $1,614,427 disgorgement sum by the applicable interest rate plus two percent.  See Promotion in Motion, Inc. v. Beech-Nut Nutrition Corp., No. 09-1228, 2012 WL 5045135, at *4 n.3 (D.N.J. Oct. 17, 2012); Atl. City Assocs., LLC v. Carter & Burgess Consultants, Inc., No. 05-3227, 2010 WL 1371938, at *3 (D.N.J. Mar. 31, 2010); see also N.J. Ct. R. 4:42-11(a)(ii)-(iii) (stating that interest is to be calculated to the nearest whole

This places the final sum to be awarded to Newborn at $2,148,004. Newborn has further expressed its intention to seek attorney's fees. (ECF 464 Law at ¶¶ 4, 46-47). The Lanham Act provides that reasonable attorney's fees may be awarded to a prevailing party "in exceptional cases," 15 U.S.C. § 1117(a), which may be found "when (a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner,'" Fair Wind Sailing, Inc. v. Dempster, 764 F.3d 303, 315 (3d Cir. 2014) (quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014)). This standard is a high one where, as here, the parties have engaged in twelve years of contentious, hard-fought litigation and have each obtained favorable rulings. See Kern v. Med. Protective Co.,

---

or half percent of the average rate of return of the preceding State of New Jersey Cash Management Fund plus two percentage points for judgments exceeding the monetary limit of the Special Civil Part); Post-Judgment and Pre-Judgment Interest Rates, N.J. Courts, https://www.njcourts.gov/sites/default/files/courts/civil/postprejudgmentrates.pdf (last visited on Feb. 28, 2024) (setting rates). Rounding to the nearest half percent, interest totals amount to $25,032.44 (2.5 percent interest) for the 227 days in 2012 following the filing of the complaint; $40,360.68 per year (2.5 percent interest) for 2013, 2014, 2015, 2016, 2017, 2018, 2022, and 2023; $56,504.95 per year (3.5 percent interest) for 2019 and 2021; and $72,649.22 (4.5 percent interest) for 2020. The Court declines to add additional interest for 2024 as the parties submitted final briefing on January 2, 2024 and did not contribute to any delay in rendering this decision. Applicable prejudgment interest thus totals $533,577.00.

Inc., No. 13-02286, 2019 WL 2265330, at *2-4 (D.N.J. May 28, 2019) (concluding that factual arguments were made in good faith and that, while discovery featured numerous related opinions and orders, neither party "resorted to wasteful procedural or dilatory tactics that would make th[e] matter exceptional"); Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC, No. 12-787, 2019 WL 1397387, *4-5, 7 (D.N.J. Mar. 28, 2019) (finding that the parties' protracted, contentious family-business dispute did not meet the exceptional standard).

The Court will therefore direct Newborn to make an application on the docket for attorney's fees within thirty days of the issuance of this opinion and accompanying order and provide Albion thirty days to file an opposition.  The Court will withhold entry of judgment until it renders a decision on the forthcoming application for attorney's fees.

**B. Injunctive Relief**

The Court makes the following findings of fact relevant to Newborn's request for injunctive relief.

- In 2012, Albion's counsel presented United States Customs and Border Protection with multiple manufacturing scenarios to determine under which scenarios products need not be marked "Made in Taiwan," to which Customs approved one presented scenario.  (PTX-123; 2023 Evid. Hr'g Tr., Schneider at 442:20 to 444:4).  In that approved scenario,

Scenario A, "[t]he handle, trigger, barrel, and barrel lock ring are imported and assembled with the other U.S. components." (PTX-123 at 2; 2023 Evid. Hr'g Tr., Schneider at 444:11-23).

- Scenario A was distinguished from Scenario B, which was not approved and included using imported square rods with threaded ends as well as an imported hinge pin and T-pull. (PTX-123 at 2, 5-6; 2023 Evid. Hr'g Tr., Schneider at 449:10-18). Schneider further distinguished the process in Scenario B, in which rod is threaded in Taiwan, and a process in which bar stock is threaded and completed in the United States. (2023 Evid. Hr'g Tr., Schneider at 448:19 to 449:1). Schneider testified that he did not consider rods to be imported when they are cut to length and threaded in the United States. (Id. at 453:1-15).

- On June 25, 2019, Newborn received a ruling from United States Customs and Border Protection on a proposed scenario in which steel rods imported from Taiwan were "cut to lengths ranging between 18 and 24 inches, threaded at both ends, stamped to make a small concave indent, and treated with black oxide for corrosion resistance." (PTX-2073). Customs concluded that such a process "does not constitute a substantial transformation" and "the country of origin is Taiwan for marking purposes." (Id. at 3). Lee testified

33

that Newborn sought this and other rulings for
clarification following the liability phase of trial.
(2023 Evid. Hr'g Tr., Lee at 203:2 to 204:18).

