# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **NEWBORN BROS. CO., INC.,**<br><br>               **Plaintiff,**<br><br>    v.<br><br>**ALBION ENGINEERING COMPANY,**<br><br>               **Defendant.** | **Civil No.**<br>**1:12-cv-02999 (ESK-AMD)**<br><br>**Motion Day July 1, 2024** |

## BRIEF IN SUPPORT OF PLAINTIFF NEWBORN BROS. CO., INC.'S APPLICATION FOR ATTORNEYS' FEES

By:          s/ John-Paul Madden
                       John-Paul Madden, Esquire
                       Madden & Madden, P.A.
                       108 Kings Highway East
                       Haddonfield, NJ 08033
                       Tel: (856) 428-9520
                       Co-Counsel for Plaintiff
                       Newborn Bros. Co., Inc.

Dated: May 29, 2024

*Pro Hac Vice Counsel*
Michael K. Tomenga, Esquire
John M. Peterson, Esquire
Neville Peterson, LLP
1310 L Street, N.W., Suite 300
Washington, DC 20005
Co-counsel for Plaintiff,
Newborn Bros. Co., Inc.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION ..................................................................... 1

II.  STATEMENT OF FACTS ........................................................ 2

   A. Relative Merits............................................................... 3

   B. Albion's Unreasonable Manner of Litigation........................................ 9

       1. Failure to Concede Undisputed Core Material Facts .............. 10
       2. Mediating Three Times Without Albion Making
          a Significant Offer................................................. 12
       3. Repeated Refusal to Authenticate Its Own Business Records. 13
       4. Redaction of Unprivileged Prejudicial Information................ 14
       5. Failure to Prepare Witness Against Perjury ............................ 15
       6. Failure to Prevent and Correct False Testimony .................... 16
       7. Repeated Attempts to Introduce Summary Financial Information
          When the Underlying Data was Not Produced in Discovery for
          Verification................................................... 16
       8. Repeated Rule 52(c) Motions.................................... 19
       9. Unreasonably Delayed Filing its Motion to Stay Injunction and
          Failed to Identify Any Terms Allegedly Causing Irreparable
          Harm ........................................................... 20

III. LEGAL STANDARD ............................................................. 21

   A. Exceptionality ............................................................ 21
   B. Reasonableness ........................................................... 24

       1. Prevailing Party ............................................... 24
       2. Lodestar Test.................................................. 25

   C. Evidentiary Burden...................................................... 28

IV.  SUMMARY OF ARGUMENT ................................................. 28

V.   ARGUMENT .......................................................................... 29

   A. Newborn Established the Merits of its Claims While Albion's
       Litigation Position was Found Unsupported ...................................... 29

VI.   NEWBORN'S ATTORNEY'S FES ARE "REASONABLE" ............. 37

VII.   CONCLUSION ........................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES</u>

*2109971 Ontario Inc. v. Matrix Hospitality Furniture Inc.*,
2022 WL 154411 (D.N.J. January 14, 2022)........................................... 24

*A.B. by & through F.B. v. Pleasant Valley Sch. Dist.*,
839 Fed. Appx. 665 (3d Cir. 2020) ........................................................ 25

*Allstate Life Ins. Co. v. Stillwell*,
2022 WL 17443838 (N.J.D. Dec. 6, 2022)............................................... 24

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
421 U.S. 240, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975).......................... 35

*AT&T Corp. v. JMC Telecom, LLC*,
2005 WL 2086194  (D.N.J. Aug. 26, 2005) ........................................... 26

*Assessment Technologies of WI, LLC v. WIREdata, Inc.*,
361 F.3d 434 (7th Cir.2004) .................................................................... 27

*Barefoot Architect, Inc. v. Bunge*,
2014 WL 12744795 (D.V.I. April 29, 2014).......................................... 27

*Blanchard v. Bergeron*,
 489 U.S. 87 (1989)................................................................................. 28

*Blum v. Stenson*,
465 U.S. 886 (1984)................................................................................ 38

*Brandenburger v. Thompson*,
494 F.2d 885 (9th Cir. 1974) .................................................................. 35

*Chanel Inc. v. Gordashevsky,*
558 F.Supp.2d 532 (D.N.J. 2008) ........................................................... 30

*Coldwell Banker Real Estate LLC v. Bellmarc Group LLC*,
2021 WL 6066646 (D.N.J. 2021) ........................................................... 26

*Daimler v. Moehle*,
2023 WL 4925374 (W.D.P.A. 2023)...................................................... 23

*DiCarlo v. MoneyLion, Inc.*,
988 F.3d 1148 (9th Cir. 2021)................................................................. 35

*E.A. Sween Company Inc. v. Deli Express of Tenafly*,
19 F. Supp. 3d. 560 (D.N.J. 2014) .......................................................... 23

*Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC*,
2019 WL 1397387 (D.N.J. Mar. 28, 2019)............................................. 30

*Evans v. Port. Auth.*,
273 F.3d 346 (3d Cir. 2001)................................................................... 26

*Fair Wind Sailing, Inc. v Dempster*,
764 F.3d 303 (3d Cir. 2014)..................................................... 1, 2, 22, 29

*Farrar v. Hobby*,
506 U.S. 103, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992) ....................... 35

*Green v. Fornario*,
486 F.3d 100 (3d Cir. 2007)............................................................. 22, 23

*Hensley v. Eckerhart*,
461 U.S. 424, (1983) .............................................................................. 25

*In re Water Use Permit Applications*,
96 Haw. 27, 25 P.3d 802 (Haw. 2001) ................................................... 35

*Interfaith Cmty Org. v. Honeywell Int'l, Inc.*,
426 F.3d 694 (3d Cir. 2005).................................................................. 25

*J & J Snack Foods Corp. v. Earthgrains Co.*,
2003 WL 21051711 (D.N.J. May 9, 2003)............................................. 26

*JCW Investments, Inc. v. Novelty Inc.*,
482 F.3d 910 (7th Cir. 2007).................................................................. 27

*Lashea LLC v. Ningbo Ocean Textiles Co.*,
   2011 WL 13286041 (Aug. 29, 2011 N.D. Ala.) ...................................... 28

*Lohman v. Duryea Borough*,
   574 F.3d 163 (3d Cir. 2009)...................................................................... 27

*M.B.I. Merch. Ind. v. United States*,
   16 C.I.T. 495 (1992)................................................................................. 33

*MCO & EA LLC v. Silver Globe Inc.*,
   2023 WL 3478466 (D.N.J. May 15, 2023)............................................... 27

*North Bergen Rex Trans., Inc. v. Trailer Leasing Co.*,
   158 N.J. 561, ........................................................................................... 24

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014) .........................................................................*Passim*

*Polselli v. Nationwide Mut. Fire Ins. Co.*,
   1993 U.S. Dist. LEXIS 16195 (E.D. Pa. Nov. 15, 1993) ........................ 27

*R.M. v. Supreme Court of New Jersey*,
   190 N.J. 1 (2007)...................................................................................... 25

*Sadler v. Balboa Capital Corp.*,
    2014 U.S. Dist. LEXIS 27161 (W.D. Pa. Mar. 4, 2014) ........................ 27

*San Diego Comic Convention v. Dan Farr Prods.*,
   807 Fed. Appx. 674 (9th Cir. 2020)......................................................... 24

*Singer v. State*,
   95 N.J. 487 (1984).................................................................................... 24

*Truesdell v. Phila. Hous. Auth.*,
   290 F.3d 159 (3d Cir. 2002)..................................................................... 25

*United Auto Workers Loc. 259 Soc. Sec. Dep't v Metro Auto Ctr.*,
    501 F.3d 283 (3d Cir. 2007) ................................................................... 25

*United States v. Aysheh*,
   2023 U.S. Dist. LEXIS 97122 (D.N.M. 2023) ........................................ 33

*United States v. Sterling Islands, Inc.*,
   391 F. Supp. 3d. 1027 (D.N.M. 2019) ..................................................... 33

*Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*,
   318 Fed. Appx. 146 (3d Cir. 2009) .......................................................... 23

*Washington v. Philadelphia Cnty. Ct. of Common Pleas*,
   89 F.3d 1031 (3d Cir. 1995) ..................................................................... 26

*W.L. Gore & Assocs., Inc. v. Totes Inc.*,
   788 F. Supp. 800 (D. Del. 1991) .............................................................. 34

## STATUTES, REGULATIONS & RULES

Fed.R.Civ.P. 54 ................................................................................................ 1
15 U.S.C. § 1117(a) ........................................................................................ 21
19 U.S.C. § 1304(a)(j)(i)(l) ..................................................................... 32, 33
15 U.S.C. § 45 ................................................................................................ 32
19 C.F.R. § 134.47 ......................................................................................... 32
N.J.Ct.R. 1:21-7 ............................................................................................. 38

## SECONDARY SOURCES

Samuel R. Bagenstos, *Mandatory Pro Bono and Private Attorneys General*,
   101 Nw. U. L. Rev. 1459, 1461-62 (2007) ............................................. 25

## I.    <u>INTRODUCTION.</u>

As the prevailing party in this exceptional Lanham Act case, plaintiff Newborn Bros. Co. Inc. ('Newborn") hereby applies for an award of attorneys' fees against defendant Albion Engineering Company ("Albion"). The Court has found Albion to have intentionally engaged in the literal false advertising of the geographic origin of its manual caulking guns. *See* ECF 363 at 67, 73-82, and 102 and ECF 457 at 3. An award of attorney's fees in exceptional Lanham Act cases is provided by statute, *i.e.*, 15 U.S.C. § 1117(a). [1] The Court's February 29, 2024, Opinion and Order specifically provided for Newborn to submit this application. *See* ECF 457 and 458.[2] As explained below, the criteria for an award is met here.

The Supreme Court of the United States set forth the standard for an "exceptional" case in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  This is the standard adopted by the Third Circuit in *Fair Wind Sailing, Inc. v Dempster*, 764 F.3d 303, 315 (3d Cir. 2014).  Under the *Octane*

---

[1]    By filing this application, Newborn does not waive its right to pursue an award of costs as a prevailing party pursuant to Fed.R.Civ.P. 54. Newborn intends to file an application for costs after the Court issues its final determination. In light of pending motions before the Court, Newborn also reserves the right to supplement this application for fees later incurred.

[2]    The Court has twice extended the deadline for submission of this application and Newborn has consented, in advance, to any extension of corresponding duration for Albion's opposition should Albion find it necessary to prepare its response. *See* ECF 461 and 471.

*Fitness* standard, an exceptional case is found "when (a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner,'" *Fair Wind, 764 F.3d at* 315 (quoting *Octane Fitness,* 572 U.S. at 554). This action satisfies both of the two alternative *Octane Fitness* tests in that there is an "unusual discrepancy in the merits of the positions taken by the parties" <u>and</u> the losing party has litigated the case in an "unreasonable manner." In addition, this case is exceptional because Newborn is vindicating both its private rights and enforcing public interests in having Albion provide accurate information about the country of origin of its products, as required under the pertinent country of origin marking laws.

## II.   <u>FACTS.</u>

As noted by the Court, before commencing this action, Newborn's President, Albert Lee, contacted U.S. Immigration and Customs Enforcement, the investigative arm of U.S. Customs and Border Protection ("CBP") and the U.S. Attorney's office in Camden, seeking relief from Albion's conduct but was unsuccessful. Trial Transcript ("TTr.") 354:20-356:7 and Remedies Trial Transcript at 97:2-9 (Mr. Lee). Mr. Lee "testified that he spoke with a customs agent who explained that the agency was overextended and short staffed. According to Lee, the customs agent

2

recommended that Newborn pursue a private lawsuit." *Id.*, *See also* ECF 363 at 8-9.[3]

Now, Newborn is a prevailing party in light of the Court's February 29, 2024 Order awarding Newborn the significant relief requested in the form of a permanent injunction against Albion and disgorgement of Albion's profits. *See* ECF 458.

Newborn engaged counsel Neville Peterson LLP on a contingent fee arrangement. *See* Tomenga Cert. Exh. 1. Newborn engaged local counsel, Madden & Madden, P.A. on a discounted hourly fee arrangement. *See* Madden Cert. Exh. A.

## A. Relative Merits.

The relative merits of the parties' positions is as follows. The Court found that Newborn had met its burden of establishing liability and entitlement to remedies in the form of disgorgement of Albion's profits and a permanent injunction against Albion. In contrast, in most respects, the Court found Albion's positions on liability, affirmative defenses, and remedies, to be unsupported by the evidence.

---

[3]    Mr. Lee also researched soliciting the U.S. Federal Trade Commission ("FTC") to investigate Albion's origin marking claims. But he found that the FTC does not become involved in business-to-business disputes, only consumer to business disputes. In false "Made in USA" marking cases involving consumer complaints, the FTC would require the violator to fund refunds to be made to consumers. *See, e.g.,* https://www.ftc.gov/news-events/news/press-releases/2024/05/ftc-sends-refunds-consumers-harmed-false-made-usa-claims-cycra , last visited May 28, 2024.

Newborn alleged, and subsequently proved at trial, that Albion had consistently, pervasively, and intentionally marked its caulking guns with false representations that the caulking guns had been "Made in U.S.A.", when in fact they had been manufactured in Taiwan or assembled in the United States with substantial foreign material content. Accordingly, the Court found Albion liable for an <u>intentional</u> violation of the Lanham Act and New Jersey common law. *See* ECF 363 at 107.  The Court explained:

> Albion intended to distinguish itself from Newborn by stating that all of its products were made in the United States to the detriment of its customers understanding of where Albion products were made. As stated above, Newborn has demonstrated that Albion's statements diverted sales away from Newborn. *Id*.

Albion's litigation position did not concede that its country-of-origin advertising was false and it presented no evidence that the advertising was a mistake. In the absence of any evidentiary support, the Court explicitly rejected Albion's President's position and the self-serving testimony that the false advertising was justified or a "good faith" mistake.  Judge Hillman concluded in his opinion that:

> ECF No. 315 at 32. ("I felt that as long as we put more than 50 percent of the cost into the tools in the States, we were okay. And, of course, I was being advised by my agent, and that really was about it."). When pressed, Schneider had no explanation of where there this formula came from or why he felt it justified the continued use of a "Made in America" label. Nor did Albion introduce any hard calculations or other evidence of how this formula was actually applied to particular products or lines of

product. See ECF No. 316, at 92-105; see also ECF No. 342, at 61-62 and ECF No. 342, at ¶¶ 125-26. It appears to have been either an ad hoc, or worse post-hoc, attempt to create the illusion that Albion's imprecise and at times indiscriminate use of "Made in America" was a good faith mistake. The Court concludes on the testimony as a whole, as set forth in more detail in this Opinion, that at least up through the filing of this case, and as it related to export certificates up through the trial testimony in this matter, Albion lacked any systematic or disciplined program designed to insure that its products met Department of Homeland Security marking requirements, that its export certificates were truthful, or that its website and product literature regarding foreign-made products sold domestically adequately and accurately revealed the country of origin. Rather, the Court concludes Albion deliberately kept its head in the sand content to free-ride on, and at times promote, the false illusion that it was a purely "Made in the USA" company.

*See* ECF 363 at 18-19 fn. 6.[4]

The Court further found, in its 2021 Opinion, that Albion failed to establish, or even address, four of its five asserted affirmative defenses of failure to state a claim, lack of standing, laches, and statute of limitations because Albion failed to address them at trial or in its post-trial memorandum. *See* ECF 371 at 3-4, 7.

In Albion's Post-Trial Memorandum of Law, Albion failed to address its previously plead affirmative defense for lack of standing, which suggests it is no longer

---

[4]    As recently as December 23, 2023, conduct comparable to Albion's conduct has been treated as criminal by Judge Kirsch in the New Jersey District. *See* Department of Justice Press Release "Chief Executive Office Admits False Statements to Conceal Foreign Origin of Forklifts Provided to U.S. Army" available at      https://www.justice.gov/usao-nj/pr/chief-executive-officer-admits-false-statements-conceal-foreign-origin-forklifts , last visited May 28, 2024.