- Newborn ceased placing markings on B-line guns representing
Albion's eighty-year history of American manufacture
following the filing of the instant lawsuit in 2012.  (2017
Trial Tr., Schneider at 2549:22 to 2550:17; 2023 Evid. Hr'g
Tr., Schneider at 328:21-25).

- A December 2012 change notice stated that "[t]he existing
number 500-427 and 500-428 point of purchase labels used on
the B12, B12Q, B26 and B26Q tools is illegal in regards to
all country of origin regulations," a "Made in Taiwan"
label was added to handles, and that label was later
replaced by a stamp on the recoil plate.  (2017 Trial Tr.,
Becker at 988:8 to 994:15; 2017 Trial Tr., Schneider,
2602:4-15). The change notice also instructed the deletion
of point-of-purchasing labeling for several B-line guns.
(2017 Trial Tr., Becker at 1252:12-19).

- Albion guns stamped or otherwise marked to indicate
American manufacture are presently displayed across the
country.  These include a B-line gun labeled with "75 Year
History - USA Manufacturer & Designer," another caulking
gun stamped "ALBION ENG. CO., PHILA., PA U.S.A.," and a
bulk gun with a "Made in USA" label on display in Anaheim,

34

California in August 2023, (PTX-2055A; PTX-2055B; PTX-2055C); a gun stamped "ALBION ENG. CO., PHILA., PA, U.S.A." on display in Portland, Oregon in August 2023, (PTX-2071); a cutaway of a gun stamped with "ALBION ENG. CO., PHILA., PA, U.S.A." on display in Oklahoma City, Oklahoma in August 2023, (PTX-2099); a caulking gun with a "Made in USA" label on display in Orlando, Florida in September 2023, (PTX-2051); and a cutaway of a gun stamped with "ALBION ENG. CO., PHILA, PA, U.S.A." on display in Memphis, Tennessee in September 2023, (PTX-2053).

- One of Albion's distributors, Schroeder Log Homes, continued to advertise a B-line gun as American made until October 2023.  (PTX-2063; 2023 Evid. Hr'g Tr., Schneider at 320:25 to 321:24).  Further, an Albion catalogue from approximately 2009 accessible on the website of distributor Best Materials showed Albion guns featuring markings stating "75 Year History – USA Manufacturer & Designer" and otherwise referred to Albion as "a third generation American manufacturer."  (PTX-2068; PTX-2068A; 2023 Evid. Hr'g Tr., Lee at 251:11 to 253:3; 2023 Evid. Hr'g Tr., Schneider at 413:18 to 415:2).

- As of December 6, 2023, an imagine of a B-line gun bearing a "80-year history U.S. manufacturer" label was displayed

on the mobile version of Albion's website.  (2023 Evid.
Hr'g Tr., Schneider at 456:9 to 457:22).

In its proposed findings of fact and conclusion of law,
Albion argues that permanent injunctive relief is unnecessary
due to its efforts to rectify any previously improper labeling
and phase-out inaccurate or misleading marketing materials with
blanket references to American manufacture.  (ECF 455-1 at ¶¶
33-41).  The Court's 2020 opinion concluding that injunctive
relief is appropriate was based on evidence available as of
September 2017 as opposed to current practices, according to
Albion, and Newborn's current request for injunctive relief
based on Albion's current practices is unwarranted.  (Id. at ¶¶
42-51).  Newborn argues in response that evidence presented
during evidentiary hearings in November and December 2023 showed
that inaccurate or obsolete materials continue to appear on
displays and point-of-sale locations and proposes several
corrective injunctive measures.  (ECF 454 Law at ¶¶ 32-38).

"Under the Lanham Act, an injunction is a 'usual and
standard remedy' and 'the common historical practice has been
that a prevailing plaintiff in a case of . . . false advertising
will ordinarily receive injunctive relief of some kind.'"
Bracco Diagnostics, Inc., 627 F. Supp. 2d at 479 (omission in
original) (quoting 5 J. Thomas McCarthy, Trademarks & Unfair
Competition § 30:1 (4th ed. 2006)).  As stated above, a

36

plaintiff seeking a permanent injunction must demonstrate that they have suffered an irreparable injury, remedies at law are inadequate, an equitable remedy is warranted after balancing the parties' respective hardships, and the public interest will not be disserved by the permanent injunction.  E.A. Sween Co., Inc., 19 F. Supp. 3d at 576.