> pursuing this affirmative defense. Nevertheless, the reasoning for rejecting this affirmative defense is the same reasoning that leads this Court to reject Albion's affirmative defense for failure to state a claim.

ECF 373 at 3-4 fn. 3. The Court continued:

> Having held that the burden remains with Albion, the next issue for the Court to address is whether Albion has adequately shown that Newborn's delay in filing this suit was both inexcusable and prejudicial to Albion. This Court concludes, Albion is unable to satisfy this burden ….

ECF 372 at 7.

Notably, while the Court found for Albion on its unclean hands defense, it did so only in part, excluding low value accessories from the disgorgement award and excluding disgorgement of Albion's profits from competing dispending guns before February 7, 2007 while granting such an award for the five years thereafter up to the time of initiation of this action. *See* ECF 410 at 13 fn. 6.

Newborn's counsel expended considerable time and effort to establish Albion's liability, requiring depositions of 15 people, including nonparties, on 18 days. One deposition was a Rule 30(b)(6) deposition lasting 3 days and another deposition involved the same witness after receipt of new documents. Albion took depositions of 13 people, including nonparties, over 16 days. Albion deposed the principal owner of Newborn three times. Albion produced over 140,000 pages of

documents that Newborn reviewed to prepare for trial. Newborn produced nearly 50,000 pages of documents.

The liability phase bench trial lasted 21 days over the summer of 2017 starting in June. Newborn introduced roughly 150 exhibits and called 12 fact witnesses and one expert witness during the liability trial.  Albion introduced roughly 100 exhibits and called four fact witnesses and one expert witness. Albion also introduced read-in deposition testimony from three additional witnesses. The witnesses called during the liability trial were as follows:

| Newborn | Albion |
|---|---|
| Albert Lee, Pres. Newborn | Anthony Bartle, VP Sales TB Philly |
| Robert Wallace (marketing expert) | Stephen Nowlis (marketing expert) |
| Ken Becker Albion production engineer | Mark Schneider, Pres. Albion |
| Sandy Butcher, Advance Design Interactive, Albion webpage host | Robert Reynolds, GM, VP Sales Albion |
| Louis Matlack, Albion Bd Member | Joseph Shiffler, Albion engineer |
| Brian Glass, Newborn, VP Sales | Rene DesRochers, VP Sales, DM Figley (video) |
| George Hall, Construction Contractor, fmr Br. Mgr, DM Figley | Lance Florian (video) |
| Anthony Carroll, Purchasing & Whse Mgr, Western Waterproofing | Peter Chang, owner Newborn |
| Robert Reynolds, Albion GM, VP Sales | |
| Dell Skluzak, Newborn Indep Sales Rep | |
| Rachel Lelionis, Albion employee | |
| Mark Schneider, Pres. Albion | |
| Joesph Shiffler, Albion engineer | |

In support of its advertising practices, Albion relied on the expert opinion testimony of its marketing expert, Dr. Stephen Nowlis. The Court found the opinion testimony of Dr. Nowlis, to be "incredible" and "unworthy of belief." TTr. at 3336.

A further exchange illustrates how little support Dr. Nowlis' opinion testimony provided to Albion's position despite his purported expertise on marketing. The Court was "shocked" that Dr. Nowlis had no honest answer to the Court's question on the meaning of the term "Made in USA."

> THE COURT: I'm asking you, what does that phrase, "Made in the U.S.A." say to you, mean to you?

> THE WITNESS: Yes.

> THE COURT: What's the impression that you have as a person who holds a Ph.D.

> THE WITNESS: Right.

> THE COURT: What does that say to you?

> THE WITNESS: I'm trying to give you an honest answer and I'm saying –

> THE COURT: And I'm shocked that you don't have one.

TTr. 3344:16-25.

Furthermore, during the remedies phase of trial in 2023, Albion failed to demonstrate that during the period 2012-2023 it was in compliance, as alleged, with a 2012 ruling Albion obtained from CBP that found one post-importation production scenario that would allow Albion to refrain from marking "Made in Taiwan" on its Deluxe and Special Deluxe dispensing guns made substantially with components imported from Taiwan. Compliance with the CBP ruling was one of the primary

corrective actions Albion claimed it undertook in 2012.  Judge Hillman rejected

Albion's assertion:

> Ultimately, however, the Court is unpersuaded that Albion's 2012 Customs ruling is "specific to its practices," (id. at ¶ 57), which only approved of a scenario in which "the handle, trigger, barrel, and barrel lock ring are imported and assembled with the other U.S. components," (PTX-123 at 2, 5-6). Schneider testified that he did not consider rods to be imported when they are cut to length and threaded domestically, distinguishing that process from the disapproved Scenario B in which a rod is threaded in Taiwan. (2023 Evid. Hr'g Tr., Schneider at 448:19 to 449:1, 453:1-15).

> Though the Court does not accept the June 2019 ruling obtained by Newborn as per se evidence that Albion's practices do not comport with the approved Scenario A, it certainly points in that direction. This leads, in turn, to a reasonable conclusion that Albion has intentionally foregone a subsequent, clarifying ruling, choosing instead to forego any country-of-origin markings at all.

ECF 457 at 39.

## B. Albion's Unreasonable Manner of Litigation.

Albion engaged in litigation of this matter in an unreasonable manner by,

among other things: (1) failing to concede facts that Albion had no factual basis to

dispute, (2) mediating three times without making a significant offer, (3) refusing to

authenticate before trial any of Albion's business records produced in discovery, (4)

redacting information from non-privileged, responsive documents produced in

discovery purely because the information was unfavorable, (5) requiring the Court

to order Albion to instruct a former board member called to testify to facts adverse to Albion that his persistent testimony that he failed to remember information that he did in fact remember constituted perjury, (6) providing an Albion employee witness who gave false testimony that Albion knew or should have known would be false, (7) violating discovery and evidentiary rules by seeking to introduce at trial financial information created specifically for trial from an unreliable computer database and never produced, (8) pursuing a Rule 52(c) motions at an inappropriate time and renewing the motion without any new argumentation after the Court had shared its thoughts rejecting Albion's arguments, and (9) unreasonably delaying before filing a motion to stay the injunction and without specifying any term of the injunction with which Albion could not comply without irreparable harm.

### 1.  Failure to Concede Undisputed Core Material Facts.

Albion had no defense to its false "Made in U.S.A." claims but did not concede their falsity during the five years in which the parties engaged in discovery and preparation of the Joint Final Pretrial Order preceding trial.  At the outset of this matter, Albion denied that it labeled its products as Made in U.S.A. *See* PTX 747 (After Newborn filed its complaint, The Moorestown Patch newspaper reported "Albion owner Mark Schneider dismissed Newborn's claims, saying Albion has a longstanding reputation for making quality products and that none of their products are actually labeled 'Made in U.S.A.'").  The Court held 12 days of bench trial on

Albion's false origin claims in June 2017 before Albion's President, Mark Schneider, finally admitted to the literal falsity of the Albion's blanket Made in U.S.A. origin claim. The falsity of this claim could have and should have been admitted before trial in the Joint Final Pretrial Order. *See* TTr. 2420:7-2421:7. The trial commenced on June 6, 2017. Not until June 30, 2017 did Albion's President testify on direct examination as follows:

BY MR. PETERSON:

> Q. The statement here says, "All our dispensing products and accessories are designed and manufactured in the U.S.A., from our location Philadelphia, Pennsylvania." Do you see that statement, sir?
>
> A. Yes.
>
> Q. Now, is that a true statement at the time it was made in 2004?
>
> A. Well, the true statement, the Philadelphia, Pennsylvania is true. The design, some of our accessories, yeah, we didn't make everything in the United States.
>
> Q. So, it's not true, in other words?
>
> A. Correct.
>
> Q. Okay.