Though, in the Court's research, the substantial majority of relevant authorities have involved injunctions enjoining infringement of a plaintiff's mark, injunctions related to country of origin have been issued within this Circuit.  See Freddy S.p.A. v. Kalai, No. 20-628, 2022 WL 1411690, at *3 (D. Del. Apr. 28, 2022), report and recommendation adopted, 2022 WL 2915765 (D. Del. July 25, 2022) (recommending that the district court grant the plaintiff's motion for entry of default judgment and issue a permanent injunction enjoining the defendants from "falsely claiming that products sold on the Defaulting Defendants' website were 'made in the USA'"); see also 15 U.S.C. § 1116(a) ("The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions . . . to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title.").

The Court, in its August 2020 opinion, held that Newborn established its entitlement to injunctive relief.  (ECF 363 at 102).  In so holding, the Court considered the relevant facts

and concluded that Newborn would be irreparably harmed without
an injunction as Albion's American-made claims placed Newborn at
a competitive disadvantage, granting an injunction would not
cause greater harm to Albion, and that updated and accurate
country-of-origin information served the public interest. (Id.
at 103-04). Albion now argues that that was then and this is
now. However, in revisiting the relevant factors and hearing
the most recent evidence, the Court finds Albion's efforts to
use time as a means of preventing injunctive relief to be
unavailing.

First, the Court concluded in its August 2020 opinion that
Albion was liable for violating the Lanham Act. (Id. at 108);
see also Howard v. Laws, No. 13-0957, 2014 WL 3925536, at *8
(D.N.J. Aug. 12, 2014) (concluding that the plaintiff
demonstrated irreparable injury based on violations of the
Lanham Act). Specifically, the Court concluded that Albion's
repeated claims that its products were made in America were
"closely related to competitive superiority in the dispensing
gun market" and some customers refused to consider purchasing
from Newborn even though neither Newborn nor Albion manufactured
all of their products in the United States. (ECF 363 at 103).
Injury was not presumed in the Court's earlier opinion, (id.),
and is not presumed now. In so finding, the Court has weighed
Albion's position that it has proactively sought to correct and

phase-out representations of American manufacturer, does not make blanket statements about products' origin, does not mark products "Made in USA" even when manufactured entirely in America, and has relied upon and complied with the 2012 Customs ruling.  (ECF 455-1 at ¶¶ at 35-42).

Ultimately, however, the Court is unpersuaded that Albion's 2012 Customs ruling is "specific to its practices," (id. at ¶ 57), which only approved of a scenario in which "the handle, trigger, barrel, and barrel lock ring are imported and assembled with the other U.S. components," (PTX-123 at 2, 5-6).  Schneider testified that he did not consider rods to be imported when they are cut to length and threaded domestically, distinguishing that process from the disapproved Scenario B in which a rod is threaded in Taiwan.  (2023 Evid. Hr'g Tr., Schneider at 448:19 to 449:1, 453:1-15).

Though the Court does not accept the June 2019 ruling obtained by Newborn as per se evidence that Albion's practices do not comport with the approved Scenario A, it certainly points in that direction.  This leads, in turn, to a reasonable conclusion that Albion has intentionally foregone a subsequent, clarifying ruling, choosing instead to forego any country-of-origin markings at all.  While Albion portrays that decision as conservative and benign, it must be juxtaposed with the other evidence in the record that Made-in-America misrepresentations

39

persist in the marketplace.  The record contains more than sufficient examples of recent displays featuring products marked in such a way as to indicate American manufacture, (PTX-2051; PTX-2053; PTX-2055A; PTX-2055B; PTX-2055C; PTX-2071; PTX-2099), continued representations of the American manufacture of Albion products on third-party websites, (PTX-2063; PTX-2068; PTX-2068A), and an image of a B-line gun with a "80-year history U.S. manufacturer" label on the mobile version of Albion's website, (2023 Evid. Hr'g Tr., Schneider at 456:9 to 457:22).

The Court therefore finds that despite Albion's corrective efforts, the harms caused by its violative conduct remain imminent to the extent that they are ongoing.  See Tri-Union Seafoods, LLC v. Ecuatorianita Imp. & Exp. Corp., No. 20-9537, 2021 WL 1541054, at *9 (D.N.J. Apr. 20, 2021); see also Meenaxi Enter., Inc. v. Shakti Grp. USA LLC, No. 22-7383, 2023 WL 7181433, at *11 (D.N.J. Nov. 1, 2023) ("[T]here is irreparable harm based on the potential for continued infringement.").