BY MR. PETERSON:

> Q. Now, sir, this is again an Albion website page. It's been admitted into evidence, and the date is June 7, 2007. And again, if you could read into the record the first, the first dotted point appearing under The Albion Difference.

A. It is the same as the 2004, "All of our dispensing gun products and accessories are designed and manufactured in the United States, from our location in Philadelphia, Pennsylvania."

Q. Now, in 2007, sir, that statement was false, was it not?

A. Correct.

Id.

### 2. Mediating Three Times Without Albion Making a Significant Offer.

A significant delay in the progress of this litigation resulted from three mediations between the parties in which Albion did not negotiate in good faith. In fact, Albion did not negotiate at all. Newborn and Albion mediated twice preceding trial on February 25, 2014, and January 29, 2015, and once after the liability phase of trial on April 11, 2018, without Albion making a significant offer. The first two mediations were conducted by Retired Delaware District Court Judge Joseph J. Farnan, and the third was conducted before Retired Eastern District of Pennsylvania District Court Judge John J. Hughes. Albion made one monetary offer of a nominal low six-figure amount to settle before the second mediation.  Over the course of the three mediations, Newborn made multiple offers at various seven figure amounts that are not significantly out of line with the amount awarded by the Court or that may be awarded by the Court if Newborn's pending motion to correct the calculation

error in the award [ECF 459] is granted. However, during the three mediations, Albion never made an offer or counteroffer on a settlement amount or terms that was communicated to Newborn, leaving Newborn the option of continuing the litigation or walking away. At the suggestion of Judge Hughes, Newborn made a post-mediation offer on June 18, 2018, that was unsuccessful. Through continued litigation, this Court has awarded Newborn disgorgement of an amount of Albion's profits that is substantially more than Albion offered preceding the first mediation. Newborn has filed a motion, pending before the Court, to correct a math error in the Court's calculation of the award. If that motion granted, correction of the math error would nearly triple the award to Newborn through this litigation. *See* ECF 459.

### 3.   Repeated Refusal to Authenticate Its Own Business Records at Trial.

Before and throughout the trial, Albion steadfastly refused to authenticate any of Albion's business records produced in discovery. This refusal burdened the resources of the Court and Newborn's counsel with having to authenticate every trial exhibit to gain its admission as evidence. *See* TTr. 50:21-51:16, 2962:6-10; 2983:21-2985:7. The Court admonished Albion's counsel:

> … 902(11) and (12) certifications are not to be withheld unreasonably. If documents are produced during discovery pursuant to a document request and produced by a company, there's no reason why they shouldn't be accompanied at that time with a 902(11) certification either sought or given freely. … so that this doesn't

> become an issue, should not be wasting the Court's time
> in terms, or the witness's time ….

*See* TTr. 4270:1-4271:6, 4273:18-4274:3.

### 4. Redaction of Unprivileged Prejudicial Information.

At a hearing on June 5, 2017, immediately preceding the trial, the Court considered one of Newborn's motion's *in limine* regarding Albion's redactions in documents produced during discovery.  Newborn obtained information sufficient to challenge one of Albion's numerous redactions in the documents it produced in discovery only because Albion's redaction was imperfect thereby allowing Newborn to see the language redacted when the document was printed. *See* June 5, 2017, Hearing Transcript ("HTr.") at 5-6. Upon the Court's review, the Court found that Albion's counsel had improperly withheld the information redacted simply because the information was prejudicial to Albion.

> MR. BERKOWITZ: The point of the redaction was to cover up a passage that is -- that could have a very prejudicial effect upon the reader.
>
> THE COURT: Mr. Berkowitz, that can't be a basis for redaction. Then all the documents in discovery would – any number of different documents would be redacted in that way. You can't redact things that are potentially admissible and harmful to you. Can you? I don't know of such a rule.
> \*                           \*                           \*
> THE COURT: Well, it may be, perhaps it could have been and should have been a motion made earlier by the plaintiff, but this in my view has been caused by an improper redaction of the document. I don't see any basis

> to redact it. And it's contrary to the spirit of the Rules of Civil Procedure. You turn it over to your adversary. If you think it should not come into evidence for any number of good reasons, then you make a motion to exclude it. Hiding it from your adversary is not the proper process. I'm surprised that that's been the position of the defendant, apparently.

*See* HTr. at 10 and 12 and ECF 258 at 3. There is no way for Newborn to ever know what portion of the many documents Albion redacted were redacted for similar reasons or the number documents Albion failed to produce at all for the same improper reason - - they were prejudicial to Albion.

### 5.  Failure to Prepare Witness Against Perjury.

When called to testify, Albion's former board member, Louis Matlack, repeatedly responded that he could not remember the answers to Newborn's counsel's questions. As a result, the Court found it necessary to instruct Albion's counsel to advise Mr. Matlack of the penalty for perjury for repeatedly testifying he failed to remember information responsive to questions if, in fact, he did remember the information. *See* TTr. 1185:7-1187:4, 1189:25-1190:10, 1359:11-1360:11. The Court observed the witnesses ability to read and comprehend documents, then questioned Albion's counsel and confirmed that the witness was semi-retired, lived independently with his wife, had worked until recent years as a private mediator, drove himself from his home in New Jersey to his hotel near the courthouse, checked himself into the hotel, routinely walks a mile a day, has a Ph.D. in polymer chemistry

from Princeton, served as a member of the Board of Albion and Geo. D. Wetherill and Co., Inc [TTr. 1177:11-19, 1185:14-1191:2] and concluded "So it's my impression that he is being reluctant, reticent, incomplete, unwilling to testify to his actual memory when he can't remember who he met with this morning prior to his testimony." TTr. 1360:6-9.

### 6. Failure to Prevent and Correct False Testimony.

Albion produced an employee witness, Rachel Lelionis, who gave false testimony, that Albion knew or should have known was false prior to her taking the stand, as to Albion's corrective action by cessation of its issuance of false NAFTA certificates of origin and other certificates of origin in 2013 only to produce the next day at trial NAFTA certificates created by Albion after 2013 that were not previously produced in discovery and that established that her testimony the prior day was false. *See* TTr. 2348:4-2350:21 (Mr. Schneider). Albion's counsel never made a formal correction to Ms. Lelionis's testimony despite a reminder of the Court and Albion's counsel's commitment to do so. *See* TTr. 2454:24-2455:11.

### 7. Repeated Attempts to Introduce Summary Financial Information When the Underlying Data was Not Produced in Discovery for Verification.

Prior to trial, Newborn's filed a motion *in limine* to preclude the introduction at trial of Albion financial information provided to and compiled in summaries by its damages expert, Dr. Samuel Kursh, because that financial information was not

produced in discovery to allow Newborn to verify its accuracy [ECF 210]. The Court deferred a decision on that motion until the remedies phase of trial when Dr. Kursh's opinion relying on such financial information would be at issue. Notwithstanding Newborn's pending motion, Albion repeatedly tried to introduce that information during the liability phase of trial as well as other financial information that Albion specifically created in the midst of trial from information that was not produced in discovery. Albion's counsel did not provide these newly created Albion exhibits to Newborn until 8:35 PM in the evening of the day preceding and at 1:15 AM in the morning of the day of Albion's intended use of the information requiring Newborn's counsel to spend the morning hours before trial preparing a brief opposing the introduction of those proposed exhibits. *See* TTr. 2782:18-2804:21, 2804:22-2805:1, 2805:2-12 (concerning Albion's exhibits 387A, B, and C, 469, 470, and 503) and TTr. 3844:12-3861:13 (concerning defendant's exhibit 510).

In response to Albion's first attempt to introduce the financial information not produced in discovery, the Court ruled:

> THE COURT: I think that's your obligation under 1006. I would grant you any reasonable continuance to allow you to find the documents, produce them to the plaintiff, to see whether there's any continuing dispute about it. But you must -- if they are a summary created for the purpose of the trial, then you must provide the backup to your adversary.