Second, the Court finds that Newborn has adequately demonstrated, through the persistent presence of these representations, that the remedies available at law are inadequate.  "Monetary damages . . . cannot . . . prevent future trademark infringement." Cosmetic Warriors Ltd. v. Nailush LLC, No. 17-1475, 2017 WL 5157390, at *8 (D.N.J. Nov. 6, 2017).  Similarly, while the disgorgement sum seeks to account

for profits received to date, it cannot and will not protect
against continuing violative conduct.  See CrossFit, Inc. v. 2XR
Fit Sys., LLC, No. 2:13-1108, 2014 WL 972158, at *10 (D.N.J.
Mar. 11, 2014); see also Monster Energy Co. v. Vital Pharms.,
Inc., No. EDCV 18-1882, 2023 WL 2918724, at *6 (C.D. Cal. Apr.
12, 2023) (rejecting the defendants' argument that advertising
was not continuous due to new labeling and advertising and that
the harm of legacy products would soon be phased out).  The
inadequacy of compensation for past harm is all the more
apparent, in the Court's view, in light of the continuing
misrepresentations and lack of clarity in the market despite
Albion's assertion that it has engaged in corrective efforts for
more than a decade.

Third, the Court finds that the balance of equities favors
Newborn.  It concludes that, without an injunction, inaccurate
and misleading products, displays, and advertisements will
persist within the market.  This conclusion is supported by the
fact that such representation have continued, including on
Albion's own mobile website, despite this action being filed
nearly twelve years ago and Albion's purported immediate
corrective actions.  See Rolls-Royce Motor Cars Ltd. v. Davis,
No. 15-0417, 2016 WL 3913640, at *10 (D.N.J. Mar. 11, 2016)
(noting that the defendant continued infringement after being
notified of the plaintiffs' marks); Howard, 2014 WL 3925536, at

*9 (same).

The Court appreciates that the cost associated with compliance with an injunction will be compounded by the disgorgement sum awarded.  It concludes, however, that Albion cannot claim that it will be harmed by an injunction "since it brought any and all difficulties occasioned by the issuance of an injunction upon itself."  See Coach, Inc. v. Bag Place, Co., No. 10-6226, 2012 WL 13028160, at *8 (D.N.J. May 7, 2012) (quoting Opticians Ass'n. of Am. v. Indep. Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990)).

Finally, the Court holds that the public interest would not be disserved by issuance of a permanent injunction.  To the contrary, an injunction would benefit the public by eliminating continued confusion in the marketplace.  See Hayward Indus., Inc. v. Saltwater Pool Supplies, No. 20-6105, 2021 WL 1940711, at *15 (D.N.J. May 14, 2021); Tri-Union Seafoods, LLC, 2021 WL 1541054, at *9.

Therefore, the Court will grant the following injunctive relief:

First, within ninety days of the date of this opinion and accompanying order, Albion shall mail a letter and a copy of the order to each distributor it has sold a caulking gun to within the past five years.  The letter shall state that it is acting pursuant to an order from this Court and request that any

42

samples, displays, or other materials referencing "Phila. PA."
or referring to Albion caulking guns being "Made in USA" be
returned.  Albion must remove from the inventory of its
distributors any B-line guns that bear markings describing
Albion's history as an American manufacturer.  Albion shall
offer to replace any returned materials at its own cost.

Second, to each distributor Albion mails the above-
referenced letter and order, Albion shall also provide notices –
printed on durable cardboard or plastic and sized eight inches
by ten inches or larger – to be displayed at each location at
which Albion products are displayed and which shall state:

NOTICE REGARDING COUNTRY OF ORIGIN OF ALBION
ENGINEERING CAULKING GUN PRODUCTS

A judge of the United States District Court for the
District of New Jersey has ruled that Albion
Engineering Corp. has previously misrepresented that
certain products were "Made in USA," through product
mismarking and statements in advertising, promotional
materials, websites, and to customers.  Newborn
Brothers Co. Inc. v. Albion Engineering Co., No. 12-
Civ-2999 (NLH).

The Court has ordered Albion to comply with all
applicable country-of-origin marking and disclosure
requirements.  The Court has ordered Albion to provide
to its distributors copies of this notice so that they
may be displayed at all distributor sales locations.

Third, within 120 days of the date of this opinion and
accompanying order, Albion shall file on the docket a list of
distributors the letters, orders, and notices were sent to; the

date they were sent; and the number of notices sent to each distributor.

Finally, until such time that Albion seeks and receives confirmation from United States Customs and Border Protection as to the marking requirements of its specific manufacturing processes, the packaging of each Albion caulking gun with any foreign component shall list each component of the caulking gun and its country of origin.

## IV. Conclusion

For the reasons stated above, the Court will grant a permanent injunction and disgorge Albion's profits totaling $2,148,004.  Newborn shall apply for an award of attorney's fees within thirty days of this opinion and accompanying order and Albion shall file an opposition within thirty days thereafter.

An order consistent with this opinion will be entered.


Date: February 29, 2024            s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.