TTr. 2804:13-18

On the Albion's second attempt to introduce financial information not produced in discovery, the Court ruled:

> The Court: ….you can't just put a document together for the purposes of having a witness testify to the truth of the contents without providing the other side the underlying information so they can test the veracity of it. It's that simple.
>
> You've got to provide a backup for this. The rule is clear. You can't just create a document for the purposes of the case and have a witness testify about it. He's not even -- he didn't even create it.

TTr. 3858:1-9.

After Newborn had rested its case, Albion made a third attempt to introduce Albion's financial information not produced in discovery including documents that were internally inconsistent. *See* TTr. 3943:11-4015:13.

> THE COURT: But the point that someone can go to the Kursh data and produce a document that has two different numbers proves the point that this should not be dealt with now in the middle of a trial in a case this old. It deprives the plaintiff or the other side of the opportunity to test the underlying reliability of the evidence or to contest it. You can't simply have somebody throw up two documents that are completely different and expect me to rely on it. I have no reason to trust these documents. They are completely inconsistent. And yet the proffer is they come from a flat file that can't be changed.

TTr. 4012:4-14. And the Court continued:

> THE COURT: Ms. Chewning, this is real simple. This is real simple. There is no question in this case that there was going to be an issue about sales amounts. Up until the decision to forgo actual damages, even in the absence of

18

that, with the disgorgement of profits and the defendant's defense that the plaintiff had an obligation to show actual injury, all of those legal issues scream out for both sides to disclose their sales figures, especially all this evidence, testimony about the SEAL group and its significance and what the sales were from that.

There should have been no question that both sides would have an obligation that they were going to produce as substantive evidence an exhibit, a contemporaneous business record, or if it didn't exist in that form, an extraction, identify it as such, provide the other side with the underlying data, do it in a timely manner, call it an exhibit and put it on your exhibit list.
This is not a game of hide and seek. It's not let's hear what they have to say and then we're going to go back into this database and hire somebody to gather evidence in the middle of trial. That's just not the way the system works. That's not the way the rules are designed. It's not fair to either side. It is not fair to me. I have now spent hours trying to understand all of this that should have been resolved years ago. It's out.

TTr. 4018:9-4014:8

## 8. Repeated Rule 52(c) Motions.

The record demonstrates that Albion burdened the Court and Newborn by raising multiple, repetitive Rule 52(c) motions at an inappropriate time and without raising new arguments. Albion first sought to raise a Rule 52(c) motion for judgment as a matter of law prematurely, on July 6, 2017, before the close of Newborn's affirmative case. *See* TTr. 2765:21-2770:17 The Court held: "It's the cart before the horse for me to hear this motion before the end of the plaintiff's case." TTr. at 2768:9.

Then at the close of Newborn's case, on July 24, 2017, Albion argued its Rule 52(c) motion on the same day that Albion filed its Rule 52(c) motion on the record, requiring Newborn's counsel to respond without having seen the record motion. *See* ECF 279. The Court exercised its discretion and declined to rule on the motion until the record closed [TTr. 3520:18-20]; however, shortly after the argument on the motion, the Court shared its thoughts on a response to the arguments. *See* TTr. 3473:18-3525:5. On August 10, 2017, Newborn filed its formal opposition to the motion. *See* ECF 284.

At the close of defendant's case, on August 24, 2017, Albion again renewed its Rule 52(c) motion with a supplemental brief in response to which Newborn filed its Opposition on August 30, 2017. *See* TTr. 4389:22-4396:8 and ECF 291 and ECF 292, respectively. As Newborn's Opposition made clear, Albion relied on no new evidence in support of its renewed motion. Nevertheless, Newborn was forced to respond with another submission. *See* ECF 292.

### 9. Unreasonably Delayed Filing its Motion to Stay Injunction and Failed to Identify Any Terms Allegedly Causing Irreparable Harm.

Albion remains in denial that it has violated, and continues to violate, the Lanham Act and New Jersey common law fraud. Albion's motion to stay the May 29, 2024 deadline for compliance with the permanent injunction issued by the Court on February 29, 2024, was a thinly veiled effort to delay facing the appropriate consequences of its violations. Despite filing an appeal against the permanent

injunction within 25 days of the issuance of the Order, Albion delayed nearly two full months before seeking a stay. *See* ECF 458 and 469. As the Court is aware from Newborn's Opposition, Albion identified no specific injunction terms that were objectionable, offered no alternative language or deadlines, and provided no description of any irreparable harm to Albion other than an inability to appeal the injunction Order if it complied. *See* ECF 474. The basis Albion alleged for the stay was that the Court failed to give sufficient weight to the corrective actions it allegedly took in 2012, notwithstanding the two fulsome opinions issued by the Court identifying a range of facts to the contrary. *Id*. and *see* ECF 363 and ECF 457. As Newborn pointed out in its Opposition, the Court's Opinion supporting the permanent injunction found that the factors to be considered all favored Newborn and that any injury to Albion was self-inflicted as a result of its violation of the Lanham Act and New Jersey common law. In short, Albion's motion to stay was merely a delaying tactic that rehashes facts about its corrective actions that the court has twice found inadequate. *Id.*

## III.   <u>LEGAL STANDARD.</u>

### A. Exceptionality.

The Lanham Act, in 15 U.S.C. § 1117(a), provides statutory authority for the award of attorney's fees in "exceptional" cases, stating:

> The court in exceptional cases may award reasonable attorney fees to the prevailing party.

The Supreme Court of the United States in *Octane Fitness* found the term "exceptional" for the purposes of the Patent Act's fee shifting provision means:

> "uncommon," "rare," or "not ordinary." Webster's New International Dictionary 889 (2d ed. 1934). An "exceptional" case, then, is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances. *Octane Fitness,* 572 U.S. at 545.

The Third Circuit, relying on *Octane Fitness,* has held that in Lanham Act cases, an "exceptional" case is found "when (a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner," *Fair Wind*, 764 F.3d at 315 (quoting *Octane Fitness*, 572 U.S. at 554).

The Third Circuit has established a two-step process for determining that a case is "exceptional" under the Lanham Act.

> First, the District Court must decide whether the defendant engaged in any culpable conduct. We have listed bad faith, fraud, malice and knowing infringement as non-exclusive examples of the sort of culpable conduct that could support a fee award. Moreover the culpable conduct may relate not only to the circumstances of the the Lanham Act violation, but also to the way the losing party handled himself during the litigation. Second, if the District Court finds culpable conducts, it must decide whether the circumstances are 'exceptional' enough to warrant a fee award.

*Id.* at 314 (citing *Green v. Fornario*, 486 F.3d 100, 103 (3d Cir. 2007)).

Willful conduct is sufficient to support an award of fees. *See E.A. Sween Company Inc. v. Deli Express of Tenafly, LLC*, 19 F.Supp.3d 560, 578 (D.N.J. 2014). However, as noted by the District Court in *Daimler v. Moehle*, 2023 WL 4925374 (W.D.P.A. 2023), under *Octane Fitness*, a District Court has discretion to find a case to be "exceptional" without finding culpability relying on "the governing law and the facts of the case" alone:

> In *Octane Fitness*, the Supreme Court embraced an expansive definition of "exceptional" and explained that an "exceptional" case is simply one that stands out from the others with respect to the substantive strength of the party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in this the case was litigated. [*Octane Fitness* at 554]. Thus it is within a court's discretion to find a case "exceptional" based on "the governing law and the facts of the case, "irrespective of whether the losing party is culpable. For example, a case presenting exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award. Id. at 555. This is so even if the losing party's conduct did not suggest "bad faith, malice, [or] knowing infringement." *Green*, 485 F.3d at 103. Thus, it is within a court's discretion to find a case "exceptional" based upon "the governing law and the facts of the case," irrespective of whether the losing party is culpable.

Indeed, this Court has also found that "wasteful procedural or dilatory tactics" make a matter exceptional. *See Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC*, No. 12-787, 2019 WL 1397387, *4-5, 7 (D.N.J. Mar. 28, 2019).  Discovery abuses and "chicanery" are also factors that may be considered to determine that a

23

case is exceptional. *See Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc*., 318 Fed. Appx. 146, 148-49 (3d Cir. 2009).  Other factors considered by courts under the *Octane Fitness* "totality of the circumstances" analysis include failure to comply with court rules, persistent desire to relitigate issues already decided, advocacy that veered towards gamesmanship and unreasonable responses to litigation. *See San Diego Comic Convention v. Dan Farr Prods*., 807 Fed. Appx. 674, 676 (9th Cir. 2020).  A defendant's refusal to negotiate once an infringement was brought to its attention has been considered by this Court to be sufficient to be exceptional. *See 2109971 Ontario Inc. v. Matrix Hospitality Furniture Inc.*, 2022 WL 154411, at \*6 (D.N.J. January 14, 2022).

### B. Reasonableness.

#### 1. Prevailing Party.

A threshold question in determining whether an award of attorneys' fees is reasonable is whether the party seeking the fee prevailed in the litigation. *North Bergen Rex Trans., Inc. v. Trailer Leasing Co*., 158 N.J. 561, 570 (citing *Singer v. State*, 95 N.J. 487, 494, 472 A.2d 138 (1984).  A two-prong test applies.  First, a party seeking attorneys' fees must demonstrate that the lawsuit was causally related to securing the relief obtained.  A fee award is justified if the party's efforts are a "necessary and important" factor in obtaining relief. *See Allstate Life Ins. Co. v. Stillwell*, 2022 WL 17443838, at \*3 (D.N.J. Dec. 6, 2022) (citations omitted).

Second, the party seeking attorney's fees must show that the relief granted had some basis in law. *Id*. With respect to the second prong, the party seeking attorney's fees need not recover all relief sought, but rather, there must be a settling of some dispute that affected the behavior asked to pay attorney's fees toward the party seeking attorney's fees. *Id. See also R.M. v. Supreme Court of New Jersey*, 190 N.J. 1, 10 (2007) (a "prevailing party" is one that succeeds on any significant issue in litigation which achieves some of the benefit … sought in bringing suit.") (internal quotations and citation omitted). A court order provides the appropriate basis for awarding attorney's fees to the prevailing party where it "contains mandatory language" and "bears the signature of the District Court judge, not the parties' counsel." *Truesdell v. Phila. Hous. Auth.*, 290 F.3d 159, 165 (3d Cir. 2002).

## 2. Lodestar Test.

Within the Third Circuit, the "lodestar" calculation is used to determine the reasonableness of attorney's fees.

> "'The most useful starting point for determining the amount of a reasonable fee' is the lodestar calculation," which multiples a reasonable number of hours expended by a reasonable hourly rate. *United Auto Workers Loc. 259 Soc. Sec. Dep't v Metro Auto Ctr.*, 501 F.3d 283, 290, (3d Cir. 2007) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, (1983)). "[T]he relevant rate is the prevailing rate in the forum of the litigation' unless 'the special expertise of counsel from a distant district is shown' or 'local counsel are unwilling to handle the case.'" *A.B. by & through F.B. v. Pleasant Valley Sch. Dist.*, 839 Fed. Appx. 665, 668 (3d

Cir. 2020) (quoting *Interfaith Cmty Org. v. Honeywell Int'l, Inc*., 426 F.3d 694, 704-05 (3d Cir. 2005)).

Once determined, the lodestar is presumed to be a reasonable fee. *Rode v. Dellarciprete*, 892 F.2d 1177, 1182 (3d Cir. 1990) (citing *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). The lodestar calculation calls for the Court to undertake three steps: (1) decide a reasonable hourly rate and multiply that rate by (2) the number of hours reasonably expended by counsel, and (3) alter the total amount, if adjustment is necessary. *See J & J Snack Foods Corp. v. Earthgrains Co*., 2003 WL 21051711 at \*6 (D.N.J. May 9, 2003).

"'A reasonable hourly rate is calculated according to the prevailing market rates in the community,' which the requesting party has the burden of establishing." *Coldwell Banker Real Estate LLC v. Bellmarc Group LLC*, 2021 WL 6066646, at \*5 (D.N.J. Nov. 29, 2021) (citing *AT&T Corp. v. JMC Telecom, LLC*, 2005 WL 2086194, at \*3 (D.N.J. Aug. 26, 2005) (in turn, citing *Washington v. Philadelphia Cnty. Ct. of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir. 1995)). "The requesting party may establish that an hourly rate is reasonable by submitting the affidavits of other attorneys in the relevant legal community, attesting to the range of prevailing rates charged by attorneys with similar skill and experience." *Id*. at \*6 (citations omitted). After the prevailing party has made a *prima facie* showing of a reasonable hourly rate, the losing party may contest that rate, 'but only with appropriate record evidence.'" *Id*. (citing *J&J Snack Foods v. Earthgrains Co.,* 2003 WL 21051711, at

*7 (D.N.J. May 9, 2003)) (quoting *Evans v. Port. Auth*., 273 F.3d 346, 361 (3d Cir. 2001). "With such evidence, the Court has great discretion to adjust the rate." *Id.* (citations omitted). Without it, the prevailing party must be awarded fees at the requested rate. *Id.*

In determining the reasonableness of attorney's fees, the Court may consider whether a party in bad faith improperly delayed settlement to maximize fees. *See MCO & EA LLC v. Silver Globe Inc.*, 2023 WL 3478466, at*7-*8 (D.N.J. May 15, 2023). Federal Rules of Evidence 408 precludes the use of settlement negotiations only "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction" and does not bar a court's consideration of  settlement negotiations in its analysis of what constitutes a reasonable fee award. *See Lohman v. Duryea Borough*, 574 F.3d 163, 167 (3d Cir. 2009).

An award of attorneys' fees is not dependent on a prevailing party's obligation to pay the attorney. *Barefoot Architect, Inc. v. Bunge*, 2014 WL 12744795,  at *14 (D.V.I. April 29, 2014) (citing *Polselli v. Nationwide Mut. Fire Ins. Co*., 1993 U.S. Dist. LEXIS 16195, at *8 (E.D. Pa. Nov. 15, 1993)). *See also*, *Sadler v. Balboa Capital Corp*., 2014 U.S. Dist. LEXIS 27161 (W.D. Pa. Mar. 4, 2014). A contingent fee arrangement is not controlling, nor is it conclusive evidence of the amount of a reasonable fee. *See JCW Investments, Inc. v. Novelty Inc*., 482 F.3d 910 (7th Cir.

2007) (citing *Assessment Technologies of WI, LLC v. WIREdata, Inc.,* 361 F.3d 434, 439 (7th Cir.2004)) and *Lashea LLC v. Ningbo Ocean Textiles Co*., 2011 WL 13286041, at *4  (Aug. 29, 2011 N.D. Ala.) (citing *Blanchard v. Bergeron*, 489 U.S. 87, 92 n.5, 93 (1989) (noting that existence of contingency fee agreement is only one factor in determining reasonableness of attorney's fee award)).

### C. Evidentiary Burden

The evidentiary burden to show entitlement to fees is a preponderance of the evidence, clear and convincing evidence is not required. *See Octane Fitness*, 572 U.S. at 557-58.

## IV.   <u>SUMMARY OF ARGUMENT.</u>

Newborn is a prevailing party having obtained an Order from the Court awarding a permanent injunction against Albion and disgorgement of Albion's profits. This case is "exceptional" in satisfaction of the *Octane Fitness* test because it stands out from others entitling Newborn to an award of attorneys' fees. There is an extreme disparity between the parties' litigation positions and Albion's litigation conduct was unreasonable for a spectrum of reasons. This case is also exceptional in that Newborn's lengthy and arduous litigation effort served to enforce not just Newborn's private rights but also, and importantly, the rights of the public, i.e., thousands of purchasers of Albion's caulking guns who are entitled to know the true origin of those caulking guns. The record shows that, before initiating this action,

Newborn sought to have Customs enforce the public's rights to no avail and the Customs agent recommended that Newborn initiate this action.

## V.   ARGUMENT.

The Court's February 29, 2024, Order awarding Newborn a permanent injunction against Albion and disgorgement of Albion's profits demonstrates that Newborn is the prevailing party in this twelve-year old litigation. *See* ECF 458. Newborn is entitled to an award of attorneys' fees because this is an "exceptional case" under the *Octane Fitness* test established by the U.S. Supreme Court and followed by the Third Circuit in *Fair Wind*. This action satisfies both of the alternative prongs of the *Octane Fitness* test because of the extreme disparity in the merits of the litigation positions of the two parties and because of the unreasonable manner in which Albion litigated this action. In addition, this action is exceptional because, unlike a typical Lanham Act trademark claim, it involves both Newborn's private rights to the truthful advertising of the origin of Albion's products and enforcement of public rights to accurate country of origin claims as is required by law.

### A. Newborn Established the Merits of its Claims While Albion's Litigation Position was Found Unsupported.

The strength of the merits of Newborn's position and the absence of support for Albion's litigation position reflect the extreme difference in the merits in the position of the parties which is evident from the Court's August 2020 and February

2024 Opinions. ECF 363 and ECF 457. As set out in the Facts section above, the Court found Albion's violation of the Lanham Act and New Jersey common law to be intentional. Notably, culpability is not required for an award of attorneys' fees but it is an important factor to be considered.  Further, willful conduct itself is sufficient for a finding of exceptionality.  *See E.A. Sween Company Inc. v. Deli Express of Tenafly*, 19 F. Supp. 3d. 560, 578 (D.N.J. 2014)(exceptional cases include where court has made finding of willfulness); *Chanel Inc. v. Gordashevsky*, 558 F.Supp.2d 532, 539 (D.N.J. 2008)(willful infringement sufficient to award fees).

In addition, the absence of any evidence of either (1) the purported origin test on which Albion relied and Albion's validation of its compliance with the purported test, even once, for a period of over a decade before Newborn initiated this action, provides a strong indication that Albion's litigation position was a meritless post-hoc rationalization contrived for trial. Furthermore, Albion's touted corrective actions are undermined by the trial record. Evidence is absent to establish Albion's alleged compliance with the 2012 ruling obtained from CBP in support for its current failure to mark the origin of its caulking guns. Albion's failure to mark the foreign origin of its dispensing guns since 2012 allows Albion to continue to benefit from the confusion present in the marketplace among distributors and consumers as to the origin of Albion's caulking guns. That confusion arises from the lingering and undisturbed presence of many legacy caulking guns on display across the nation at

large distributors bearing prominent Made in USA marks and the existence of Albion marketing materials with Made in USA claims never recalled by Albion. Despite Albion's protestations that it had taken adequate corrective action in 2012, the evidence presented at the remedies phase of trial at the end of 2023 established that displays at major distributors remain untouched, one proven to date back to 2007, a sixteen-year period, without correction. Even Albion's own mobile website at trial in 2023 prominently displayed the image of a legacy B-Line gun, never made in the United States, marked "USA manufacturer." In 2020, the Court found that, as of 2012, "… third parties who rely on Albion's false representations to sell Albion's products are evidence that the third parties themselves were deceived by Albion's false origin claims and evidence that Albion has never corrected the false perception it created about the origin of its products. Numerous instances of trial testimony support this conclusion." *See* ECF 363 at 66. Nothing changed between 2012 and 2023 when the Court opined:

> … other evidence in the record that Made-in-America misrepresentations persist in the marketplace. The record contains more than sufficient examples of recent displays featuring products marked in such a way as to indicate American manufacture, (PTX-2051; PTX-2053; PTX-2055A; PTX-2055B; PTX-2055C; PTX-2071; PTX-2099), continued representations of the American manufacture of Albion products on third-party websites, (PTX-2063; PTX-2068; PTX-2068A), and an image of a B-line gun with a "80-year history U.S. manufacturer" label on the mobile version of Albion's website, (2023 Evid. Hr'g Tr., Schneider at 456:9 to 457:22).

*See* ECF 457 at 39-40.

Albion may emphasize to the Court its partial success on its unclean hands defense limiting Newborn's disgorgement award to a period after February 7, 2007.[5] However, that partial success does not preclude an award of attorneys' fees to Newborn. The *R.M.* decision requires a prevailing party to succeed only on one significant issue. Thus, it is clear that a prevailing party need not succeed on every issue to be entitled to an attorneys' fee award and Newborn has certainly succeeded on the significant issues of Albion's liability and Newborn's entitlement to injunctive and monetary relief.

The Court may also consider that Albion's conduct violated both the marking law administered by CBP, 19 U.S.C. § 1304 and the Federal Trade Commission Act Section 5, codified at 15 U.S.C. § 45, administered and enforced by the FTC. Section 304 of the Tariff Act of 1930, 19 U.S.C. §1304(a), requires that all imported articles be marked, permanently, legibly in a conspicuous place, to indicate to an "ultimate purchaser" in the United States the English name of the product's foreign country of origin. Violations of the law can result in the exclusion of unmarked or mismarked

---

[5]  In contrast to Albion's thousands of blanket false misrepresentations of its products as U.S.A. origin, the Court limited disgorgement based on Newborn's mistaken renewal of its Newborn U.S.A. registered trademark on February 7, 2007. That trademark was always used on Newborn's products that were properly marked with their foreign country of origin on the same side of the product. Newborn's use of its trademark was lawful under CBP's regulations. *See* 19 C.F.R. § 134.47. Albion presented no evidence of consumers being deceived by Newborn's trademark.

goods from entry [19 U.S.C. §1304(j)], imposition of additional duties [19 U.S.C. §1304(i)], or in the case of intentional mismarking as practiced here by Albion, criminal fines and imprisonment [19 U.S.C. §1304(l)][6].

While violation of those laws and the regulations, rulings, and guidance issued by the agencies does not constitute a *per se* violation of the Lanham Act's false advertising prohibition, they provide examples of Albion's malfeasance proved by Newborn at trial and are the framework of marking laws with which all companies doing business in the United States must comply. The victims of this malfeasance were not merely Newborn, which suffered lost sales and profits due to Albion's actions, but thousands of distributors, and tens of thousands of users of the subject caulking guns, who were denied the "right to know" the marking law requires they be given.

Albion's unlawful acts also violated the Federal Trade Commission's "Made in the USA" labeling policy, which provides that a product may be marketed in the United States with the unqualified statement that it is "Made in the USA" only if it is "wholly or almost wholly" made in this country "wholly or almost wholly" of domestic materials. This is a policy which the FTC has enforced against violators by means of "cease and desist" orders, as well as significant monetary fines.

---

[6]     *See, e.g.*, *United States v. Aysheh*, 2023 U.S. Dist. LEXIS 97122 (D.N.M. 2023); *United States v. Sterling Islands, Inc.*, 391 F. Supp. 3d. 1027 (D.N.M. 2019); *M.B.I. Merch. Ind. v. United States*, 16 C.I.T. 495 (1992),

In effect, Newborn in this case acted as a "private attorney general", investing its own resources into enforcing Federal law and policy. In similar circumstances, relators in "reverse False Claims Act" cases are, beyond any relator's compensation received, typically reimbursed separately for their attorneys' fees. See *DOJ and Florida Company Settle Allegations it Imported Roofing Materials Without Required Country of Origin Markings*, available at https://www.justice.gov/usao-wdwa/pr/doj-and-florida-company-settle-allegations-it-imported-roofing-materials-without (January 20, 2021). Such awards are typical in cases where private actors invest legal fees to ensure enforcement of the Customs laws. *See*, Three Importers to Pay over 3 Million to Settle False Claims Act Suit Alleging Evaded Duties, available at https://www.justice.gov/opa/pr/three-importers-pay-over-3-million-settle-false-claims-act-suit-alleging-evaded-customs.

The Court recognized this public benefit in its liability opinion. *See* ECF 363 at 100 ('the public has a right to information that will allow them to assess the quality of a product and to accurately price the product in accordance with their priorities and desires" (citing *W.L. Gore & Assocs., Inc. v. Totes Inc*., 788 F. Supp. 800, 810 (D. Del. 1991)). Thus, it is fair for the Court to consider Newborn to be standing in the shoes of Customs that admitted its inability to act to protect public and private rights at stake. *See* ECF 363 at 8-9 (Newborn's President, Albert Lee "testified that he spoke with a customs agent who explained that the agency was overextended and

short staffed. According to Lee, the customs agent recommended that Newborn pursue a private lawsuit.").

Further, courts have recognized the concept of the "fee shifting private attorney general". As noted in *DiCarlo v. MoneyLion, Inc.*, 988 F.3d 1148, 1155 (9th Cir. 2021). Courts generally have an "equitable power, in the absence of legislation, to award attorneys' fees" to a prevailing litigant "in the interest of justice." *Brandenburger v. Thompson*, 494 F.2d 885, 888-89 (9th Cir. 1974). This equitable practice died long ago in the federal courts but continues in many state courts. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 269, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975) (federal courts); *In re Water Use Permit Applications*, 96 Haw. 27, 25 P.3d 802, 804-06 (Haw. 2001) (surveying state-court approaches nationwide).

At both the federal and state level, legislatures have mimicked the equitable practice by statute. Legislatures often lean heavily on private enforcement of civil-rights legislation. To incentivize that enforcement, some civil-rights statutes make attorney's fees available to the prevailing plaintiff. Samuel R. Bagenstos, *Mandatory Pro Bono and Private Attorneys General*, 101 Nw. U. L. Rev. 1459, 1461-62 (2007). The fee-shifting provisions act as "a tool that ensures the vindication of important rights, even when large sums of money are not at stake, by making attorney's fees available under a private attorney general theory." *Farrar v. Hobby*, 506 U.S. 103,

122, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992) (O'Connor, J., concurring); *see also*

90 U.S. 400, 402, 88 S. Ct. 964, 19 L. Ed. 2d 1263 (1968) (per curiam). The

prevailing plaintiff is the fee-shifting private attorney general.

In this case, the attorney fee provisions of the Lanham Act give the Court

discretion to award attorney's fees in "exceptional" cases. While it is not necessary

that the prevailing party have acted as a private attorney general in order to trigger

the award of fees, the fact that Newborn did so here undergirds the entire proceeding

and suggests that this is an "exceptional" case where an award of fees to Newborn

is appropriate.

The second alternative *Octane Fitness* test is also met here because Albion

has litigated this case in an unreasonable manner. Any one of the following, further

described above in the Facts section, would be sufficient to make this case

"exceptional." It is not "reasonable" for Albion to litigate this matter:

- requiring Newborn to undertake 12 days of a bench trial to establish
  facts that Albion has no basis to dispute,

- burdening the Court and Newborn by refusing to authenticate business
  records that Albion produced,

- redacting information from documents responsive to discovery requests
  because the information was prejudicial to Albion,

- requiring the Court to order Albion to caution its competent, former Albion board member for perjury after a complete memory failure of facts adverse to Albion,

- allowing an Albion employee to testify falsely, when it knew or should have known the testimony would be false, and never correct the record,

- violating discovery and evidentiary rules by repeated attempts to introduce inconsistent summary financial information prepared during for trial when no underlying information to allow Newborn to test the validity of the information was ever produced in discovery,

- filing repetitive Rule 52(c) motions without new arguments, and

- delaying its filing of a motion to stay the permanent injunction to create an argument for irreparable harm resulting from the impact of the delay on its appeal rights.

From all of the foregoing, Newborn has established that this is an "exceptional" case that satisfies the *Octane Fitness* test so that Newborn is entitled to an award of attorneys' fees.

## VI.   NEWBORN'S ATTORNEY'S FEES ARE "REASONABLE".

Newborn was unable to interest any firm in taking on this matter as a class action. Remedies Trial Transcript 97:8-9. In April 2012, Newborn negotiated a contingency fee arrangement with its *pro hac vice* counsel, Neville Peterson LLP

("NPLLP"). *See* Tomenga Cert. Exh. 1. Newborn reached a discounted fee agreement with local counsel Madden & Madden, P.A. *See* Madden Cert. Exh. A.

As noted above, under the Supreme Court's holding in *Blanchard*, a contingent fee agreement is not determinative of the amount of an attorneys' fee award under 15 U.S.C. § 1117(a). At the time, Newborn engaged NPLLP, NPLLP anticipated that this matter might settle quickly for a nominal amount in the face of what appeared to be indisputable import data showing that Albion's advertised origin claims were false and given that remedial action was required by law. The contingent fee percentage was set at 50 percent for any recovery over $120,000 in the hope that, with a quick settlement, this percentage would yield enough to cover NPLLP's effort to prepare for litigation. In the event protracted litigation would become necessary, NPLLP would be bearing all of the burden of the litigation effort and the risk that evidence of injury necessary for success could be established despite the passage of time and the retirement and unavailability of critical witnesses.[7]

NPLLP used its standard billing rates to record the value of its time devoted to this matter. NPLLP's standard rates are reasonable. According to Community Legal Services, hourly rates for attorneys having over 25 years of experience in the Philadelphia area, unadjusted for any contingency, as of July 1, 2018, ranged from

---

[7]   When granting *pro hac vice* admission to Mr. Tomenga, the Court Ordered that he be deemed to agree to take no fee in any tort case in excess of the New Jersey Court Contingency Fee Rule, Rule 1:21-7, as amended. *See* ECF 12.

$650 to $700, and as of July 1, 2023 ranged from $735-$850. *See also* National Law Journal Billing Rates Across the country, available at https://www.law.com/ nationallawjournal/almID/1202636785489/, last visited May 28, 2024 (reporting that Blank Rome, the firm used by Albion for its advice on compliance with origin marking, had Philadelphia partner hourly rates ranging from $445 to $940 and associate rates ranging from $175 to $565).

*Pro hac vice* counsel Michael Tomenga based in NPLLP's Washington, DC, office and lead trial counsel John Peterson, who founded the firm and is based in the New York office, are experienced in customs and international trade, the related agency requirements enforced by CBP, and litigation in the courts of appeal therefrom. They are experienced in the country of origin marking requirements applicable to companies engaging in business in goods in the United States, the laws pertaining to which are administered by CBP and the U.S. Federal Trade Commission. Mr. Tomenga and Mr. Peterson each had more than 30-years substantive experience with origin marking requirements when Newborn brought this action in 2012 and each had nearly 40 years' experience when this action went to trial in 2017.  Mr. Tomenga prepared this matter for trial. Mr. Peterson was lead trial counsel.

During the period of this litigation, Mr. Peterson's and Mr. Tomenga's billing rates have ranged from $565/hour to $775/hour, respectively.  Other attorneys and

staff within the firm assisted with the matter, including Sulafa Grijaiva Quenard, Esquire, Patrick Klein, Esquire, Richard O'Neill, Esquire, Urie Axel, Esquire, Peter Bogard, Esquire and Judy Han. Their billing rates ranged from $150/hour to $500/hour. The total of NPLLP fees amounted to $1,150158.92.

Local counsel at the firm of Madden & Madden has charged rates ranging from $150/hour to $200/hour in this matter. The attorneys involved were John-Paul Madden, Esquire, Timothy Bieg, Esquire, Robin Gotilla, Esquire and Mark Strassel, Esquire.  The total amount of fees sought related to Madden & Madden is $604,686.96.

An Enhancement Factor is appropriate in light of the risk to Newborn's counsel and the public benefit to consumers from correction of Albion's marking.

## VII.   <u>CONCLUSION.</u>

Newborn has demonstrated that this case is an exceptional one that merits an award of attorney's fees as provided by the Lanham Act. Newborn's attorney's rates and fees are reasonable. An enhancement factor is appropriate in light of the risk taken by its counsel and in light of the public benefit to millions of consumers of professional caulking guns throughout the nation that has been provided through correction of Albion's false marking as a direct result of this litigation.